**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
DASTECH INTERNATIONAL, INC., *et al.*,   )
                                                    )
              Plaintiffs,                          )
                                                    )
       v.                                          )          **Civil Action 07-01296 (HHK)**
                                                    )
ALBERTO GONZALES, *et al.*,                )
                                                    )
                                                    )
              Defendants.                        )
_____)

**<u>PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO</u>**
**<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

## **INTRODUCTION**

Contrary to Defendants' assertions, Plaintiffs' Motion for a Preliminary Injunction is anything but moot. Plaintiffs continue to demonstrate that this Court should issue an order enjoining Defendants from (1) recognizing the validity of Mr. Villacari's "voluntary surrender" of Plaintiffs' DEA Certificates of Registration ("DEA registrations"); (2) harassing, antagonizing, and threatening Plaintiffs' businesses associates; and (3) seizing, keeping, destroying, or otherwise preventing Plaintiffs from possessing and selling the valuable inventory seized by the DEA on June 21, 2007.

First, although Defendants have asserted that they would refrain from recognizing the validity of Mr. Villacari's "voluntary surrender," they have failed to return Plaintiffs' DEA registrations to them, demonstrating a live case or controversy. Second, injunctive relief is required to prevent the DEA from antagonizing and harassing Plaintiffs' customers and businesses associates in order to effect a *de facto* termination of Plaintiffs' DEA registrations. Third, the DEA's illegal seizure of Plaintiffs' listed chemicals presents a live case or controversy because it is currently speculative whether the Government will actually file a forfeiture complaint. Even if it does, Plaintiffs, Plaintiffs' customers, and their intermediary brokers will suffer irreparable harm before those proceedings can conclude.

Given that Plaintiffs demonstrate their Motion for a Preliminary Injunction presents a live case or controversy, that they are likely to succeed on the merits in the underlying actions, and that they and other actors will suffer irreparable harm in the absence of an injunction, Plaintiffs are entitled to a preliminary injunction against Defendants.

**DISCUSSION**

A preliminary injunction is available in this circuit when the plaintiff demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors a preliminary injunction. *Nat'l Treasury Employees Union v. United States,* 927 F.2d 1253, 1243 (D.C. Cir. 1991). A plaintiff is not required to prevail under each of these factors; rather, "the factors must be viewed as a continuum, with more of one factor compensating for less of another." *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997). Indeed, "[a] stay may be granted with either a high probability of success and some injury, or *vice versa.*" *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F. 2d 972, 974 (D.C. Cir. 1985).

**I.     Likelihood of Success on the Merits.**

Plaintiffs demonstrate they are likely to succeed on the merits of their underlying claims. They can prove that (1) their listed chemicals were converted by the DEA; (2) the DEA violated Plaintiffs' constitutional rights to due process; and (3) Plaintiffs' claims are not moot.

**A.     Property Interest in Seized Listed Chemicals.**

Ordinarily, a party aggrieved by an unlawful seizure moves for the property's return under Fed. R. Crim. P. 41(g) in the district where the property was seized. Fed. R. Crim. P. 41(g); *see also Smith v. Katzenbach*, 351 F.2d 810, 815 (D.C. Cir. 1965) (dismissing an injunctive action for return of property for not bringing it in the district where the property was seized). In this case, however, Plaintiffs do not specifically ask

for return of their property, but seek an injunction to prevent the DEA from destroying and possessing their property.  Such an injunction will allow for the sale of Plaintiffs' property to its intended customers, under government supervision if the DEA so wishes, while the Government retains title to the proceeds of those sales until it either files a forfeiture complaint or the time for filing passes.  Therefore, this injunctive action as it relates to Plaintiffs' seized property is properly before this Court.

Turning to the merits then, to be lawful a seizure must be based on a warrant issued for probable cause.  U.S. Const. Amend. IV.  Even if a warrant issues based on affidavits which appear to establish probable cause, if those affidavits are proven to contain material misrepresentations the warrant must be voided.  *Franks v. Delaware*, 428 U.S. 154, 156 (1978).  Otherwise, if the constitutionally infirm seizure is allowed to persist, the government has effected a conversion.  *Cf. Calamia v. City of New York*, 879 F.2d 1025, 1031 (2d Cir. 1989); *Lathon v. City of St. Louis*, 242 F.3d 841, 843–44 (8th Cir. 2001).  Thus, property seized under what is demonstrated to be an invalid search warrant must be returned to its rightful custodian.  *See United States v. M.V. Atlantic Reefer*, 221 F.2d 940, 941–42 (5th Cir. 1955); *see also* Fed. R. Crim. P. 41(g).

The sufficiency of a particular affidavit is tested by deleting the affidavit's false material, and if the remaining content is insufficient to establish probable cause, the warrant must be voided to the same extent as if probable cause was lacking on the face of the affidavit.  *Franks*, 428 U.S. at 156; *see also State v. Leon*, 468 U.S. 897 (1984).  When a warrant's validity is challenged for deliberate or reckless omissions of facts, the affidavit must be considered with the omitted information included.  *United States v. Condo*, 782 F.2d 1502, 1506 (9th Cir. 1984); *Supreme Video v. Schauz,* 15 F.3d 1435,

1441 (7th Cir. 1994) (holding that an affiant "may not intentionally or recklessly misrepresent material information to magistrate judges, and misrepresentations encompass omissions").  Recklessness on the part of law enforcement may be inferred from proof of the omission of facts that are clearly material to the determination of probable cause,  *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980), while the effect of the misrepresentations and omissions on the existence of probable cause is considered cumulatively,  *United States v. 1328 North Main St.*, 713 F. Supp. 1495 (S.D. Ohio 1988).

In this case, the seizure warrants issued for Plaintiffs' property were based on the recklessly false, misleading, and fraudulent affidavit of Diversion Investigator ("DI") Salera.  It is only DI Salera's egregious misrepresentations which, set out below, misled the Magistrate into believing probable cause existed to suspect Dastech had violated the Controlled Substances Act. ("CSA").  If a complete and truthful affidavit had been presented to the Magistrate, the Magistrate would have been shown a bare bones affidavit, and the seizure warrants would never have issued.

       1.    **The Numerous Material Misrepresentations and Omissions in DI Salera's Affidavit.**[1]

       a.    **Statements About Diversion Intended to Mislead the Magistrate.**

DI Salera begins his Affidavit by noting that he was a law enforcement officer with the State of Pennsylvania and was there involved with over 1,000 Narcotic and controlled substance investigations, "including cases that involved the manufacturing of

---

[1] The portions of DI Tileny's Declarations which contain the same or similar material misrepresentations as does DI Salera's Affidavit are noted in citation form only, to avoid repetition.

methamphetamine."  Salera Aff. ¶ 1 (Exhibit 1); *see also* Tilney Decl. ¶ 1 (Exhibit 2);

Tilney 2d Decl. ¶ 1 (Exhibit 3).  While the statement may be true, highlighting DI

Salera's involvement with controlled substance investigations could only be intended to

mislead the Magistrate to believe that diversion took place in the instant case, which it

did not.  Therefore, these statements should not have been entitled to any weight in

determining probable cause.

**b.    Misrepresentations Regarding Dastech's Ability to Handle Listed Chemicals.**

DI Salera continues his Affidavit by making a highly material and critical

misrepresentation in paragraph three.  There, he asserts that Dastech was "a **former**

regulated person under" the CSA.  Salera Aff. ¶ 3 (emphasis added); *see also* Tilney

Decl. ¶ 11; Tilney 2d Decl. ¶ 18.  DI Salera similarly states in paragraph twelve that

Dastech "is no longer permitted to handle List I chemicals."  Salera Aff. ¶ 12.  A true

statement would have been that "Dastech is currently a regulated person under the

CSA and is currently permitted to handle List I chemicals."  These misrepresentations

were based on DI Salera's recklessly false assertion that Mr. Villacari had standing to

surrender Plaintiffs' registrations.  However, even at the time DI Salera executed his

Affidavit, he should have been well aware that a warehouseman does not have standing

to surrender the DEA registration of one of its customers.

As a general legal principle, one cannot knowingly and voluntarily relinquish

property for another, especially when that person is not even the other's agent.  Based

upon the statutory structure of the Controlled Substances Act ("CSA") and the DEA's

regulations promulgated thereunder,[2] a warehouseman is not the agent of a registrant that he or she services.  Thus, Mr. Villacari had no legal authority with which to "voluntarily" surrender Dastech's DEA registrations.

  "Agent" is defined in the CSA as

> [A]n authorized person who acts on behalf of or at the direction of a manufacturer, distributor, or dispenser; **except that such term does not include a common or contract carrier, public warehouseman, or employee of the carrier or warehouseman, when acting in the usual and lawful course of the carrier's or warehouseman's business**.

21 U.S.C. § 802(3) (emphasis added).  While the term "public warehouseman" is not defined in the CSA, the term means what one would expect: "A 'public warehouse' is a place held out to the public as being one where any member of the public, who is willing to pay the regular charges, may store goods and then sell or pledge them by transferring the receipt given by the keeper or manager."  93 C.J.S. Warehousemen and Safe Depositories § 1 (citing *Reading Co. v. U. S.*, 316 F.2d 738 (Ct. Cl. 1963)).  As Mr. Villacari holds Hawks Express out to the general public as a business willing to store goods for a fee, he is a public warehouseman.  *See id.*; *see also* Villacari Aff. ¶ 1 (Exhibit 4).

  According to the CSA's own definition, public warehousemen are not agents of manufacturers, distributors, or dispensers.  21 U.S.C. § 802(3).  Because public warehousemen are not authorized to act on the behalf of a distributor, they would have no authority to surrender the distributor's DEA registrations.  *See id.*; *see also* Villacari Aff. ¶ 1.  Therefore, neither Hawks Express nor Mr. Villacari had the authority to act on behalf of Dastech and surrender Dastech's DEA registrations.  As a DEA diversion

---

[2] It is interesting to note that the Government cited to no law to support its proposition that Mr. Villacari had authority to surrender Dastech's DEA registrations.

agent, DI Salera should have been familiar with the CSA's statutory scheme and should have therefore known that a warehouseman cannot surrender one of his clients' DEA registrations.

Regardless of what DI Salera should have known, the fact of the matter is that the DEA has recognized that Dastech's DEA registrations are currently valid and enforceable. *See* DEA Letter to Dastech (Aug. 3, 2007) (Exhibit 5). Therefore, Dastech is authorized, by the DEA's own admission, to handle listed chemicals. This is a very different situation from the one that was presented to the Magistrate. The Magistrate was led to believe Dastech could no longer handle listed chemicals.[3] This allegation was necessarily a significant portion of the Magistrate's probable cause decision because without DEA registrations, it would have been illegal for Plaintiffs to possess listed chemicals as an importer and distributor. *See* 21 C.F.R. §§ 1309.22, 1309.23. However, pursuant to the DEA's own admission, Dastech is authorized to handle the listed chemicals the DEA seized under false pretense. *See* DEA Letter to Dastech (Aug. 3, 2007) (Exhibit 5). This very material and critical misrepresentation cannot be overstated.

Moreover, DI Salera also fails to disclose that Dastech has several other valid DEA registrations apart from those identifying Hawks Express as the registered location. Thus, the Affidavit omits the material fact that the Attorney General has consistently determined that Dastech is to be trusted with the importation and distribution of listed chemicals, and that the DEA has never suspended or revoked those registrations.

---

[3] The DEA must return Dastech's DEA registration for Hawks Express, however, in order for listed chemicals to be held at the warehouse. The Code of Federal Regulations specifically requires that the DEA registrations be located at the registered site. 21 C.F.R. § 1309.23(a).

      c.      **Misrepresentations Regarding DI Salera's Meeting with Mr. Villacari.**

Related to these misrepresentations are DI Salera's misrepresentations in paragraphs nine and eleven of his Affidavit.  Salera Aff. ¶¶ 9, 11; *see also* Tilney Decl. ¶¶ 11; Tilney 2d Decl. ¶ 16–18.  There, DI Salera states that Mr. Villacari no longer wished to retain Dastech's DEA registrations and that his company would no longer act on behalf of Dastech.  Mr. Villacari made no such statement to the DEA.  Instead, as Mr. Villacari's Affidavit makes clear, Mr. Villacari was intimidated into "surrendering" Dastech's DEA registration by threats of 25-30 years of imprisonment.  *See* Villacari Aff. ¶¶ 5–9 (Exhibit 4).  Indeed, DI Tilney **insisted** that Mr. Villacari "surrender" Dastech's DEA registrations.  *Id.*  The affidavits of Hawks Express employees who were able to observe the "meeting" between the DEA and Mr. Villacari corroborate Mr. Villacari's account.  *See* DeGregorio Aff. (Exhibit 6); Levine Aff. (Exhibit 7).

      d.      **Omissions Regarding Centralized Recordkeeping.**

Paragraph four of the Affidavit contains yet another serious material misrepresentation.  DI Salera states there that Dastech was obligated to keep CSA required records "at the controlled premises" (i.e., Hawks Express).  *Id.* at ¶ 4.  This is a complete and utter falsehood.  As DI Salera should know, having worked on over 1,000 cases, a registrant is free to notice the DEA that it has decided to store the its records at a central location.  21 CFR § 1310.04(c).  This location does not have to be the controlled premises.  *See id.*  Dastech elected to use this centralized recordkeeping scheme over five years ago, choosing to house its records at its headquarters in Great Neck, New York.  *See* Dastech Letter to DEA (April 4, 2002) (Exhibit 5).  Thus, the

location of Dastech's recordkeeping is in full compliance with the CSA, and the

Magistrate was presented with yet another reckless misrepresentation.[4]

### e.    Misrepresentations Regarding Customs Brokers.

DI Salera begins paragraph five of his Affidavit by discussing an arrival notice

and invoice for forty drums of pseudoephedrine.  *See* Salera Aff. ¶ 5.  His handwritten

remarks in this paragraph are largely illegible, apart from his assertion that the arrival

notice and invoice listed the wrong "broker."  *See id.*  The arrival notice and invoice

referred to, however, does not list any broker on it.  *See* Vanguard Logistics Services

Arrival Notice & Invoice (Exhibit 8).  Plaintiffs, however, assume that DI Salera made a

mistake and meant to state that Dastech's DEA Form 486 for this shipment

inadvertently referred to the incorrect customs broker.  *Compare* Salera Aff. ¶ 5 *with*

Tilney Decl. ¶ 7 & Tilney 2d Decl. ¶ 11.  Still, it was a material misrepresentation to

imply that such a mistake is a CSA violation.

First, Dastech notes that its inadvertent mistake is somewhat understandable

given the similarity in the first names of the two customs brokers it has used: J.M.

Rodgers and J.W. Hampton, Jr.  Second, regardless of the comprehensibility of this

error, the fact remains that Dastech was not even required to report which **customs**

broker it happened to be using on the Form 486.

It is true that a chemical importer is required to report the broker or forwarding

agent's information, **if one was used**.  21 C.F.R. § 1313.13(c) (emphasis added).

---

[4] In paragraph nine of his Affidavit, DI Salera similarly states that there were no documents at
Hawks Express identifying the importer or the customer for ten drums of listed chemicals.
Salera Aff. ¶ 9.  Again, DI Salera misrepresented the law to the Court regarding centralized
recordkeeping.  Because DI Salera recklessly concealed this information, DI Salera again
misrepresented highly material information to the Court.

However, a **customs** broker is not included within the definition of "broker or forwarding

agent."  The DEA's own instructions on how to fill out a Form 486 make this point.

Those instructions provide that the "broker" who must be reported on the Form 486 is:

> [A] legal entity that assists in **arranging** an international transaction in a
> listed chemical by (1) negotiating contracts; (2) serving as an agent or
> intermediary; or (3) fulfilling a formal obligation to complete the transaction
> by bringing together a buyer and seller, a buyer and transporter, or a seller
> and transporter, or by receiving any form of compensation for so doing.

*Instructions for Completing Import/Export Declaration, DEA Form 486*, available at

http://www.deadiversion.usdoj.gov/21cfr_reports/chemicals/486_instruct.htm (emphasis

added); *see also Use of the Internet To Arrange International Sales of Listed*

*Chemicals: Guidance*, 69 Fed. Reg. 7348-01, 7349 (Feb. 17, 2007) (noting that

providing "[a]ssistance in arranging international transactions by a Web site provider"

qualifies the Web site provider as a broker or trader).  A **customs** broker does not

assist in arranging the transaction between the foreign exporter and the ultimate

consignee, but rather only assists an importer in clearing customs.  *See Foreign Trade*

*Regulations: Mandatory Automated Export System Filing for All Shipments Requiring*

*Shipper's Export Declaration Information: Proposed Rule*, 70 Fed. Reg. 8200, 8200

(Feb. 17, 2005) (defining a customs broker as "[a]n individual or entity licensed to enter

and clear imported goods through CBP [Customs and Boarder Protection] for another

individual or entity").  Therefore, a customs broker is not a "broker" as that term is used

on the Form 486 because a customs broker does not assist in arranging the transaction

between the chemical exporter and importer.

    This conclusion is reinforced by the recent changes the DEA has made in its

Form 486.  Previously, the DEA Form 486 provided one box under which to place

"importer/exporter" information and a separate box for "broker or forwarding agent" information, if there was any.  *See* DEA Form 486 (1989 version) (Exhibit 9).  The updated Form 486 combines these two boxes and eliminates the forwarding agent term, indicating that **either** a U.S. importer, U.S. exporter, **or** U.S. broker is to be identified on the form.  *See* DEA Form 486 (2006 version) (Exhibit 10).  Because the form now only requires the designation of either a U.S. importer **or** a U.S. broker, it is a necessity of logic that a single transaction cannot involve both a U.S. importer **and** a U.S. broker. Therefore, DI Salera's implication that providing the incorrect customs broker on the DEA Form 486 is a violation of the CSA is a material misrepresentation of the law.[5] Because Dastech only reported the incorrect customs broker on the DEA Form 486, it did not violate the CSA contrary to DI Salera's material misrepresentation.  This analysis applies with equal force for the same allegation DI Salera makes regarding an additional Dastech shipment.  *See* Salera Aff. ¶ 8.

      f.      <u>Misrepresentations Regarding Notice of Listed Chemical Shipments.</u>

Also in paragraph five, DI Salera states that Dastech never notified Hawks Express of the arrival of the forty drums of List I chemicals.  Salera Aff. ¶ 5; *see also* Tilney Decl. ¶ 11; Tilney 2d Decl. ¶ 16.  DI Salera does not state any reason why this alleged fact constitutes a violation of the CSA.  Plaintiffs can find no provision in the CSA which requires an importer to give anticipatory delivery notice to the warehouse

---

[5] The CSA provision criminalizing reporting errors holds that it is unlawful "to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed under th[e CSA]."  21 U.S.C. § 843(a)(4)(A) (emphasis added).  Therefore, misreporting non-material information would not be a violation of the CSA.  Because the DEA did not include a requirement to report the customs broker on the DEA Form 486, such information is necessarily not material to registrant's reporting requirements.

with which it contracts.  Thus, DI Salera appears to be implying that failure to give a

warehouse prior notice of a shipment is a violation of the CSA, when, in fact, it is not.

Moreover, when DI Salera spoke with Mr. Villacari on June 5, 2007, Salera Aff. ¶ 9, the

seized shipments had yet to be "entered."[6]  *See* CBP Forms 3461, Entry/Immediate

Delivery (June 25, 2007) (Exhibits 11a–11e).  Therefore, it is completely logical that

Hawks Express would not yet have any paperwork related to this shipment.  Disclosure

of these facts was necessary so that the Magistrate was not left with the false

impression that a CSA violation occurred here.

### g.    Misrepresentations Regarding Common Carriers (NVOCCs).

DI Salera continues his Affidavit by stating that the forty drums were to be

transported to an unregistered location, Tiger Freight International, Inc. ("Tiger

Freight").[7]  Salera Aff. ¶ 5.  DI Salera alleges that Tiger Freight was neither authorized

---

[6] "When a shipment arrives in the United States, the importer of record is required to file
documents for 'entry' of the goods—which are filed with the port director at the port of entry.
'Entry' is a term of art.  It refers to the process of clearing goods through [CBP].  Imported goods
are not considered to be legally entered until after (1) the shipment has arrived within the port of
entry; (2) delivery of the merchandise has been authorized by Customs; and (3) the estimated
duties have been paid."  Corporate Counsel's Guide to Importing under the U.S. Customs Laws:
Executive Legal Summary No. 418, Entry Under U.S. Customs Laws, 101 Supp. 15, ELS-105
(June 2006).

Additionally, it makes sense that the forty drums had yet to clear customs when the DEA
seized them because they were seized from a bonded U.S. Customs Warehouse.  *See* In the
Matter of the seizure of 40 Drums X 25 kg. for a Total of 1000 kg. for a Total of 1300 kgs of List
1 Chemicals Located at the U.S. Customs Warehouse, Application and Affidavit for Seizure
Warrant Case No. 07-3093 (June 21, 2007) (Exhibit 12).

[7] Perhaps DI Salera believed that the listed chemicals were to be transported to Tiger Freight
because it was listed as the "consignee" on Vanguard Logistics' arrival notice and invoice.  *See*
Vanguard Logistics Services Arrival Notice & Invoice (Exhibit 8).  Tiger Freight, because it was
one of the shipment's common carriers, see infra text, is also considered a "nominal consignee"
because it handles the listed chemicals as a common carrier under a bill of lading.  See CBP
Informed Compliance Publication, *What Every Member of the Trade Community Should Know
About: Entry*, 9 (Mar. 2004) (Exhibit 14).  It, however, is not the "ultimate consignee," which was
Dastech.  See Customs Directive No. 3550-079A, Ultimate Consignee at Time of Entry or

to handle listed chemicals nor listed on the relevant DEA Form 486.  *Id.*  These statements regarding alleged CSA violations are egregious misrepresentations because Tiger Freight is a non-vessel operating **common carrier** ("NVOCC").  *See* Fed. Maritime Comm'n, *OTI/NVOCC Listing*, available at

http://www2.fmc.gov/oti/nvos_listing.asp (Exhibit 13).  As such, it is not required to maintain a DEA registration to handle listed chemicals, nor need it be listed on the DEA Form 486.

The United States Code ("U.S.C.") defines a NVOCC as a "common carrier[8] that-- **(A)** does not operate the vessels by which the ocean transportation is provided; and **(B)** is a shipper in its relationship with an ocean common carrier."  46 U.S.C. § 40102(16).  In a more practical sense, a NVOCC is an entity that books space on steamships in large quantities and sells this space to shippers.  *See* U.S. Dept. of Agriculture, *Shipper and Exporter Assistance*, available at

http://www.ams.usda.gov/tmd/freight/nvocvc.htm (Exhibit 16).

---

Release, 6.3 (June 27, 2001) ("The Ultimate Consignee at the time of entry or release is defined as the party in the United States to whom the overseas shipper sold the imported merchandise").  Moreover, Tiger Freight issued its own arrival notice and invoice which lists Dastech as the consignee.  *See* Tiger Freight Arrival Notice/Freight Invoice (Exhibit 15).  Even if there is some basis for DI Salera's mistake, it was still a reckless action not to review the varying definition of terms used in the importation process and not review all documents that exchanged hands during the importation process.

8 A "common carrier" "**(A)** means a person that--**(i)** holds itself out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for compensation; **(ii)** assumes responsibility for the transportation from the port or point of receipt to the port or point of destination; and **(iii)** uses, for all or part of that transportation, a vessel operating on the high seas or the Great Lakes between a port in the United States and a port in a foreign country; but **(B)** does not include a carrier engaged in ocean transportation by ferry boat, ocean tramp, or chemical parcel-tanker, or by vessel when primarily engaged in the carriage of perishable agricultural commodities--**(i)** if the carrier and the owner of those commodities are wholly-owned, directly or indirectly, by a person primarily engaged in the marketing and distribution of those commodities; and **(ii)** only with respect to the carriage of those commodities."  46 U.S.C.A. § 40102(6).

The most important aspect about an NVOCC's definition for this case, however, is that it is a common carrier. 46 U.S.C. § 40102(16). The CSA provides that "[t]he following persons shall not be required to register and may lawfully possess any controlled substance or list I chemical under this subchapter: . . . (2) A **common or contract carrier** or warehouseman, or an employee thereof, whose possession of the controlled substance or list I chemical is in the usual course of his business or employment. 21 U.S.C. § 822(c) (emphasis added). Because Tiger Freight is a NVOCC and therefore a common carrier, it was not required to obtain a DEA registration to lawfully possess listed chemicals. Moreover, it would have been a CSA violation to list Tiger Freight on the Form 486 because Tiger Freight was not the ultimate consignee.[9] *See* 21 U.S.C. § 843(a)(4)(A); *see also* Tiger Freight Arrival Notice/Freight Invoice (Exhibit 15) (listing **Dastech as the consignee**, not Tiger Freight). Therefore, DI Salera's assertions that Tiger Freight had to have a DEA registration and be listed on the Form 486 are additional material misrepresentations that were submitted to the Magistrate. If only DI Salera had not been reckless in failing to study the CBP, DEA and Federal Maritime Commission ("FMC") statutes and regulations,[10] it is highly likely that the instant proceedings could have been avoided.

---

[9] The Form 486 is to be distinguished form the Vanguard Logistics arrival notice and invoice. The former is notice to the DEA. The latter is simply commercial paper.

[10] An excerpt from a treatise on admiralty and maritime law provides a good overview of the complexity of the importation process, demonstrating why it critical that DEA agents that investigate importation of listed chemicals become familiar with CBP and FMC regulations and statutes, as well as their own:

> When shipments are made by regular shipping lines, both the carrier and the shipper may employ agents and independent contractors in connection with the movement of goods. The carrier usually employs a ship's agent or loading broker to advertise, secure business, schedule shipments of cargo, and arrange

i.      **Misrepresentations Regarding Common Carriers (CFSs).**

However, as paragraph eight of DI Salera's Affidavit demonstrates, the CBP, DEA and FMC statutes and regulations were less important to him than recklessly pursing a law abiding corporation that happens to import industrial-use chemicals that DIs Salera and Tilney have personally targeted for eradication despite its lawful use.  In that paragraph, DI Salera discusses the importation of sixty-six drums of List 1 chemicals, contending that Salson Container Freight Services ("Salson") was not authorized to handle listed chemicals.  Salera Aff. ¶ 8; *see also* Tilney Decl. ¶ 8; Tilney Decl. ¶ 13.  Salson, however, is a CFS, another entity in the common carrier chain that handles consolidated freight.  *See* Tiger Freight Turnover Letter (listing Salson as the relevant CFS) (Exhibit 17); *see also* Salson Container Freight Station Overview, available at http://www.salson.com/container.html (Exhibit 18).  Therefore, it need not be registered to handle listed chemicals because it is an extension of the common carrier, as the following makes clear.

---

bunkers and supplies. Agency principles govern the relationship between the loading broker or ship's agent and third parties.
. . .
Non-vessel operating common carriers (NVOCCs) are middlemen who typically arrange for relatively small shipments to be picked up from shippers, consolidate the smaller parcels, and ship them via a carrier or several carriers. They do not own or charter the ships carrying the cargo. The law treats the NVOCC as a hybrid. With respect to shippers, the NVOCC is a common carrier that must file a rate tariff with the Federal Maritime Commission.  With respect to the vessel and her owner, the NVOCC is a shipper or customer.  The ship aboard which goods assembled by an NVOCC is shipped is not liable *in rem* for an unauthorized bill of lading issued by the NVOCC.

1 Admiralty & Mar. Law (4th ed.) § 10-7, Freight forwarders, agents, brokers, and non-vessel operating common carriers (citations omitted).

A CFS is a U.S. Customs bonded area,[11] *see* 19 C.F.R. § 19.40(a), that "is a secured area within the United States into which containers of merchandise may be moved for the purpose of breaking bulk and redelivery of the cargo." Customs Ruling HQ 115494, *Container stations; 19 C.F.R. § 19.41; Requirement to Move In-bond Freight to Container Station upon Arrival at Port of Destination* (Jan. 8, 2002), available at http://rulings.cbp.gov/detail.asp?ru=115494&ac=pr. In lay terms, CFSs receive and unpack the truck-sized metal containers used to transport goods on ocean-going vessels. *See Komori Am. Corp. v. Howland Hook Container Terminal, Inc.*, 1998 WL 614194, *4 (S.D.N.Y. 1998); *see also* 46 C.F.R. § 535.104(p) (defining "marine terminal facilities" to include CFSs). Each container is packed with a variety of products, often imported by different importers. The CFS's job is to unpack these containers so that they are ready for pick up and transport to each importer's warehouse. *See Komori*, 1998 WL 614194 at *4. Containers of merchandise are moved here "before any entry is filed with Customs or duty is paid." Customs Ruling HQ 223354, *Internal Advice; File – ENF 4-DD:FPF ah, x 91-1512-20150; Formal Receipt of Cargo*, (Jan. 27, 1992) available at http://rulings.cbp.gov/detail.asp?ru=223354&ac=pr. Given a CFS's function and its chronological situs in the importation chain, it is an extension of the common carrier.

Indeed, CFSs only have a right to the goods they handle under a bill of lading, just like common carriers. *See*, CBP Informed Compliance Publication, *What Every Member of the Trade Community Should Know About: Entry*, 9 (Mar. 2004) (Exhibit 14).

---

[11] To be able to operate, CFSs must first apply to CBP for licensure. *See* 19 C.F.R. § 19.40; *see also See Air Cargo Services, Inc. v. United States*, 678 F. Supp. 296 (C.I.T. 1988). Moreover, the operation of CFSs are regulated by CBP. *See* 19 C.F.R. §§ 19.41–48. Indeed, once licensed CBP may suspend or revoke the privilege of operating as a CFS. *See* 19 C.F.R. § 19.48.

Thus, they are considered "nominal" rather than "ultimate" consignees, but are still designated as a "consignee" on bill of ladings and related documents. *Id.*; *see also supra,* n.3. If NVOCCs do not provide their own CFS services, they will contract with an independent CFS to provide CFS services for the NVOCC's consolidated shipment. *See Aquascutum of London, Inc. v. S/S Am. Champion*, 300 F. Supp. 26, 30 (S.D.N.Y. 1969) *aff'd in part rev'd in part by* 426 F.2d 205 (2d Cir. 1970) (both the appellate and district court cases noting that a particular ocean bill of lading named the CFS as a consignee, with the appellate case holding the NVOCC transacted business in New York by contracting with a New York-based CFS"); *see also* U.S. Dept. of Agriculture, *Shipper and Exporter Assistance*, available at

http://www.ams.usda.gov/tmd/freight/nvocc.htm (Exhibit 16); *Maher Terminals, Inc. v. Director, Div. of Taxation*, 6 N.J. Tax 513, 518–521 (N.J. Tax 1984) *rev'd in part by* 514 A.2d 532 (N.J. Super. A.D. 1986) (describing the typical contractual relationship between a container terminal operator/CFS and common carriers); *Great Am. Trading Co. v. Am. President Lines, Ltd.*, 641 F. Supp. 396, 397–98 (N.D.Cal. 1986) (describing a CFS as the common carrier's agent). Finally, a standard shipping industry liability limitation clause, the Himalaya clause, typically defines "carrier" to include CFSs. *See, e.g., Sony Computer Entm't. Inc. v. Nippon Express U.S.A. (Ill.), Inc.*, 313 F. Supp. 2d 333, 335 (S.D.N.Y. 2004) (noting that under that Himalaya clause, "carrier" means "Nippon Express [the NVOCC in the case], the Underlying Carrier, the ship, her owner, Master, demise charterer, . . . as well as any of the agents, servants, and/or employees of the foregoing parties, including but not limited to, stevedores, container yards, **container freight stations**, [and] intermodal inland carriers . . . .") (emphasis added).

18

Thus, it is the common carrier or NVOCC that chooses which CFS is to be used as its agent, not the importer, while the CFS is considered to be contained within the term, "common carrier." *See also Jaycees Patou, Inc. v. Pier Air Int'l, Ltd.*, 714 F. Supp. 81, 81–84 (S.D.N.Y. 1989) (holding that a door-to-door shipment of the goods was to be construed as one contract for carriage, and, therefore, even if damage to the goods might have occurred at the U.S. located CFS or during ground transport to the ultimate consignee, the Warsaw Convention governed liability).

Because CFSs are an extension of the common carrier and because they handle merchandise before it clears customs, they are not required to be registered to handle listed chemicals. *See* 21 U.S.C. § 822(c) ("The following persons shall not be required to register and may lawfully possess any controlled substance or list I chemical under this subchapter: . . . (2) A **common or contract carrier** or warehouseman, or an employee thereof, whose possession of the controlled substance or list I chemical is in the usual course of his business or employment") (emphasis added). The DEA's own comments in promulgating an intermediate final rule make clear that intermediate carriers of listed chemicals, such as CFSs, do not have to be reported on the Form 486. *See Implementation of the Combat Methamphetamine Epidemic Act of 2005: Interim Final Rule*, 72 Fed. Reg. 17401-01, 17404 (April 9, 2007) (stating that "a number of fields" were **eliminated** from the Form 486, "including: gross weight of chemicals imported/exported; **intermediate carriers**; **address of intermediate consignees**").

Given the above, DI Salera's statement that shipment of pseudoephedrine to Salson would have been in violation of the CSA was a reckless and material misrepresentation. DI Salera thus misrepresented crucial facts and misled the

Magistrate to believe that CFSs, including Salson, must be registered with the DEA when the law clearly rebuffs that proposition.

**j.    Misrepresentations Regarding Import Location.**

Also in paragraph eight, DI Salera states that information provided by CBP identified a different import location than the import location identified on the DEA Form 486.  Salera Aff. ¶ 8; *see also* Tilney Decl. ¶ 8; Tilney 2d Decl. ¶ 12.  In this remark, DI Salera is probably referring to the Automated Targeting System reports that listed Dastech's Great Neck location under the title of "I," perhaps indicating "importer."  *See* CBP Automated Targeting System report (Exhibit 19).  Giving a sinister spin to Dastech's Great Neck location being identified in CBP's internal control forms is a reckless and material misrepresentation.

As an initial matter, CBP, not the importer, generates these reports, largely deriving them from the observation of bills of lading.  *See* U.S. Dept. of Homeland Security, *Privacy Impact Assessment for the Automated Targeting System*, 5, 17, 19, 25 (Nov. 22, 2006) (Exhibit 20).  Bills of lading are not completed by Dastech, but by other entities in the importation chain, primarily the various types of common carrier.  It is not surprising that these other entities would use Dastech's principal place of business to identify Dastech rather than the addresses listed on Dastech's DEA registrations.  The Great Neck location is where these entities must send their invoices, it is the registered location of Dastech with the New York Department of State, *see* NYS Department of State, *Division of Corporations Entity Information* (Exhibit 21), and it is where Dastech properly keeps its DEA records, s*ee* Correspondence from Dastech to DEA, dated April 4, 2002 (Exhibit 22); *see also* 21 CFR § 1310.04(c).

20

The fact that **other entities** identified Dastech by its principal address where it stores all of its DEA related paperwork should not be held against Dastech when Dastech has properly indicated the true warehouse destination of its listed chemicals on its Form 486s.  Indeed, for purposes of the Controlled Substances Act ("CSA"), mistakes on bills of lading, arrival notices, invoices, or CBP's Automated Targeting System reports are not regulatory violations.  Instead, only a mistake on a DEA Form 486 is a potential recordkeeping violation.  *See* 21 U.S.C. § 971(a) & 21 C.F.R. § 1313.13 (listing the reporting requirements fulfilled by filing the DEA Form 486 but nowhere discussing bills of lading, arrival notices, invoices, or CBP's Automated Targeting System reports); 21 U.S.C. § 827 (listing additional recordkeeping requirements but nowhere discussing bills of lading, arrival notices, invoices, or CBP's Automated Targeting System report); 21 U.S.C. § 830 (same); 21 U.S.C. § 843(a)(4)(A) (criminalizing recordkeeping violations).  Finally, additional documentation, which Dastech submitted to its customs broker, identifies Hawks Express as the "destination" of this shipment.  *See* Dastech, *Copies of Documents to Clear Shipment* (Exhibit 23); Dastech Container Breakdown (Exhibit 24a–24c).

### k.    Misrepresentations Regarding "Unaccounted for" Listed Chemicals.

The most egregious misrepresentation in the Affidavit is also contained in paragraph eight.  There, DI Salera asserts that Dastech had imported 300 kilograms of phenylpropanolamine without accounting for it to the DEA.  Salera Aff. ¶ 8; *see also* Tilney Decl. ¶ 8.  If DI Salera would have taken the time to fully review the records available to him, he would have discovered that Dastech had properly accounted for the 300 kilograms of phenylpropanolamine.  Eventually, DI Tilney discovered this error and

withdrew it from DI Salera's Affidavit, as well as from his own Declaration. *See* Tilney Corrected Decl. ¶¶ 2–4 (Exhibit 25). When DI Tilney discovered his and DI Salera's mistake, however, the seizure warrant had already been issued and Plaintiffs' listed chemicals had already been unlawfully seized.

It is abhorrently reckless behavior to allege that listed chemicals are unaccounted for when, in fact, they are not. Common sense counsels that missing listed chemicals would weigh very heavily on the mind of a magistrate. While DI Salera has withdrawn this allegation, the Magistrate did not have the benefit of knowing there was not one shred of evidence that Dastech failed to account for listed chemicals or engaged in diversion. The critical nature of this material misrepresentation provided to the Magistrate cannot be overstated. This misrepresentation was the only hint of diversion on the part of Dastech. When the DEA finally admitted that it had misrepresented this fact, the only "evidence" of loss or diversion was revealed to be a figment of the DEA's imagination.

And so ends the discussion of the major material misrepresentations contained in DI Salera's Affidavit in support of his application for the seizure warrants. With the preceding reckless and material misrepresentations removed and the recklessly omitted facts added, the Affidavit would have contained not one allegation that the seized shipments were imported in violation of the CSA. It is simply untrue that (1) Dastech diverted 300 kilograms of phenylpropanolamine; (2) Dastech intended to transport listed chemicals to entities that did not have necessary DEA registrations; and (3) Dastech's inadvertent listing of an incorrect customs broker on the DEA Form 486 constitutes a violation of the CSA. All of these allegations are, and were at the time of the execution

of Defendants' affidavit and declaration, completely false.  Without any evidence that the
shipments were imported in violation of the CSA, Plaintiffs have demonstrated that the
seizure warrant must be voided and that Plaintiffs' property was unlawfully converted by
the DEA.

As noted above, though, the Department of Justice ("DOJ") *might* file a forfeiture
complaint at some point in time.  Therefore, Dastech does not currently seek return of
title of the seized property, but only an injunction to prohibit the DEA from seizing,
keeping, destroying, or otherwise preventing Plaintiffs from possessing and selling the
seized listed chemicals.  Such an injunction will allow Dastech to sell the listed
chemicals to its customers, with all proceeds to be delivered to the Government, so that
its customers do not continue to be irreparably injured.

## 2.    A Note About DI Tilney's Declarations.

Plaintiffs feel they should also briefly address the material misrepresentations
contained in DI Tilney's Declarations that were not replicated in DI Salera's Affidavit.  As
the following discussion demonstrates, these further allegations cannot be used to save
the infirm seizure warrant.

### a.    Statements About Diversion Intended to Mislead.

DI Tilney's Declarations repeat, in one form or another, that Pseudoephedrine,
Red Phosphorus, and Phenylpropanolamine may be diverted to the clandestine
manufacture of methamphetamine.  Tilney Decl. ¶ 1–3; *see also* Tilney 2d Decl. ¶ 1–3.
The way in which DI Tilney emphasizes this observation can only be an attempt to
distract the Court from the fact that Dastech and its customers have never diverted a

listed chemical and that the DEA has never suspended any of Dastech's shipments of listed chemicals.

### b.    Misrepresentations Regarding Import Location.

DI Tilney also makes allegations additional to DI Salera's averments regarding Dastech's importation of the forty drums of Pseudoephedrine.  DI Tilney alleges that, according to the CBP Automated Targeting System reports, the forty drums (i.e. 1000 kilograms of pseudoephedrine) were to be imported to Vanguard Logistics, an unregistered location, not Dastech.  Tilney Decl. ¶ 7; *see also* Tilney 2d Decl. ¶ 11.  Vanguard's Arrival Notice demonstrates that Vanguard's agent, NACA Logistics,[12] was the CFS for the shipment, not the ultimate consignee.  *See* Vanguard Arrival Notice and Invoice (Exhibit 8).  As demonstrated above, CFSs are legally considered to be common carriers, and, as such, do not have to be registered by the DEA.  21 U.S.C. § 802(3).  Moreover, the importer has no choice as to which, if any, CFS is used; that is solely the common carrier's decision.  *See supra*, at 18–19.  Therefore, this allegation simply adds to the material misrepresentations contained in DI Salera's Affidavit.

DI Tilney also alleges that the forty drums were being imported Dastech's Great Neck New York location, as well as Vanguard Logistics.[13]  Tilney Decl. ¶ 7; *see also* Tilney 2d Decl. ¶ 11.  This allegation is based on the same CPB internal report listing Dastech's principal place of business rather than the destination of the goods.  As such, it is subject to the same analysis as detailed above regarding DI Salera's comments derived from the CBP reports.

---

[12] Both Vanguard Logistics and NACA Logistics are NVOCCs.  *See* Fed. Maritime Comm'n, *OTI/NVOCC Listing*, available at http://www2.fmc.gov/oti/nvos_listing.asp (Exhibit 13).

[13] Perhaps the DEA should have a discussion with CBP why it can't keep its paperwork in order.

### c.    Misrepresentations Regarding Prior Clerical Error.

The next set of material misrepresentations involves a prior clerical error Dastech made.  In 2002, the DEA notified Dastech that supplying its central office address rather than its registered locations' addresses on the DEA Form 486 was improper.  Tilney Decl. ¶ 12; *see also* Cazeneuve 2d Aff. ¶ 18 (Exhibit 26).  No penalty was ever assessed against Dastech for this inadvertent error; the DEA simply wanted to make sure Dastech was aware that it was required to list its registered addresses on the Form 486, not its central headquarters.  Cazeneuve 2d Aff. ¶ 18.  Dastech corrected the errors and has not made the same mistake since.  *See id.*; *see also* Dastech Letter to DEA (Exhibit 27); and (Corrected) DEA Form 486 (Exhibit 10).  It is a material misrepresentation to omit the circumstances surrounding this event to leave the Court with the false impression that Dastech is a rogue importer.

### d.    Misrepresentations Regarding Dastech Transaction with RP Scherer.

Paragraph thirteen contain contains additional material misrepresentations regarding a Dastech transaction with RP Scherer.  Tilney Decl. ¶ 13; *see also* Tilney Decl. ¶ 21.  Contrary to DI Tilney's assertion, sometime in August of 1999, RP Scherer ordered 4,500 kilograms of pseudoephedrine from Dastech.  *See* Letter to DI Boerner (Jan. 29 2001) (Exhibit 28a).  The DEA apparently investigated this shipment because of RP Scherer's use of an agent, Harris & Ford, LLC, in ordering the pseudoephedrine.  *See* Letter to DI Boerner (Dec. 15, 2000) (Exhibit 28b).  To alleviate this confusion, Dastech provided the DEA with the purchase orders which demonstrated RP Scherer had ordered the 4,500 kilos of pseudoephedrine.  *See* Letter to DI Boerner (Dec. 15,

2000).[14]  Nothing came of the investigation, as Dastech was able to demonstrate that it had provided the correct consignee's name on the DEA Form 486.  *See* Letter to DI Boerner (Jan. 29 2001).  Because the DEA possesses the order forms which demonstrate RP Scherer did order 4,500 kilos of pseudoephedrine from Dastech, it was a reckless misrepresentation for DI Tilney to suggest Dastech acted illegally or improperly on this occasion.

e.     **Misrepresentations Regarding Dastech's Former California Importation Location.**

DI Tilney brings up still another past event regarding Dastech's former California importation operations in an attempt to mislead the Court.  Tilney Decl. ¶ 14; *see also* Tilney Decl. ¶ 21.  In 2005, Dastech surrendered its DEA registration for California because it ceased importing to California due to changes in California state regulations.  Cazeneuve 2d Aff. ¶ 9.  DI Tilney grossly mangles the facts of this event.  First, he asserts that Admiral (the warehouse Dastech had used in California) surrendered Dastech's DEA registration for California.  Tilney Decl. ¶ 14; *see also* Tilney Decl. ¶ 21.  Admiral did not surrender Dastech's DEA registration.  (Again this is not surprising because Admiral would have no authority to surrender a separate entity's DEA registration.)  Instead, Ms. Cazeneuve surrendered Dastech's DEA registration for California.  *Compare* Dastech DEA Form 486 (Feb. 14, 2007) (Exhibit 29) (identifying Ms. Cazeneuve's signature) *with* Dastech Vol. Surrender (Jan. 25, 2005) (containing an unidentified signature that is nearly identical to Ms. Cazeneuve's identified signature (Exhibit 30).  DI Tilney apparently added this falsehood either to provide the Court with a sense that DEA registrations are routinely surrendered by warehousemen that have

---

[14] Because this order was placed over eight years ago, Dastech cannot currently locate the relevant purchase order.  Cazeneuve Aff. 2d at ¶ 18.

26

no proprietary interest in the registration, or to suggest that the DEA has previously demanded the surrender of Dsatech's registrations.

DI Tilney also misrepresents why this DEA registration was surrendered. First, the DEA was conducting an inspection of Admiral for reasons completely unrelated to Dastech. Cazeneuve 2d Aff. ¶ 8–12. At that time, the DEA discovered that **Admiral** was not in compliance with *new* **California** regulations concerning the storage of listed chemicals. *Id.* at ¶ 9. These regulations had been enacted just a few months before the DEA inspected the premises. Contrary to DI Tilney's assertion, there was no federal regulatory compliance issue (apart from being in compliance with state law). After having discovered the state compliance issue, the DEA even tried to help Dastech find a warehouse that would be in compliance with the new California regulations. *Id.* at ¶ 10–11.

Despite Dastech's best efforts, it could not find a suitable warehouse. *Id.* at ¶ 11. Other similarly situated importers also failed to find new accommodations. *Id.* Therefore, because Dastech could not find a warehouse that would comply with the new California regulations, it decided to stop importing to California. *Id.* As such, it no longer had a need for its DEA registration for California and surrendered it. *Id.* The absence of a regulatory violation is made clear by the fact that the box checked on the surrender form states that the surrender was executed "in view of [Dastech's] desire to terminate handling of all List 1 chemicals" for the specified location. *See* Dastech Vol. Surrender (Jan. 25, 2005) (Exhibit 30). It is a shame DI Tilney did not attach this form to his Declaration, for simply viewing the form could have cleared up some of his material misrepresentations.

Overall, because DI Tilney's Declarations are rife with material misrepresentations and omissions, those Declarations cannot save the infirm seizure warrant. Therefore, even considering DI Tilney's allegations, Plaintiffs continue to demonstrate that Defendants converted their property in contravention of the Fourth Amendment.

### 3.    Mootness.

The DEA's illegal seizure of Plaintiffs' listed chemicals continues to present a live case or controversy. All that Defendants offer to support their mootness claim is speculation that the DOJ will file a complaint for forfeiture at some future point in time. First, the DOJ need not file a forfeiture action until October 24, 2007, because Plaintiffs filed their claim to the seized property on July 26, 2007. *See* 18 U.S.C. § 983(a)(3) (noting that the U.S. Attorney must file a complaint for forfeiture, if at all, by 90 days after the defendant files a claim to the property); *see also* Notices of Seizure (Exhibits 31a–31e); Dastech's Claim to Property Notices (July 26, 2007) (Exhibit 32). Therefore, it is not at all certain that forfeiture proceedings will actually be had, especially in light of the reckless misrepresentations and omissions contained in DI Salera's Affidavit and DI Tilney's Declarations.

Second, even if the DOJ eventually files a forfeiture complaint, litigating forfeiture actions is a time-consuming process. The resolution of a forfeiture case can take well over a year. An aggrieved claimant may eventually be compensated for this delay through monetary relief. In this case, however, continued deprivation of Plaintiffs' listed chemicals is currently harming and will continue to irreparably harm several parties. *See infra*, Section II of this Reply.

Finally, Defendants cite to no binding precedent which holds that District of Columbia District Courts loose equity jurisdiction once a forfeiture action has been noticed.  Therefore, a party aggrieved by an illegal seizure is free to pursue injunctive relief against that seizure in this circuit insofar as the filing of forfeiture proceedings is concerned.  *But see Smith v. Katzenbach*, 351 F.2d at 815.  Therefore, this action is not moot.

**B.    Due Process Violations.**

Plaintiffs are likely to show that the DEA violated their right to due process by depriving them of protected property and liberty interests without any notice or opportunity for a hearing.  While Defendants have voluntarily given lip service to their recognition of Plaintiffs' DEA registrations, they have not returned the registrations, which is a prerequisite for the handing of listed chemicals.  Furthermore, in the absence of injunctive relief they are free to return to their old ways at any time.

**1.    Property Interest in DEA Registrations.**

On June 4, 2007, Plaintiffs possessed DEA registrations, permitting them to import and distribute listed chemicals.  On June 5, 2007, Plaintiffs did not have DEA registrations even though Plaintiffs never validly surrendered their registrations.  Today, Defendants recognize the continued validity of Plaintiffs' registrations.  Tomorrow, there is nothing to stop the DEA from again asserting Plaintiffs' DEA registrations are terminated.  Indeed, he DEA's actions counsel that it seeks to engage in just that behavior.

Regarding the initial deprivation, the DEA never issued Plaintiffs a show cause order or notice of immediate suspension, the normal administrative procedures by which

a DEA registration is revoked or suspended.  *See* 21 C.F.R. § 1301.36.  Instead, the

DEA coerced Mr. Villacari, who no legal authority with which to "voluntarily" surrender

Dastech's DEA registrations, into "surrendering" them.  *See supra*, Section I(A)(1) of

this Reply.  The DEA provided no pre-deprivation or post-deprivation process to

Plaintiffs.  It simply asserted, and continues to assert, that an independently owned

warehouse from which registrants rent space have standing to surrender the registrant's

registration.  (*See* Def. Opposition to Mot. Prelim. Inj., at 2–3.)   These actions were

clearly a violation of Plaintiffs' right to due process.

In fact, the DEA's own behavior demonstrates that even it realizes a registrant is

not provided due process of law when the registrant's independently owned warehouse

surrenders its registrations.  On June 6, 2007, precisely one day after DI Tilney had

obtained "Dastech's" "voluntary" surrender from Mr. Villacari, DI Tilney contacted a true

Dastech employee, Luz Cazeneuve, by email.  Cazeneuve 2d Aff. ¶¶ 13; *see also*

DeGregorio Aff. (Exhibit 6) (corroborating that Mr. Villacari's surrender of Dastech's

DEA Registration was anything but "voluntary"); Levine Aff. (Exhibit 7) (same).  In this

email, DI Tilney requested that Ms. Cazeneuve sign two DEA Form 104s that were

electronically attached to the email.  Cazeneuve 2d Aff. ¶ 13.  DI Tilney's email also

requested that Ms. Cazeneuve immediately fax the signed DEA Form 104s to him and

return the signed originals via overnight express.  *Id.*

Later on the same day, Ms. Cazeneuve received a facsimile from DI Tilney.  *Id.*

at ¶ 14.  This facsimile contained a cover sheet and two DEA Form 104s.  *Id.*  The

instructions on the cover sheet largely mirrored those contained in DI Tilney's email

from earlier in the day—Ms. Cazeneuve was directed to sign the two DEA Form 104s,

immediately fax the signed forms to DI Tilney, and then overnight the signed originals to his office. *See id.* Knowing how critical Dastech's DEA registrations are to Dastech's continued operation and knowing that Dastech had done nothing wrong, Ms. Cazeneuve refused to follow DI Tilney's orders to sign the forms. *See id.* at ¶ 6. Then, on June 7, 2007, Ms. Cazeneuve received a call from DI Tilney. *Id.* at ¶ 7. He requested that Ms. Cazeneuve come into his office in New Jersey the following day to discuss the voluntary surrender of Dastech's DEA Certificates of Registration. *Id.* Ms. Cazeneuve again refused. *Id.*

The import of DI Tilney's actions cannot be ignored. If DI Tilney believed that he had obtained a valid voluntary surrender of Dastech's DEA registration from Hawks Express, there was no reason to require a Dastech employee to execute another set of Form 104s. DI Tilney's actions show that he was aware Hawks Express did not have the authority to surrender Dastech's DEA registrations. Further, Dastech never manifested any intent to voluntarily surrender its DEA registrations as Ms. Cazeneuve continually refused to follow DI Tilney's orders to surrender Dastech's registrations. Thus, DI Tilney must have known that Mr. Villacari's execution of the DEA Form 104s was void *ab initio*.

Because Mr. Villacari had no authorization to surrender the Dastech's DEA registrations, the DEA's assertion that Mr. Villacari's surrender of those registrations was valid is incorrect. Instead, due process required that Dastech be given notice and a meaningful opportunity for a hearing before the DEA could revoke or suspend its DEA registrations, which are recognized property interests. *See, e.g., Harline*, 148 F. 3d at

1204.  Because the DEA had fulfilled neither deprivation prerequisite, it violated Dastech's right to due process of law by terminating Dastech's DEA registrations.

### 2.    Liberty Interest.

Plaintiffs also suffered a cognizable deprivation of a liberty interest when the DEA terminated their registrations.  This circuit has found a deprivation of a liberty interest exists where, for example, the government has alleged that a contractor suffers from a conflict of interest, which resulted in the contractor not receiving future government contracts.  *Conset Corp. v. Community Services Admin.*, 655 F.2d 1291, 1296–98 (D.C. Cir. 1981); *see also Old Dominion Dairy Products, Inc. v. Sec. of Defense*, 631 F.2d 953, 955–56 (D.C. Cir. 1980) (holding that "when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges before adverse action is taken").

Plaintiffs' situation is analogous to that of the contractors in *Old Dominion* and *Conset*.  Plaintiffs' DEA registrations were terminated through the DEA's coercive actions.  The termination of Plaintiffs' DEA registrations was a change in Plaintiffs' status: On June 4, 2007, Plaintiffs were DEA registered listed chemical handlers—on June 5, 2007, Plaintiffs were barred from handling listed chemicals until the DEA's August 3, 2007, letter.  This deprivation and change in status occurred without any notice or an opportunity for a hearing.

Further, the DEA's actions have stigmatized Plaintiffs as entities that are not to be trusted with the handling of chemicals for which legitimate uses exist.  *See*

*Chemicals for Research & Industry*, 762 F. Supp. at 1396 (holding "[o]ne who is labeled not worthy of being trusted with common chemicals that have both legitimate and illegitimate uses is severely stigmatized and . . . would appear to be entitled to some sort of notice and hearing").  As a result of this stigmatization, Plaintiffs' clients cancelled contracts with them, just as the plaintiffs in *Old Dominion* and *Conset* lost future contracts due to the government's stigmatization of their business practices.  See *Conset*, 655 F.2d at 1296–98; *see also Old Dominion*, 631 F.2d at 955–56; Robert Kahen Aff. ¶ 7 (Exhibit 33).  Thus, Plaintiffs demonstrated that a change in status—from a registrant to a nonregistrant, stigmatized Plaintiffs, thereby causing them present and possible future irreparable.  Such a showing is that sort of "plus" that the U.S. Supreme Court requires to find the deprivation of a liberty interest.  *See Paul v. Davis*, 424 U.S. 693 (1972).  Indeed, unless this Court grants injunctive relief, Plaintiffs' reputation will continue to be damaged.

### 3.   **Mootness.**

Plaintiffs' due process claims against Defendants present a live case or controversy because Defendants have yet to return Plaintiffs' DEA registrations to them. Until Plaintiffs are in possession of their registrations, they cannot lawfully import or distribute controlled substances.  21 C.F.R. § 1309.23(a).  The DEA's failure to return Plaintiffs' DEA registration has the same effect as a formal termination of those registrations.  The only difference is that Plaintiffs have been accorded no post- or pre-deprivation process.  Thus, the same controversy as was presented this Court in Plaintiffs' Complaint persists.

Even if Plaintiffs' DEA registrations are promptly returned, however, Defendants' continuing recognition of the validity of Mr. Villacari's "voluntary surrender" presents a live case or controversy under the voluntary cessation doctrine. The doctrine provides that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case . . . ." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968). Instead, a case only "become[s] moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*

The DEA's letter dated August 3, 2007, fits neatly within the voluntary cessation doctrine. The letter does recognize the current validity of Plaintiffs' DEA registrations, but fails to concede that Mr. Villacari's "surrender" of those registrations was invalid. Moreover, the DEA has yet to return Dastech's DEA registrations to it, a behavior which demonstrates a reasonable expectation that the DEA will again decide not to honor Plaintiffs' DEA registrations. In the absence of an injunction, therefore, there is nothing to prevent Defendants from again asserting that Plaintiffs' DEA registrations were terminated when Mr. Villacari "surrendered" them.

## II.    Plaintiffs Have Suffered and Will Continue to Suffer Irreparable Harm Without Injunctive Relief.

### A.    Seized Property.

Plaintiffs have a long history of competently, professionally, and legally supplying listed chemical to American companies for use in those companies' manufacturing processes. The disruption in those companies' supply lines has caused and will continue to cause those companies injury. The harm being incurred by these parties cannot be repaired through monetary damages.

For example, on March 21, 2007, Revere Smelting and Refining Corporation ("RSR"), located in Middletown, New York, ordered 34,819.2 pounds of red phosphorus from Dastech.  *See* Purchase Order (Exhibit 34).  On March 30, 2007, Dastech agreed to fulfill RSR's order.  *See id.*  The contract price for the red phosphorus was $63,370.94.  *See id.*  The order was brought about through the efforts of Jim Lingle, an independent red phosphorus broker.  *See* Lingle Aff. ¶ 1–4, 13 (Exhibit 35).

The principal function of RSR's New York smelting and refining plant is to convert used batteries and related lead containing materials into lead bullion as mandated by the federal government.  Used batteries are defined as a hazardous waste under the Resource Conservation and Recovery Act ("RCRA").  *Id.* at ¶ 11.  RSR uses the red phosphorus it buys from Dastech to convert these hazardous waste materials into non-hazardous lead bullion through a proprietary smelting and refining process.  *Id.*  Without red phosphorus, RSR obviously cannot process the hazardous waste stockpiled at its facilities.

Subsequent to accepting RSR's most recent order for red phosphorus, Dastech informed the red phosphorus broker that it would be unable to deliver the red phosphorus to RSR in a timely manner.  *See* Lingle Aff. ¶ 14.  This event was caused by the DEA's seizure of the red phosphorus that Dastech had imported for RSR's benefit.  *See id.*  There is no red phosphorus manufactured in the western hemisphere.  *Id.* at ¶ 12.  Therefore, RSR will suffer irreparable harm if an injunction is not granted.

Finally, Mr. Lingle's business has also been severely impacted by the DEA's actions.  Lingle Aff. ¶ 16.  His reputation as a dependable businessman has been harmed.  *Id.*

In sum, Dastech's customers and an intermediary broker are suffering and will continue to suffer irreparable harm unless an injunction issues enabling the sale of Plaintiffs' property to its intended customers, such as RSR. Therefore, Plaintiffs' Motion for a Preliminary Injunction need be granted.

**B.** **Violation of Due Process.**

Dastech will be irreparably harmed when the DEA again decides to view Dastech's DEA registrations as terminated for the reasons stated in its Motion for a Preliminary Injunction.

There is a reasonable expectation that Defendants will return to their old ways. Even if they do not, Plaintiffs will continue to be irreparably harmed in the absence of an injunction. Continuing adverse consequences of an action that been ceased can still be felt. This occurs, for example, when an inmate challenges a denial of parole, but is later paroled before the legal action concludes. *Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. Cir. 1998). In such a situation, the parolee will continue to be stigmatized by the parole denial. Therefore, unless the prior denial of parole is reviewed by a court, the stigma attached to the parolee will continue to diminish the parolee's job prospects. *Id.* (gathering cases that support his proposition).

Plaintiffs find themselves in an analogous position to the injured parolee. Unless an injunction issues, Plaintiffs future business opportunities will be curtailed by the continuing stigma attached to its reputation. Therefore, an injunction must issue to demonstrate that the DEA never had cause to terminate Plaintiffs DEA registrations.

**III.    There Is No Cognizable Harm to Others or the Public Interest.**

Plaintiffs have violated no law, therefore it is not in the public interest that they continue to be punished by the DEA's actions.  Further, it is in the public interest that the reckless misrepresentations and omissions the DEA made to both this Court and the Magistrate who issued the seizure warrants be brought to light.  Therefore, it is in the public interest that an injunction issue.  Finally, there is no possible harm to the DEA in enjoining it from preventing the sale of Dastech's legally imported listed chemicals, when Plaintiffs concede that Defendants may retain possession of the proceeds of such sales pending a final resolution of this matter.

**CONCLUSION**

For the reasons stated above, Plaintiffs request that this Court grant its Motion for a Preliminary Injunction.

Dated: _____

Respectfully submitted,


_____
Janet Kravitz (pro hac vice)
KRAVITZ, BROWN & DORTCH, LLC
65 East State Street, Suite 200
Columbus, Ohio  43215
Tel:  614.464.2000
Fax:  614.464.2002
jkravitz@kravitzllc.com


_____
Amy Richardson
Harris, Wiltshire & Grannis, LLP
1200 Eighteenth Street, NW, Suite 1200
Washington DC 20036
Tel: 202.730.1329
Fax: 202.730.1301

Attorneys for Plaintiffs
Dastech International, Inc. and Dastech
Industries, Ltd.

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2007, a copy of the foregoing pleading was served on each of the defendants, as well as the United States Attorney for the District of Columbia, along with the Complaint.

_____
Lynsey Knowles

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

EXHIBIT 1

# AFFIDAVIT

**STATE OF NEW JERSEY**              )

**COUNTY OF ESSEX**                  )

I, William J. Salera, state the following:

1. I am a Diversion Investigator of the Drug Enforcement Administration (hereinafter "DEA"), currently assigned to the New Jersey Division. I have been a DEA Diversion Investigator for approximately two years. I was previously a Law Enforcement Officer, with the State of Pennsylvania for over 30 years, and in that capacity I was assigned for 8 years with a DEA Task Force involved with over 1,000 Narcotic and controlled substance investigations including cases that involved the manufacturing of methamphetamine. I am currently a member of Diversion Group 2. During the course of my employment with the DEA, I have been involved with at least 2 investigations involving the importation, buying, selling or possession of controlled substances and listed chemicals, which offenses are punishable under the laws of the United States.

2. I make this affidavit in support of a warrant authorizing the United States to seize (3,550) three thousand five hundred fifty kilograms, more or less, of List I Chemicals, identified as Pseudoephedrine and Phenylpropanolamine, and an additional fourteen thousand four hundred kilograms (14,400) more or less, of Red Phosphorous as defined in 21 U.S.C. section 802 (34) (C) presently located at the U.S. Customs Warehouse, Staten Island, New York 10303, HAWK'S EXPRESS, 1000 Frank E. Rodgers Blvd., Harrison, NJ, and the U.S. Customs warehouse located at 888 Doremus Ave. Newark, NJ 07114. The facts set forth below are based on documents from the DEA, DASTECH INTERNATIONAL, INC., U.S. Customs Border

1



Protection, and my own direct observations. I have reviewed the available documents that are relevant to this investigation. Where conversations or statements of others are related herein, they are related in part and in substance. Moreover, because this affidavit is submitted for a limited purpose, I have not set forth all facts that I have learned during the course of this investigation.

3. DASTECH INTERNATIONAL, INC., is a former regulated person under the provisions of the Controlled Substance Act (CSA), as a Listed Chemical Importer and Distributor, DASTECH INTERNATIONAL, INC.,C/O HAWK'S EXPRESS, was assigned DEA registration numbers 001285DNY (Chemical Distributor) and 001277DXR (Chemical Importer) for List I chemicals, and was doing business C/O HAWK'S EXPRESS, 1000 Frank E. Rodgers Blvd., Harrison, New Jersey 07029, on premises further described as a two story warehouse building of masonry construction identified by a sign on the front saying "HAWKS EXPRESS, INC." in an industrial area. That said place of business was a controlled premises within the meaning of 21 U.S.C. § 880(a) and 21 C.F.R. § 1316.02(c) and that said place of business, HAWK'S EXPRESS acted in the capacity as an agent for DASTECH INTERNATIONAL, INC.

4. DASTECH INTERNATIONAL, INC.,C/O HAWK'S EXPRESS, was required to keep complete and accurate records of regulated transactions involving List I chemicals received, sold, delivered, or otherwise disposed of pursuant to 21 U.S.C. § 830 and 21 C.F.R. §§ 1310 and 1313 et seq. at the controlled premises.

5. On April 26, 2007, an arrival notice and invoice listing Container #LCL THPU5077757, for 40 Drums, 25 kg. per drum for a total of 1000 kg. of a List I Chemical, Pseudoephedrine, which is an immediate precursor to the manufacturer of methamphetamine. This pseudoephedrine listed the wrong broker, and the registered DEA control premises, + was imported into the United States by DASTECH INTERNATIONAL, INC., C/O HAWK'S was to recei N.A. the shipmen was unawa and had no record for this shipme

2

EXPRESS. According to the DEA Form 486 Import/Export Declarations, these List I chemicals (Pseudoephedrine and Phenylpropanolamine) were imported from Technoco Co. LTD, 9 fl. No. 1-2 Nanking West Road, Taipei, Taiwan (Pseudoephedrine), San Fu Chemical Co. LTD, 7F No. 21 Chung Shan N. Road Sec 2 Taipei, Taiwan R.O.C. (Phenylpropanolamine) and Kalpataru Chemicals Pvt. LTD, Post BoxNo.17, Krishnagiri Road, Hosur 635 109, Tamilnadu, India ( Red Phosphorus). The listed Broker for the Pseudoephedrine and Phenylpropanolamine is J.W. Hampton Jr. 161-15 Rockaway Blvd., Jamaica, N.Y. 11434. The DEA 486 Import Declarations also noted the importer as DASTECH INTERNATIONAL, INC., C/O HAWK'S EXPRESS Inc. 1000 Frank E. Rodgers Blvd., Harrison, New Jersey 07029. HAWK'S EXPRESS is the DEA Registered location for DASTECH INTERNATIONAL, INC., in New Jersey. HAWK'S EXPRESS, was never notified by DASTECH of the arrival of the Forty (40) drums of List I chemicals. These drums were going to be transported to an unregistered location by a trucking company, identified as Tiger Freight International, Inc. 150-30 132nd. Avenue, Ste # 307, Jamaica, New York 11434. This was the Consignee that was listed on the Arrival Notice and Invoice but was never listed on the DEA 486, Import Declaration. Tiger Freight International, Inc. is not a registered premises pursuant to 21 U.S.C. § 830 and 21 C.F.R. §1310 and 1313 et seq and as such is not authorized to store listed chemicals.

6. As a result of this transaction a hold was placed on this import by the D.E.A. and the U.S. Customs Service. The 1000 kg. is being stored at the U.S. Customs Warehouse located at 300 Western Avenue, Staten Island, New York 10303.

7. On April 27, 2007, the undersigned along with other DEA Diversion investigators and DEA Special Agents proceeded to the Customs Warehouse and inspected the 40 Drums of List I Chemicals. The undersigned then collected records pertaining to the importation and destination

3

that these chemicals were to be transported. A review of the available records and other evidence revealed that these drums of Pseudoephedrine and Phenylpropanolamine had been imported contrary to law.

8. On June 6, 2007, the undersigned along with other DEA Diversion investigators proceeded to Sal / Son Trucking located at 888 Doremus Avenue, Newark, New Jersey 07114, to inspect 66 Drums of List I Chemicals identified as Pseudoephedrine and Phenylpropanolamine. The undersigned then collected records pertaining to the importation and destination that these chemicals were to be transported to. A review of the available records and other evidence revealed that these drums had been imported contrary to law. These chemicals consist of 40 drums X 25 kg. for a total of 1000 kg. of Pseudoephedrine and 26 drums X 50 kg. for a total of 1300 kg. of Phenylpropanolamine. The DEA 486 Import Declaration for the Phenylpropanolamine ~~requests~~ a states N.A. total of 1,000 kgs, to be imported N.A. the actual amount imported was 1,300 kgs. Sal / Son Trucking is not a while N.A. controlled premises pursuant to 21 USC § 830 and 21 C.F.R. § 1310 and 1313 et seq and as such is not authorized to store listed chemicals. Additional information supplied by the United States Customs Border Protection (CBP) showed that the Import location, DASTECH INTERNATIONAL, INC., C/O HAWK'S EXPRESS, listed on the DEA 486 Import Declaration was different from the arrival notices filed with Customs. In addition, documents submitted by DASTECH INTERNATIONAL, INC., to the DEA, identified as the Customs Broker of record to be J W Hampton Jr. 161-15 Rockaway Blvd., Jamaica, N.Y. 11434, when in fact the actual broker for these List I Chemical imports was J M Rodgers, 1975 Linden Blvd, Elemont, NY 11003.

9. On June 5, 2007, the undersigned along with other DEA Diversion investigators proceeded to HAWK'S EXPRESS, INC., located at 1000 Frank E. Rodgers Blvd., S., Harrison, New Jersey 07029, to inspect 10 drums of a List I Chemical. The undersigned then collected

4

records pertaining to the importation and destination that these chemicals were to be transported. These chemicals consist of 10 drums X 25 kg. for a total of 250 kg. of Pseudoephedrine. There were no documents at this location that identify the importation or the customer for these 10 drums. HAWK'S EXPRESS is the DEA Registered location for DASTECH INTERNATIONAL, INC in New Jersey and is required by 21 CFR 1310.06, to have all documents pertaining to the importation and distribution of all List I Chemicals. During this investigation the owner of HAWK'S EXPRESS Neil Villacari expressed to the investigators that he did not want to retain the DEA Registrations #001277DXR (Importer) and #001285DNY (Distributor) for DASTECH INTERNATIONAL, INC., further Mr. Villacari stated that his company would no longer act on behalf of DASTECH INTERNATIONAL, INC., as their Registered location for List I Chemicals in the State of New Jersey. At this time Neil Villacari acting as the designated agent for DASTECH INTERNATIONAL, INC in New Jersey, signed two DEA Forms 104C, (Voluntary Surrender of List 1 Chemical Privileges). At this time HAWK'S EXPRESS Inc., is not a controlled premises pursuant to 21 USC § 830 and 21 C.F.R. § 1310 and 1313 et seq and as such is not authorized to store Listed Chemicals.

10. On June 8, 2007, the undersigned along with other DEA Diversion Investigators returned to HAWK'S EXPRESS where they inspected 319 Drums X 45 kg. for a total of 14,355kg. of Red Phosphorous, a List I Chemical. At this time the undersigned put all the above List I Chemicals on hold pending seizure by the DEA and U.S. Marshals Service.

11. DASTECH INTERNATIONAL, INC International, Inc. registered location, HAWK'S EXPRESS, 1000 Frank E. Rodgers Blvd., Harrison, NJ, has advised the DEA, New Jersey Division that they will no longer handle List I Chemicals for DASTECH INTERNATIONAL, INC. Therefore DASTECH INTERNATIONAL, INC International Inc., is no longer permitted to

5

possess, import or distribute List I chemicals at the Harrison, New Jersey location. DASTECH

INTERNATIONAL, INC is only permitted to import Red Phosphorous at its 600 Richmond

Terrace, Staten Island, New York 10301 location and 7715 South 78th Avenue building #4,

Bridgeview, IL 60455.

12. Your affiant submits that based on the foregoing information on DASTECH

INTERNATIONAL, INC International, Inc., is no longer permitted to handle List I chemicals.

Your affiant also believes the foregoing property that is involved in a violation of Title 21 United

States Code § 801 et seq., in that it was imported, exported, distributed, possessed, or otherwise in

violation of Chapter 13 of Title 21, and as such is subject to forfeiture to the United States

pursuant to the provisions of Title 21 United States Code § 881 (a)(9).

13. Wherefore it is hereby requested that the Court issue a seizure warrant authorizing the

Drug Enforcement Administration or other United States agency to seize the defendant property,

namely the 40 drums x 25 kgs for a total of 1,000 kgs of List I chemicals located at the U.S.

Customs Warehouse, 300 Western Avenue, Staten Island, New York 10303, 40 drums X 25 kg.

for a total of 1000 kg. of Pseudoephedrine and 26 drums X 50 kg. for a total of 1300 kg. of

Phenylpropanolamine, located at the U.S. Customs warehouse, 888 Doremus Ave, Newark, NJ

07114, and 10 drums X 25 kg. for a total of 250 kg. of Pseudoephedrine and 319 Drums X 45 kg.

for a total of 14,355kg. of Red Phosphorous, located at HAWK'S EXPRESS, INC., 1000 Frank

E. Rodgers Blvd., S., Harrison, New Jersey 07029 pursuant to Title 21 United States Code

Section 881 (a)(9).

6

Based on the foregoing, I believe that there is probable cause to seize and forfeit the forty (40) drums of List I chemicals from DASTECH INTERNATIONAL, INC International, Inc. pursuant to 21 USC § 881 (a) (9).

William J. Salera
Diversion Investigator
Drug Enforcement Administration

Sworn to and subscribed in my presence this 21st day of June, 2007

PATTY SHWARTZ
United States Magistrate Judge

7

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **Civil Action 07-01296 (HHK)** |
| ALBERTO GONZALES, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC. )
*et al.*,                    )
               Plaintiffs )
                    )
                    )
            v.          )    Civil Action No. 1:07-CV-00191
                    )    (RMU)
                    )
ABERTO GONZALES, *et al.*,   )
                    )
           Defendants )
                    )

## DECLARATION OF RICHARD TILNEY

I, Richard Tilney, pursuant to 28 U.S.C. § 1746, declare and say:

1.     I am a Group Supervisor in the Office of Diversion, Neward, New Jersey Office, Drug Enforcement Administration.  My responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals and controlled substances from legitimate channels under the Controlled Substances Act.  This includes reviewing DEA Forms 486 (Import/Export Declarations).  I have served in my current capacity at the Newark Office since March 4, 2003, and have been a Diversion Investigator since July 5, 197.  I was hired by DEA as a Diversion Investigator in 1997 and attended the Basic Diversion Investigator School at the DEA Academy in Quantico, Virginia.  I have also received additional training at numerous classes administered both by the DEA and by non-DEA entities between 1974 and present.  These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and



the adverse environmental impact that results from this process. Prior to my current position, I was a Staff Coordinator for the DEA in the Operations Enforcement Dangerous Drugs and Chemical Section (OED) at DEA Headquarters, Arlington, Virginia. As part of my duties I conduct regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances and listed chemicals. I further instructed law enforcement agencies in foreign nations regarding the methods of diversion used by illicit traffickers. Prior to this, I was a Diversion Investigator in the DEA New Jersey Division and was primarily responsible for preventing, detecting and investigating the diversion of controlled substances and listed chemicals from legitimate channels to illicit traffic. I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals and chemicals diverted to the illicit market. The primary emphasis of most of these investigations has involved pseudoephedrine (also known as pseudoephedrine HCl), ephedrine, phenylpropanolamine, and red phosphorus products. I have also worked in the regulatory process of List I chemical handlers to include pre-registrant investigations, regulatory investigations, and administrative actions taken against regulated firms.

The following information is based on my personal knowledge and/or information gained in the course of my official duties.

2.    List I chemicals are legitimate chemicals that also may be used in the illicit manufacture of a controlled substance in violation of the Controlled Substances Act, 21 U.S.C. § 802 (34), 21 CFR § 1310.02(a). Ephedrine, pseudoephedrine,

2

phenylpropanolamine, and red phosphorus are List I chemicals which are commonly used to illegally manufacture methamphetamine, a Schedule II controlled substance. These chemicals have been specifically designated by the Administrator of the Drug Enforcement Administration (DEA Administrator) as four of the listed chemicals subject to the provisions of 21 CFR §§ 1309 and 1313. *See* 21 CFR § 1310.02 (a).

3.    Pursuant to 21 U.S.C. § 971 (c) and 21 CFR § 1313.41 (a), the DEA Administrator has the authority to suspend any importation or exportation of ephedrine, pseudoephedrine, phenylpropanolamine, or red phosphorus based on evidence that the chemical proposed to be imported or exported may be diverted to the clandestine manufacture of a controlled substance.

4.    The United States has implemented a system by which every regulated person who imports a listed chemical is required to notify the DEA Administrator of the importation not later than 15 days before the importation is to take place. *See* 21 CFR § 1313.12 (a). Unless the notice requirement is waived, the regulated person must complete a DEA Form 486 and deliver it to DEA not later than 15 days prior to the importation. *See* 21 U.S.C. § 971 (a); 21 CFR § 1313.12 (b). The DEA Form 486 must include, among other things, name and address information about the chemical importer and/or broker, the name and description of each listed chemical, the amount of chemical to be shipped, the proposed import date, the foreign port of exportation, and the United States Customs Port of Entry. *See* 21 CFR § 1313.13 (c).

5.    Currently, there is no statutory definition of "evidence that the chemical proposed to be imported may be diverted to the clandestine manufacture of a controlled substance." However, through prior adjudication, DEA and the courts have approved the use of a "totality-of-the-circumstances test" to decide whether substantial evidence exists to suspend an importation of List I chemicals. *See PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *Indace, Inc., Suspension of Shipments*, 69 Fed. Reg. 67,951, 67,959 (Nov. 22, 2004).

6.    Moreover, the Attorney General considers the following factors to determine whether a regulated person, such as the Plaintiff, shall receive a registration to distribute List I chemicals. *See* 21 U.S.C. § 823 (h) which provides that the "Attorney General shall consider--

(1)    maintenance by the applicant of effective controls against diversion of listed chemicals into other than legitimate channels;

(2)    compliance by the applicant with applicable Federal, State, and local law;

(3)    any prior conviction record of the applicant under Federal or State laws relating to controlled substances or to chemicals controlled under Federal or State law;

(4)    any past experience of the applicant in the manufacture and distribution of chemicals; and

(5)    such other factors as are relevant to and consistent with the public health and safety."

4

7.    On February 15, 2007, DEA received a completed DEA Form 486 from Dastech International, Inc c/o Hawks Express, Inc., 1000 Frank E. Rodgers Boulevard, Harrison, New Jersey. ("Dastech c/o Hawks"). (Exhibit ("Ex.") 1. On the form, Dastech c/o Hawks declared it intended to import 1000 kilograms of pseudoephedrine HCl to its registered location at 1000 Frank E. Rodgers Boulevard, Harrison, New Jersey. (DEA Control No.: 5046178). Dastech c/o Hawks listed J.W. Hampton Jr., Jamaica, New York, as the United States Customs broker.

This information, however, contradicted information received by the United States Customs Border Protection (CBP), and attached herein as Exhibit 2. According to CBP, the shipment of pseudoephedrine was actually being imported to Vanguard Logistics or NACA Logistics, 300 Middlesex Avenue, Carteret, New Jersey ("Vanguard location"), an unregistered location. Additionally, the actual U.S. Customs Broker was not J.W. Hampton, Jr., but J.M Rodgers. *Id.* Finally, the CBP data showed that the shipment was ultimately destined for Dastech's New York location at 10 Cuttermill Road, Great Neck, New York. ("Dastech New York location"). This is also an unregistered location. *Id.*

The CBP data was further confirmed by Vanguard's own "Arrival Notice and Invoice," attached herein as Exhibit 3. That document also shows the shipment was destined for Vanguard Logistics in Carteret, New Jersey, an unregistered location. Moreover, on May 18, 2007, I contacted Vanguard Logistics and spoke with Yolanda Fullman and Melissa Sansone, Vanguard's Import Manager. Ms. Fullman forwarded copies of the Arrival Notice and Invoice for the shipment listed in DEA 486 (Shipment #

5046178). The document did not identify Dastech c/o Hawk's as being involved with this import. Exhibit 3.

Because both the Vanguard location and the Dastech New York location are not registered locations, a shipment of pseudoephedrine to either location would be in violation of 21 U.S.C. 843 (a)(9), 21 C.F.R. 1309.21, and 21 C.F.R. 1309.23.

8.    On March 28, 2007, DEA received a completed DEA Form 486 from Dastech c/o Hawks for 1000 kilograms of pseudoephedrine HCl. This shipment was imported into the United States along with 1000 kilograms of Phenylpropanolamine, also shipped pursuant to a DEA-486 submitted by Dastech c/o Hawks. A copy of both DEA forms 486 is attached herein as Exhibits 4-4a. Both DEA-486 forms listed the Customs Broker as J.W. Hampton.

Based on information received by DEA, this shipment of phenylpropanolamine and pseudoephedrine was actually scheduled to be shipped to the Dastech New York location, an unregistered location. A copy of the CBP data is attached as Exhibit 5. Moreover, the CBP data shows an actual shipment of 66 drums which includes 40-25 kilogram drums of pseudoephedrine (1000 kg) and 26-50 kilogram drums of phenylpropanolamine (1300 kg). However, the DEA-486 submitted by Dastech c/o Hawks shows a declaration of only 1000 kilograms of phenylpropanolamine, leaving 300 kilograms undeclared.

Additionally, a review of CBP paperwork and information obtained by DEA revealed that both shipments were being handled by Sal/Son Trucking, 888 Doremus Avenue, Newark, New Jersey. This location is also not registered to handle List I chemicals.

6

9.      The owner of Hawk's Express, Neil Villacari, was asked about the shipments of pseudoephedrine and phenylpropanolamine described in paragraph 8. Mr. Villacari told investigators that he was not involved with these imports and had received no information from Dastech regarding these imports even though his company was listed as the importer.

10.     On April 20, 2007, I contacted J.W. Hampton, Jr. and Company, and spoke to Maureen Shoule about the above listed imports and the fact that her company was listed as the U.S. Customs broker. Ms. Shoule advised that her company was not involved with the above listed imports and had not filed any documents with the U.S. Customs Service for the importation of pseudoephedrine or phenylpropanolamine.

11.     On June 5, 2007, DEA spoke to Neil Villacari, owner of Hawk's Express, and requested documentation pertaining to shipments of pseudoephedrine and phenylpropanolamine to Sal/Son Trucking located at 888 Doremus Avenue, Newark, New Jersey. Mr. Villacari was also asked to provide documentation relating to the shipment of 1000 kilograms of pseudoephedrine (DEA Control No.: 3046178; referred to in Paragraph 7 of this affidavit). Mr. Villacari stated he had no documentation for either shipment.

As a result of allegedly false documentation showing that imports of pseudoephedrine and phenylpropanolamine were being consigned and shipped to Hawk's Express without Mr. Villacarri's prior knowledge, and the fact that the imports were

7

never shipped, and apparently were not intended to be shipped, to Hawk's Express, Mr.

Villacarri told DEA he no longer desired to handle List I chemicals for Dastech.

Accordingly, Mr. Villacari voluntarily surrendered his DEA registration by signing two

DEA Forms 104c. Copies of each signed form are attached herein as Exhibit 6 and 6a.

Mr. Villacarri was not threatened with any action against him in the event he failed to

surrender his DEA registration. Nor were any promises made to Mr. Villacari in

exchange for surrendering the DEA registration.

Prior to surrendering the DEA registration, Mr. Villacari never indicated that he

did not have authority to surrender the registration. Also, up until the filing of this

lawsuit, neither Mr. Villacari nor any other representative or agent of Dastech

complained that the surrender of the DEA registration was invalid or without authority or

apparent authority.

12.    Dastech International, Inc. has previously been cited by DEA for the same

violations listed above. For instance, on June 6, 2002, DEA sent a letter to Ms. Luz

Cazeneuve of Dastech, advising her that Dastech filed DEA forms 486, listing an

unregistered location as the destination of the List I chemicals to be imported. A copy of

the letter is attached herein as Exhibit 7.

13.    Dastech has also been the subject of a previous DEA investigation. Ms.

Luz Cazeneuve was investigated for filling false or fraudulent information with DEA to

obtain an import authorization for 4500 kilograms of pseudoephedrine. The shipment

identified the receiving company as RP Scherer. RP Scherer advised DEA that it had

8

never ordered any pseudoephedrine from Dastech. As a result, Ms. Cazeneuve was advised that providing false statements or filing fraudulent information when applying for an import authorization could constitute a criminal offense. See 21 U.S.C. 843(a)(4)(A).

14.    On September 24, 2004, DEA's Los Angeles Division conducted a regulatory inspection on Dastech International's registered location, c/o Admiral Transportation, 300 N. Baldwin Park Blvd., City of Industry, California. After being confronted with evidence that Dastech was in violation of state and federal regulations, Admiral surrendered its DEA registration.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Richard V. Tilney
Group Supervisor
Office of Diversion Control
New Jersey Division

Executed this 24th day of July, 2007 at Newark, New Jersey.

9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALBERTO GONZALES, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action 07-01296 (HHK)**

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC. )
et al., )
            Plaintiffs )
        )
          v. )        Civil Action No. 1:07-CV-01296
        )        (HHK)
        )
ALBERTO GONZALES, et al., )
        )
          Defendants )

## SECOND DECLARATION OF RICHARD TILNEY

I, Richard Tilney, pursuant to 28 U.S.C. § 1746, declare and say:

1.     I am a Group Supervisor in the Office of Diversion, Newark, New Jersey Office, Drug Enforcement Administration. My responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals and controlled substances from legitimate channels under the Controlled Substances Act. This includes reviewing DEA Forms 486 (Import/Export Declarations). I have served in my current capacity at the Newark Office since March 4, 2003, and have been a Diversion Investigator since July 5, 1997. I was hired by DEA as a Diversion Investigator in 1997 and attended the Basic Diversion Investigator School at the DEA Academy in Quantico, Virginia. I have also received additional training at numerous classes administered both by the DEA and by non-DEA entities between 1974 and present. These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and



the adverse environmental impact that results from this process. Prior to my current position, I was a Staff Coordinator for the DEA in the Operations Enforcement Dangerous Drugs and Chemical Section (OED) at DEA Headquarters, Arlington, Virginia. As part of my duties I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances and listed chemicals. I further instructed law enforcement agencies in foreign nations regarding the methods of diversion used by illicit traffickers. Prior to this, I was a Diversion Investigator in the DEA New Jersey Division and was primarily responsible for preventing, detecting and investigating the diversion of controlled substances and listed chemicals from legitimate channels to illicit traffic. I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals and chemicals diverted to the illicit market. The primary emphasis of most of these investigations has involved pseudoephedrine (also known as pseudoephedrine HCl), ephedrine, phenylpropanolamine, and red phosphorus products. I have also worked in the regulatory process of List I chemical handlers to include pre-registrant investigations, regulatory investigations, and administrative actions taken against regulated firms.

The following information is based on my personal knowledge and/or information gained in the course of my official duties.

2.      List I chemicals are legitimate chemicals that also may be used in the illicit manufacture of a controlled substance in violation of the Controlled Substances Act, 21 U.S.C. § 802 (34), 21 CFR § 1310.02(a). Ephedrine, pseudoephedrine,

2

phenylpropanolamine, and red phosphorus are List I chemicals which are commonly used to illegally manufacture methamphetamine, a Schedule II controlled substance. These chemicals have been specifically designated by the Administrator of the Drug Enforcement Administration (DEA Administrator) as four of the listed chemicals subject to the provisions of 21 CFR §§ 1309 and 1313. *See also* 21 CFR § 1310.02 (a).

3.    Plaintiff, Dastech International, Inc., is a registered importer and distributor of List I chemicals, which includes ephedrine, pseudoephedrine, phenylpropanolamine and red phosphorus. 21 U.S.C. § 802 (34); *see also* 21 C.F.R. § 1310.02 (a). These chemicals are often illegally "diverted" for use in the clandestine manufacture of methamphetamine, a controlled substance. In an effort to stem illegal methamphetamine production, Congress has passed a number of comprehensive measures, including the Chemical Diversion and Trafficking Act of 1988 (CDTA), the Domestic Chemical Diversion Control Act of 1993 (DCDCA), and the Comprehensive Methamphetamine Control Act of 1996 ("the Acts"), all of which are designed to impose upon distributors and sellers of List I chemicals various duties to control theft, loss, and otherwise illegal diversion of List I chemicals to clandestine laboratories.

4.    The Acts require that anyone who manufactures, imports, exports or distributes List I chemicals must be considered a "regulated person" and must register with DEA. 21 U.S.C. §§ 802(38), 843(a)(9); *see also* 21 C.F.R. § 1309.21. A person who knowingly distributes or imports a listed chemical without being registered shall be

3

sentenced to a term of imprisonment of up to four years, fined, or both. *Id.*, at § 843 (d)(1).

5.   By law, "every person who manufactures or distributes any ... List I chemical ... shall obtain annually a registration issued by the Attorney General." 21 U.S.C. 822 (a). If that person also desires to import a List I chemical, a separate registration must be obtained. 21 U.S.C. § 957 (a); *see also* 21 C.F.R. § 1309.21 (a). Moreover, any registration must be specific to the particular list I chemical to be handled. 21 U.S.C. 822 (e) (distribution); 21 U.S.C. 958 (b) (importation). For instance, a registration that permits a distributor and/or importer only to handle red phosphorus would not be sufficient to import or handle ephedrine.

6.   When a distributor or seller of List I chemicals maintains multiple locations for distributing, selling, and/or importing List I chemicals, a separate registration is required for each location. 21 U.S.C. § 822(e); 21 C.F.R. § 1309.23-24; *see also* 21 U.S.C. § 958(h) (separate registration required for each principal place of business where list I chemicals are imported). This is necessary because, without separate registrations, DEA would be unable to identify and/or inspect the new location where List I chemicals were sold or otherwise distributed. There are only two exceptions to the separate registration requirement. A registered distributor who stores chemicals at a warehouse is exempt from registering the warehouse, for instance, *if* no chemicals are *distributed* from the warehouse *and* are returned to the registered location prior to distribution (italics added). 21 C.F.R. § 1309.23 (b)(1). Also, a separate registration is

4

not required for a location used by an agent of the registrant to merely solicit sales as long as the agent does not use the location as a distribution point or storage facility. *Id.*, at § 1309.23 (b)(2). In other words, if no List I chemicals are distributed from, manufactured at, or imported to the facility, a separate registration is generally not required.

7.    In addition to the registration requirement, any importer of a list I chemical is also required to notify the DEA Administrator of each importation not later than 15 days before the importation is to take place. *See* 21 CFR § 1313.12 (a). Unless the notice requirement is waived, the regulated person must complete a DEA Form 486 and deliver it to DEA not later than 15 days prior to the importation. *See* 21 U.S.C. § 971 (a); 21 CFR § 1313.12 (b). The DEA Form 486 must include, among other things, the accurate name and address information about the chemical importer and/or broker, the name and description of each listed chemical, the amount of chemical to be shipped, the proposed import date, the foreign port of exportation, and the United States Customs Port of Entry. *See* 21 CFR § 1313.13 (c).

8.    Pursuant to 21 U.S.C. § 971 (c) and 21 CFR § 1313.41 (a), the DEA Administrator has the authority to suspend any importation or exportation of ephedrine, pseudoephedrine, phenylpropanolamine, or red phosphorus based on evidence that the chemical proposed to be imported or exported may be diverted to the clandestine manufacture of a controlled substance. Though there is currently no statutory definition of "evidence that the chemical proposed to be imported may be diverted to the

5

clandestine manufacture of a controlled substance," through prior adjudication, DEA and the courts have approved the use of a "totality-of-the-circumstances test" to decide whether substantial evidence exists to suspend an importation of List I chemicals. *See PDK Laboratories, Inc. v. United States Drug Enforcement Administration*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *Indace, Inc., Suspension of Shipments*, 69 Fed. Reg. 67,951, 67,959 (Nov. 22, 2004).

9.     If the DEA Administrator, as delegated by the Attorney General, makes a finding that a registrant "has committed such acts as would render his registration ... inconsistent with the public interest," the Administrator may revoke or suspend the registration. 21 U.S.C. 824 (a) (4) (distribution); 21 U.S.C. 958 (d) (2) (importation). In determining the public interest, the Administrator shall consider the following factors enumerated in 21 U.S.C. 823 (h):

(1)     maintenance by the applicant of effective controls against diversion of listed chemicals into other than legitimate channels;

(2)     compliance by the applicant with applicable Federal, State, and local law;

(3)     any prior conviction record of the applicant under Federal or State laws relating to controlled substances or to chemicals controlled under Federal or State law;

(4)     any past experience of the applicant in the manufacture and distribution of chemicals; and

(5)     such other factors as are relevant to and consistent with the public health and safety.

6

Accordingly, the Administrator has discretion to immediately suspend any

registration ... "in cases where [she] finds that there is an imminent danger to the public

health and safety." 21 U.S.C. 824(d). Such a suspension shall be immediate and shall

"continue in effect until the conclusion of all proceedings ..."

10.    Plaintiff is a registered importer and distributor of list I chemicals.

Currently, Plaintiff is registered in three different locations, including Harrison, New

Jersey (c/o Hawk's Express); Bridgeview, Illinois (c/o Chicagoland Quad Cities); and

Staten Island, New York (c/o Cody Enterprises).

11.    On February 15, 2007, DEA received a completed DEA Form 486 from

Plaintiff, listing the registrant as Dastech International, Inc c/o Hawks Express, Inc., 1000

Frank E. Rodgers Boulevard, Harrison, New Jersey.  ("Dastech c/o Hawks").  (Exhibit

("Ex.") 1.  On the form, Dastech c/o Hawks declared it intended to import 1000

kilograms of pseudoephedrine HCl (aka pseudoephedrine) to its registered location at

1000 Frank E. Rodgers Boulevard, Harrison, New Jersey.  (DEA Control No.: 5046178).

Dastech c/o Hawks listed J.W. Hampton Jr., Jamaica, New York, as the United States

Customs broker.

The information on the DEA Form 486, however, was inconsistent with

information received by the United States Customs Border Protection (CBP).  The CBP

data, attached as Exhibit 2, showed that the same shipment of pseudoephedrine was

actually being imported to Vanguard Logistics (aka NACA Logistics) at 300 Middlesex

Avenue, Carteret, New Jersey ("Vanguard"), an unregistered location.  Additionally, the

7

CBP data showed that the actual U.S. Customs Broker was not J.W. Hampton, Jr., but J.M Rodgers, and that the shipment was ultimately destined for yet another unregistered location, Dastech's New York location at 10 Cuttermill Road, Great Neck, New York. ("Dastech/Great Neck, N.Y."). *Id.*

I obtained documents from Vanguard which confirmed the CBP data. Vanguard produced an "Arrival Notice and Invoice," attached as Exhibit 3, which showed that the pseudoephedrine was in fact destined for Vanguard Logistics in Carteret, New Jersey, an unregistered location. This document referred to the same shipment described in the DEA Form 486 but, unlike the DEA 486, never identified Dastech c/o Hawk's as being involved with the import. Exhibit 3. Because neither the Vanguard location nor the Dastech/Great Neck, N.Y. locations are registered locations, a shipment of pseudoephedrine to either location would have been in violation of 21 U.S.C. 843 (a)(9), 21 C.F.R. § 1309.21, and 21 C.F.R.§ 1309.23.

12.    On March 28, 2007, DEA received another completed DEA Form 486 from Dastech c/o Hawks for 1000 kilograms of pseudoephedrine HCl. Exhibit 4, pp. 1-2. This shipment was imported into the United States along with 1000 kilograms of Phenylpropanolamine, also shipped pursuant to a DEA-486 submitted by Dastech c/o Hawks and received by DEA on April 10, 2007. Exhibit 4A, pp. 1-2. Copies of both DEA Forms 486 are attached as Exhibits 4-4a and, like the DEA 486 discussed above, both forms listed J.W. Hampton as the customs broker.

Again, the CBP data received by DEA contradicted the information on the DEA Forms 486. According to the CBP, the shipments of phenylpropanolamine and

pseudoephedrine were actually scheduled to be shipped to the Dastech/Great Neck, N.Y. location, an unregistered location. Exhibit 5.[1]

13.    Additionally, a review of CBP paperwork and information obtained by DEA revealed that the shipments described in Exhibits 4, 4A, and 5 were being handled by Sal/Son Trucking, 888 Doremus Avenue, Newark, New Jersey. Again, this location was not registered by DEA.

14.    On April 20, 2007, I contacted J.W. Hampton, Jr. and Company, the listed customs broker, and spoke to Maureen Shoule about the imports described above. Ms. Shoule advised that her company was not involved with these imports and had not filed any documents with the CBP for the importation of pseudoephedrine or phenylpropanolamine.

15.    On June 4, 2007, DEA served a Notice of Inspection of Controlled Premises on the manager of Hawk's Express, Inc., Dino DeGregorio. Exhibit 8.   At that time, I asked Mr. DeGregorio for documents pertaining to the shipments of all list I

---

[1] In my previous affidavit filed in the instant case, dated July 24, 2007, I stated in error that, with respect to this particular shipment of phenylpropanolamine, there was a discrepancy between the amount actually declared and the amount shipped. I stated that "the CBP data shows an actual shipment of 66 drums which includes … 26-50 kilogram drums of phenylpropanolamine (1300 kg)" and that the "DEA-486 submitted by [Plaintiff] show[ed] only a declaration of 1000 kilograms of phenylpropanolamine, leaving 300 kilograms undeclared." Since making that declaration, I have located documents provided by Plaintiff and Plaintiff's broker which indicate that the entire shipment of phenylpropanolamine appears to have been declared by Plaintiff to DEA. See Exhibit 20. This error was also included in the application for a seizure warrant, obtained on June 21, 2007, and discussed in paragraph 22 of this declaration. See Exhibit 9. Please see my corrected declaration to this effect dated August 10, 2007.

9

chemicals between December 2006 to June 2007. Mr. DeGregorio stated that he could not locate the documents but told me that the owner of Hawk's Express, Neil Vallacari, would provide them to me the following day.

16.    On June 5, 2007, I met with Mr. Villacari, who produced some importation documents, including originals, but none that pertained to the shipments declared in Exhibits 1, 4, and 4A. Nor did Mr. Villacari produce any documents pertaining to the 10-25 kilogram drums of pseudoephedrine which were found on the premises of Hawk's Express. I also specifically asked Mr. Villacari about the shipments of pseudoephedrine and phenylpropanolamine that were shipped to Sal/Son Trucking in Newark, New Jersey and were currently being detained at the CBP warehouse in Staten Island, New York. Mr. Villacari stated he had no documentation for either shipment and only learned of the shipment when contacted by the CBP.

17.    During this meeting, Mr. Villacari told me that he would no longer be handling list I chemicals for the Plaintiff. Mr. Villacari stated that, as a result of imports being documented as destined for his warehouse when in fact no shipments were actually arriving, it was in his best interest to cease acting as an agent for the Plaintiff and surrender his ability to handle list I chemicals. Accordingly, Mr. Villacari voluntarily surrendered the DEA registrations assigned to Dastech c/o Hawks by signing two DEA Forms 104c. Exhibits 6-6A. Prior to signing the forms and surrendering the registration certificates, Mr. Villacarri was not threatened with any action against him nor were any promises made to him in exchange for surrendering the registrations. Mr. Villacari also

10

never indicated that he lacked authority to surrender the registrations. To the contrary, he stated that he no longer wished to act as Plaintiff's "agent" and that, as the president of the company listed as the import location, he was ceasing all handling of list I chemicals.

18.    In executing the DEA Forms 104c, Mr. Villacari explicitly stated that he desired to "terminate handling of all List I chemicals." Exhibits 6-6A. By signing the forms, he consented to having the DEA registrations revoked "without an order to show cause, a hearing, or any other proceeding." *Id.* The following day, on June 6, 2007, I sent, by facsimile, two DEA Forms 104c to Luz Cazeneuve, Plaintiff's Operations Manager. Based on Mr. Villacari's surrender of the DEA registrations, I instructed Ms. Cazeneuve to sign identical surrender forms. However, Ms. Cazeneuve did not return the signed forms.

19.    Following the surrenders by Mr. Villacari, I contacted Ms. Cazeneuve and requested that she produce all records pertaining to list I chemical transactions from December 2006 to June 2007. Ms. Cazeneuve's attorney, Max Kravitz, requested an extension of time during which to produce the records. I agreed to the extension and on June 18, 2007, I, along with two other diversion investigators, met with Plaintiff's attorneys, Max and Janet Kravitz, as well as with Ms. Cazeneuve. During that meeting, Ms. Cazeneuve produced a collection of records which, based on my initial review, did not negate my belief that Plaintiff was engaged in importing list I chemicals to unregistered locations and that Plaintiff reported the wrong customs broker on the DEA

11

Forms 486 described above. However, I am still reviewing the documents produced by Ms. Cazeneuve.

20.    Also during that meeting, Dastech's attorneys were asked about submitting the signed DEA Forms 104c, indicating Dastech's decision to surrender their registrations. Mr. Kravitz told me that they would discuss the matter and get back to me. At no time during the meeting did Dastech's attorneys or Ms. Cazeneuve protest Mr. Villacari's surrender of Dastech's registrations or attempt to challenge Ms. Villacari's authority surrender to the registrations.

21.    Plaintiff, Dastech International, Inc., has previously been cited by DEA for the same violations listed above. For instance, on June 6, 2002, DEA sent a letter to Ms. Luz Cazeneuve of Dastech, advising her that Dastech had filed DEA Forms 486, listing an unregistered location as the destination of the List I chemicals to be imported. A copy of the letter is attached hereto as Exhibit 7.

Dastech has also been the subject of a previous DEA investigation. Ms. Luz Cazeneuve was investigated for filing false or fraudulent information with DEA to obtain an import authorization for 4500 kilograms of pseudoephedrine. The shipment identified the receiving company as RP Scherer. RP Scherer advised DEA that it had never ordered any pseudoephedrine from Dastech. As a result, Ms. Cazeneuve was advised that providing false statements or filing fraudulent information when applying for an import authorization could constitute a criminal offense. *See* 21 U.S.C. § 843(a)(4)(A).

12

On September 24, 2004, DEA's Los Angeles Division conducted a regulatory inspection of Dastech International's registered location, c/o Admiral Transportation, 300 N. Baldwin Park Blvd., City of Industry, California. After being confronted with evidence that Dastech was in violation of state and federal regulations, Admiral surrendered its DEA registration.

22. On June 21, 2007, DEA Diversion Investigator (DI) William J. Salera applied for a seizure warrant, alleging numerous violations[2] on the part of Plaintiff and indicating that Mr. Villacari had (1) voluntarily surrendered both DEA registrations held by Dastech c/o Hawks; (2) told DEA that he no longer wanted to retain the DEA registrations; and (3) told DEA that his company, Hawk's Express, would no longer act as a registered location for Dastech International, Inc. Exhibit 9, ¶ 9. Based on DI Salera's belief that Mr. Villacari had authority to surrender the registrations and had elected to cease handling all list I chemicals for Plaintiff, DI Salera concluded that Plaintiff could no longer import or distribute list I chemicals from the Dastech c/o Hawk's location. See 21 C.F.R. § 1309.62 (a) (registration shall terminate whenever registrant "discontinues business or professional practice" at registered location).

23. That same day, United States Magistrate Judge Patty Schwartz issued three seizure warrants. The first was for the seizure of approximately 15 metric tons of red phosphorus (319 drums) and 250 kilograms (10 drums) of pseudoephedrine located at

---

[2] As previously mentioned, one of the allegations in the affidavit was later determined to be in error. See FN1 of this declaration.

the Dastech c/o Hawk's Express location. The second was for 1000 kilograms (40 drums) of pseudoephedrine and 1300 kilograms of phenylpropanolamine (26 drums) located at Sal/Son trucking in Newark, New Jersey. The third warrant was for 1000 kilograms (40 drums) of pseudoephedrine that was detained at the CBP warehouse in Staten Island, New York. Exhibits 10-12. The warrants were executed and the chemicals were seized. On July 19 and 20, 2007, DEA promptly issued Notices of Seizure to Plaintiff and others with regards to all the chemicals seized, informing them of their rights to contest the forfeiture. *See* Exhibits 13-13B, 14-14B, 15-15E, 16-16E, and 17-17E.

24.   Prior to the filing of the instant lawsuit, Plaintiff never complained to me or anyone in my office that Mr. Villacari lacked authority to surrender the DEA registrations issued to Dastech c/o Hawk's Express. Nor did Mr. Villacari, prior to the filing of the suit, ever notify DEA that he was withdrawing his consent to surrender the registrations. In fact, the first time I learned that Mr. Villacari was "withdrawing" his consent to surrender and waiver of a hearing, was the filing of the instant lawsuit.

14

25.    However, out of an abundance of caution and in consideration of Plaintiff's insistence that Mr. Villacari lacked authority to act on behalf of Plaintiff, DEA considered the facts and circumstances regarding Mr. Villacari's surrender of Plaintiff's DEA registrations. After reviewing the facts and circumstances which were made known to DEA only after the instant lawsuit was filed, DEA sent a letter to Plaintiff's attorney, dated August 3, 2007, informing him that DEA had reviewed the facts and circumstances regarding the surrender of DEA registrations 001277DRX and 001285DNY, assigned to Dastech International, Inc. c/o Hawk's Express, Inc., Frank B. Rodgers Blvd, Harrison, New Jersey 07029 (Dastech c/o Hawk's Express"). Exhibit 18. Based on its review, DEA stated that Dastech's registrations are currently valid.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Richard J. Tilney
Group Supervisor
Office of Diversion Control
New Jersey Division

Executed this 10th day of August, 2007 at Newark, New Jersey.

15

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,   )
                                          )
               Plaintiffs,                )
                                          )
        v.                                )        **Civil Action 07-01296 (HHK)**
                                          )
ALBERTO GONZALES, *et al.*,               )
                                          )
                                          )
               Defendants.                )

# EXHIBIT 4

IN THE UNITED STATES OF AMERICA
DISTRICT OF

DASTECH INTERNATIONAL, INC.,          :

   Plaintiff,          :

  v.          :

ALBERTO GONZALES, et al.,          :

   Defendants.          :

---

AFFIDAVIT OF NEIL VILLACARI

---

State of New Jersey

County of Hudson: ss:

  The undersigned, Neil Villacari, having personal knowledge of the following matters, states as follows:

1. I am the sole shareholder of Hawks Express, Inc. ("Hawks Express"), a New Jersey corporation. Hawks Express operates a public warehouse under the same name, located at 1000 Frank E. Rogers Boulevard, Harrison, New Jersey 07029.

2. Hawks Express contracted with Dastech International Inc. ("Dastech"), an importer of products and chemicals, to provide warehousing services for Dastech. Hawks Express has provided warehousing services for Dastech for approximately 15-20 years. I have never known Dastech or its employees to act in an unlawful, fraudulent or questionable manner. I have high respect for the business integrity of Dastech and its employees.

3. Several of the chemicals imported by Dastech, specifically, Pseudoephedrine, Phenylpropanolamine and Red Phosphorous, are designated as List 1 chemicals by the DEA and subject to certain registration requirements. Dastech is registered with the DEA to import List 1 chemicals. Dastech was registered in the name "Dastech International, Inc., c/o Hawks Express, Inc.'s 1000 Frank E. Rogers Boulevard, Harrison, New Jersey 07029. Dastech Industries, Ltd was registered with the DEA to distribute List 1 chemicals. It was registered in the name "Dastech Industries, Ltd c/o Hawks Express Inc., 1000 Frank E. Rogers Blvd, Harrison, New Jersey 07029." The registration certificates were located on

1



a bulletin board in the office of Hawks Express. A copy of the importer and distributor registration certificates are attached as Exhibits 1 and 2. Hawks is not required to obtain a DEA registration nor did Hawks make application for DEA registration.

4. On approximately April 4, 2002, Dastech provided notice to the DEA of its intent to "centrally locate" its records at its office located at 10 Cutter Mill Road, Suite 400, Great Neck NY 11021-3201.

5. On or about June 5, 2007, Diversion Investigator William Salera and Diversion Group Supervisor Richard Tilney came to Hawks Express and wanted to speak with me. They showed me their badges and stated that they were at Hawks Express to seize the Pseudoephedrine in the warehouse that was imported by Dastech. I was told that Dastech's paperwork contained several mistakes; one of those mistakes being that the incorrect Customs' broker was identified on several documents; the other mistake was that certain documents identified the consignee as "Dastech International, Inc. c/o Hawks Express"; however, according to Mr. Tilney, the consignee should have been identified as Hawks Express c/o Dastech International, Inc." Mr. Tilney told me that that this was wrong and could result in me being convicted of a crime for which I could go to prison for 25-30 years.

6. Mr. Tilney was very vague as to why these alleged errors constituted a crime or why I was responsible for any mistakes that may have been made. I also did not understand how I could possibly be subject to a 25-30 year prison term. I was very shaken-up by Mr. Tilney's accusations. I asked Mr. Tilney what I was doing wrong. Mr. Tilney replied that he was at my warehouse to find out what I was doing wrong.

7. Mr. Tilney told me that I had to sign two "Voluntary Surrender of List 1 Chemical Privileges" forms, which had the effect of terminating DEA registrations to import and distribute List 1 chemicals for Hawks Express. Copies of the Voluntary Surrender forms are attached as Exhibit 2 and 3. I knew Hawks Express did not have a DEA registration but Mr. Tilney insisted that I sign the documents. I did not have the authority to sign the Voluntary Surrender forms on behalf of Dastech nor did I want to sign the forms.

8. After I signed the Voluntary Surrender forms, Mr. Tilney inspected the warehouse. After inspecting the warehouse, Mr. Tilney informed me that I had not done anything wrong. Mr. Tilney said that the warehouse was properly secured.

9. Mr. Tilney requested and took all of Hawks Express' paperwork relating to Dastech, inbound and outbound from this year. I also provided Mr. Tilney with a copy of an inventory of Dastech List 1 chemicals from January 2006 through to the present. Mr. Tilney also took my copy of Dastech's DEA importer and

2

2007/JUL/13/FRI 05:12 PM    KRAVITZ, BROWN&DORTCH    FAX No. 614-464-2002    P. 004

distributor registration certificates. A copy of a receipt that was provided to me by the investigators is attached as Exhibit 4. Mr. Tilney said that someone would return copies of the documents that were taken from the warehouse. I have not received the copies of the documents.

10. Before the agents left on June 5, 2007, I was told by the agents that I should not permit the removal of Dastech List 1 chemicals from the warehouse because he was getting a seizure warrant.

11. On June 21, 2007, approximately thirty agents showed up at Hawks Express. The agents took 10 drums of Pseudoephedrine that had been imported by Dastech. A copy of the receipt for the seized product is attached as Exhibit 6. The Red Phosphorous remains in the warehouse although I have been told it will be picked up so that it can be destroyed.

12. There was a film crew with the agents and they were filming the drums of Pseudoephedrine being loaded on a truck. Despite my protests, the crew also entered Hawks Warehouse and filmed in the warehouse.

FURTHER, AFFIANT SAYETH NAUGHT.

_Neil Villacari_
Neil Villacari

Sworn to and subscribed before me by Neil Villacari, this _16_ day of July, 2007.

_Irene Mandel_
My Commission Expires _7/r7/09_

IRENE MANDEL
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 28, 2009

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

EXHIBIT 5

**U. S. Department of Justice**

Drug Enforcement Administration

---

*www.dea.gov*                    Washington, D.C. 20357

### AUG 0 3 2007

Max Kravitz, Esq.
Kravitz, Brown, and Dortch, LLP
145 East Rich Street
Columbus, Ohio 43215

Re:    Re: DEA registrations of Dastech International, Inc.

Dear Mr. Kravitz:

This letter is to advise you that the Drug Enforcement Administration (DEA) has reviewed the facts and circumstances regarding the surrender of DEA registrations 001277DRX and 001285DNY, assigned to Dastech International, Inc. c/o Hawk's Express, Inc., Frank E. Rodgers Blvd, Harrison, New Jersey 07029 (Dastach c/o Hawk's Express"). As you are aware, DEA accepted the surrender of these registrations from Mr. Neil Villacari, the owner of Hawk's Express and the individual in apparent control of the registered location. At that time, Mr. Villacari indicated that he no longer wished to be involved with list I chemicals, and DEA accepted the surrenders. However, based on our review of the facts relating to Mr. Villacari's apparent authority to surrender the registrations, DEA has concluded that the registrations will remain valid.

It is, however, the intent of DEA to resume its investigation on the issue of Dastech's listed chemical activities and conduct appropriate inspections to determine whether Dastech is properly registered at the proper location, is conducting listed chemical business at the registered location, and is conducting all regulated activities at properly registered premises. Accordingly, this letter makes no representations about Dastech International's past or current activities with respect to the handling, distribution, or importation of list I chemicals.

If you have any questions regarding this matter please contact Mr. Wayne Patrick (202) 307-8010, the attorney handling this matter on behalf of DEA.

Sincerely,

Joseph T Rannazzisi

Joseph T. Rannazzisi
Deputy Assistant Administrator
Office of Diversion Control



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,   )
                                          )
                    Plaintiffs,           )
                                          )
        v.                                )        **Civil Action 07-01296 (HHK)**
                                          )
ALBERTO GONZALES, *et al.*,               )
                                          )
                                          )
                    Defendants.           )

EXHIBIT 6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC., et al.,   )
                            )

         Plaintiffs,         )

           v.              )     Civil Action No. 07-1296 (HHK)
                            )

ALBERTO GONZALES, et al.,        )
                            )

         Defendants.     )

### AFFIDAVIT OF DINO DEGREGORIO

**State of New Jersey**    :

**County of Hudson**    : ss:

The undersigned, Dino DeGregorio, having personal knowledge of the following matters, states as follows:

1.    I have been the warehouse manager at Hawks Express, Inc. ("Hawks Express") for 16 years. Hawks Express operates a public warehouse under the same name, located at 1000 Frank E. Rogers Boulevard, Harrison, New Jersey 07029.

2.    Neill Villacari, the owner of Hawks Express, is my supervisor.

3.    On or about June 4, 2007, Diversion Investigator William Salera and Diversion Group Supervisor Richard Tilney came to Hawks Express and requested that I show them Dastech International Inc.'s ("Dastech") files. I told the investigators that I did not have authority to show them any files and that they would have to come back the next day to speak to Mr. Villacari.

4.    On or about June 5, 2007, while I was working in the warehouse, Investigators Salera and Tilney returned to Hawks Express and asked to speak with Mr. Villacari.

1



5.      I was present when Investigators Salera and Tilney spoke with Mr. Villacari. They showed Mr. Villacari their badges and stated that they were at Hawks Express to seize the Pseudoephedrine in the warehouse that was imported by Dastech.

6.      I know Dastech, which utilizes our warehouse space to store its property, to be a customer of Hawks Express. I have never known Dastech or its employees to act in an unlawful, fraudulent or questionable manner. Dastech has a high degree of integrity.

7.      In all of the years that I have been employed by Hawks Express, I have never known there to be a loss, shortage, theft or damage to any of Dastech's Imported List 1 chemicals stored at Hawks Express.

8.      The investigators stated that Dastech's paperwork contained several mistakes, even though I have always known Dastech's paperwork to be completed properly.

9.      I heard Investigator Tilney threaten Mr. Villacari that he could go to jail for 25-30 years as a result of the paperwork problems. At all times the investigators were very stern and threatening to Mr. Villacari. Mr. Villacari was pretty shaken up by Mr. Tilney's accusations.

10.     I then observed the investigators physically remove Dastech's DEA Certificates of Registration from the peg board in the office where Hawks Express stored Dastech's DEA Certificates of Registration. The investigators stated they had to take the DEA Certificates of Registration with them.

11.     On June 21, 2007, while I was working at the loading dock, approximately thirty DEA agents, a U-Haul, and eight or nine other trucks showed up at Hawks Express. The agents seized various items that had been imported by Dastech.

12.     A film crew also accompanied the agents. The agents said the film crew was present for the DEA's purposes.

2

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Dino DeGregorio

The foregoing Affidavit was sworn to and signed in my presence, this **6** day of September, 2007.

_____
Notary Public

IRENE MANDEL
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES JULY 28, 2009

3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,    )
)
Plaintiffs,    )
)
v.    )    **Civil Action 07-01296 (HHK)**
)
ALBERTO GONZALES, *et al.*,    )
)
)
Defendants.    )
)

EXHIBIT 7

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC., et al.,      )

        Plaintiffs,      )

              )

        v.      )      Civil Action No. 07-1296 (HHK)

              )

ALBERTO GONZALES, et al.,      )

        Defendants.      )

### AFFIDAVIT OF MARK LEVINE

**State of New Jersey**     :

**County of Hudson**     : ss:

The undersigned, Mark Levine, having personal knowledge of the following matters, states as follows:

1.      I have been a warehouseman assistant at Hawks Express, Inc. ("Hawks Express"), a New Jersey corporation, for 5 years.

2.      Neill Villacari, the owner of Hawks Express, is one of my supervisors.

3.      On or about June 5, 2007, Diversion Investigator William Salera and Diversion Group Supervisor Richard Tilney came to Hawks Express to speak with Mr. Villacari.

4.      I was present in Mr. Villacari's office when Investigators Salera and Tilney spoke with Mr. Villacari regarding Dastech International Inc. ("Dastech").

5.      I observed the investigators physically remove Dastech's DEA Certificates of Registration from the peg board in the office where Hawks Express stored Dastech's DEA Certificates of Registration. The investigators stated they had to take the DEA Certificates of Registration with them.

1



6.    The Investigators never asked Mr. Villacari whether they could remove Dastech's

DEA Certificates of Registration—they gave him no choice in the matter.

7.    I heard the Investigators threaten Mr. Villacari that he could go to jail for 25-30 years

if he did not co-operate with them.

8.    The Investigators were very, very stern with Mr. Villacari.

      FURTHER AFFIANT SAYETH NAUGHT.

                                                _____
                                                Mark Levine

      The foregoing Affidavit was sworn to and signed in my presence, this _____ day of
September, 2007.

                                                _____
                                                Notary Public

                        IRENE MANDEL
                   NOTARY PUBLIC OF NEW JERSEY
                MY COMMISSION EXPIRES JULY 25, 2009

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*,<br><br>               Plaintiffs,<br><br>      v.<br><br>ALBERTO GONZALES, *et al.*,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action 07-01296 (HHK)** |

**EXHIBIT 8**



**VANGUARD LOGISTICS SERVICES**

300 Middlesex Ave.
Carteret, NJ 07008
Tel: +1 732-802-0304
Fax: +1 732-802-4055
www.vanguardlogistics.com



USYFN Printed: May 18, 2007 09:50
Page 1 of 1

## Arrival Notice & Invoice

For freight availability, please log on to www.vanguardlogistics.com and click on Freight Availability

| | |
|---|---|
| Shipper: T V L CONTAINER LINE LIMITED<br>5TH FL NO 217 SEC 3<br>NANKING E.RD. , TAIPEI - R.O.C. | Issue Date: Apr 18, 2007<br>File No: 1037041217/4<br>SS Ocean B/L: APLU401644167<br>House B/L: KELNYC73173<br>AMS House B/L: PLS SEE COMMENT |
| Consignee: TIGER FREIGHT INTERNATIONAL INC<br>150-30 132ND AVE., STE#.307<br>JAMAICA, NY - 11434<br>Phone: 718 341-5877 /Fax: 718 341-5570<br>eMail: TIGERFREIGHT@EARTHLINK.NET | Vessel/Voy: APL VIETNAM/0015<br>Load Port: KAOHSIUNG (TAKAO)      ETD: Apr 05, 2007<br>Discharge Port: NEW YORK      ETA: Apr 28, 2007 |

Notify:

Express Release B/L

CFS: NACA LOGISTICS - NEW YORK, F557
300 MIDDLESEX AVENUE
CARTERET, NJ - 07008
Phone: 732-8020304 Fax: 732-8024055

Container: LCL TPHU5077757 / APL8090866

Comments : PLS USE SUB HBL# AS AMS#.
AMS#TVLCLNYC7329EU01
LOADING FEE IS COLLECTED ON BEHALF OF THE WAREHOUSE.

| Part | Marks and Nos | Qty Type | Description | KG<br>LBS | CBM<br>CFT |
|---|---|---|---|---|---|
| A-1 | PSEUDOEPHEDRINE HCL. USP-29<br>C.A.S#:345-78-8 | 40 DRUMS | STC PSEUDOPHEDRINE<br>HYDROCHLORIDE,USP-29 | 1,140.000<br>2,513.272 | 3.4400<br>121.5548 |

## Invoice

| | | | |
|---|---|---|---|
| Bill To: TIGER FREIGHT INTERNATIONAL INC<br>150-30 132ND AVE., STE#.307<br>JAMAICA, NY 11434 | Code: 1023758 | INV: 1039174151 | Date: Apr 18, 2007 |

| Description | Qty | PER | Rate | CUR | O/S Total | EXCH | Item Total |
|---|---|---|---|---|---|---|---|
| FUEL SURCHARGE | | MIN CBM/KG | 10.00 | USD | 10.00 | 1.0000 | 10.00 |
| DAD/WHSE DOC FEE | | FLAT | 55.00 | USD | 55.00 | 1.0000 | 55.00 |
| LOADING | 25.1327 | LBS RATE | 4.15 | USD | 104.30 | 1.0000 | 104.30 |
| Invoice<br>Total | | | | | | USD   Due | 169.30 |
| Please include a copy of the Arrival Notice when remitting payment. | | | | | | Total USD   Due | 169.30 |

ALLOW 24 HRS FOR RELEASE OF CARGO AFTER RECEIPT OF PAYMENT & ORIGINAL B/L. FAX COPIES, CASH, PERSONAL CHECKS
OR CREDIT CARDS ARE NOT ACCEPTED. STORAGE ACCRUED AFTER 4 DAYS OF AVAILABILITY. CARGO SENT TO GENERAL ORDER
(G.O.) 15 DAYS AFTER ARRIVAL. IF NOT CUSTOMS CLEARED, ANY ADDL CHARGES WILL BE THE RESPONSIBILITY OF THE IMPORTER

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action 07-01296 (HHK)** |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EXHIBIT 9**

02/14/2007  15:32  ☎ 14667699                                                    PAGE  04

| U.S. Department of Justice | | IMPORT/EXPORT DECLARATION |
|---|---|---|
| Drug Enforcement Administration | | Precursor and Essential Chemicals |

| SEE REVERSE FOR INSTRUCTIONS AND PRIVACY ACT. | OMB Approval No. 1117-0023 |

| 1. CHECK ONE: | [✓] IMPORT DECLARATION | [ ] EXPORT DECLARATION | U.S. CUSTOMS CERTIFICATION |
|---|---|---|---|

| 1a. IMPORTER/EXPORTER (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.) | 1b. BROKER OR FORWARDING AGENT, IF USED (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.) | Date of Departure/Arrival |
|---|---|---|
| DASTECH INTERNATIONAL, INC. C/O HAWKS EXPRESS INC. 1000 FRANK E. RODGERS BLVD. HARRISON NJ 07029 TEL 973-344-5400 | J.W. HAMPTON JR. (US CUSTOMS BROKER) 161-15- ROCKWAY BOULEVARD JAMAICA, NY 11434 TEL 718-276-0301 | Name of Carrier/Vessel / Date of Certification / Signature of Customs Official |

1c. I CERTIFY THAT THE 15-DAY ADVANCE NOTICE REQUIREMENT HAS BEEN WAIVED   [✓] Check if applicable

**5046178**

### 2. LISTED CHEMICALS TO BE IMPORTED/EXPORTED

| 2a. Name and Description of Chemical appearing on label or container | 2b. Name of Chemical as designated by Title 21 C.F.R. 1310.02 | 2c. Number of containers, size, net weight of each chemical (Kg.) | 2d. Gross Weight of each item (Kg.) |
|---|---|---|---|
| Pseudoephedrine HCL, USP CAS: 345-78-8 LOT: NET WEIGHT: 25KILOS GROSS WEIGHT:27.5 KILOS NDC : NO. 1/UP MADE IN TAIWAN OUR PURCHASE ORDER # PB-7097 DEA CONTROL # _____ | Pseudoephedrine, HCL CUSTOMER HI-TECH PHARMACAL CO. INC ORDER NO. 0041429 DATED 2/13/07 | 1000 kilos 40 X 25 KGS DRUM | 1100 KILOS GROSS WEIGHT 40X 27.5 KILO DRUM |

2007 FEB 15 AM 7:53   RECEIVED DEA

| 3a. [✓] FOREIGN  [ ] DOMESTIC PORT OF EXPORTATION (last U.S. Customs Port) AND APPROX. DEPARTURE DATE | 3b. [ ] FOREIGN  [✓] DOMESTIC PORT OF IMPORTATION (first U.S. Customs Port) AND APPROX. ARRIVAL DATE |
|---|---|
| KEELUNG TAIWAN        03/30/2007 | PORT NEWARK, NJ        04/30/07 |

| 4a. MODE OF TRANSPORT; NAME OF VESSEL, CARRIER | 4b. NAME OF ALL INTERMEDIATE CARRIERS |
|---|---|
| OCEAN | N/A |

| 5a. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF FOREIGN CONSIGNEE/CONSIGNOR | 5b. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF ALL INTERMEDIATE CONSIGNEES |
|---|---|
| TECHNOCO CO. LTD. 9 FL. NO. 1-2 NANKING WEST ROAD TAIPEI, TAIWAN | N/A |

| SIGNATURE OF AUTHORIZED INDIVIDUAL ( Print or Type Name below Signature) | DATE | NAME OF FIRM |
|---|---|---|
| LUZ CAZENEUVE | 02/14/2007 | DASTECH INTERNATIONAL, INC. |

DEA Form (Jun 1989) — 486                                                         Copy 3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,   )
)
                            Plaintiffs,   )
)
        v.                                )        **Civil Action 07-01296 (HHK)**
)
ALBERTO GONZALES, *et al.*,               )
)
)
                            Defendants.   )
)

EXHIBIT 10

U.S. Department of Justice

# Import / Export Declaration
## for List I and List II Chemicals

Drug Enforcement Administration

---

SEE REVERSE INSTRUCTIONS FOR PRIVACY ACT | OMB Approval No. 1117-0023

| 1a. Type of Transaction: [X] IMPORT [ ] EXPORT [ ] INTERNATIONAL | 1b. Type of Submission: [ ] ORIGINAL [X] AMENDED [ ] WITHDRAWAL |

1c. **WARNING!** 15-day advance notice required for initial shipment or for company that has lost regular importer or regular customer status. See 21 C.F.R. Part 1313 for further details.
[ ] I certify I have met the conditions for the waiver of 15-day advance notice requirement.

**DEA Control Number** (For DEA use only)

---

**2a.** U.S. IMPORTER/ U.S. EXPORTER / U.S. BROKER
(Name, address, telephone, and fax no.)

DASTECH INTERNATIONAL INC.
C/O HAWKS EXPRESS
1000 FRANK E RODGERS BLVD.
HARRISON NJ 07029

DEA Number (for List I only):    001277DRX

Purchase/Invoice no. (optional)    PC-7162

**2b.** IF IMPORT, LIST FOREIGN CONSIGNOR; IF EXPORT OR INTERNATIONAL TRANSACTION, LIST FOREIGN TRANSFEREE.
(Name, address, telephone, and fax no.)

LIANGYUNGANG TONGJIA INTERNATIONAL CO. LTD
ROOM 615 NANGUANG BLDG. # 43 E. HAILIAN RD.
LIANGYUNGANG, CHINA
TEL 5185692319

Foreign permit no. (if applicable) _____

---

3. Listed Chemicals to be Imported / Exported / Brokered

| 3a. Name and Description of chemical appearing on label or container. For drug products, show dosage strength and dosage size. | 3b. Name of chemicals as designated by Title 21 C.F.R. 1310.02 | 3c. Number of containers, size, net weight of each chemical (kg). For drug products, show number of dosage units. | 3d. DATE OF ACTUAL IMPORT/EXPORT AND ACTUAL QUANTITY (To be completed by person named in (2a)) |
|---|---|---|---|
| RED PHOSPHOROUS PHOSPHOROUS AMORPHOUS UN 1338 CAS NO. : 7723-14-0 LOT NO: NET WEIGH : 45 KILOS GROSS WEIGHT: 51KILOS MADE IN CHINA<br><br>OUR PURCHASE ORDER  PC-7162 | RED PHOSHOROUS PHOSPHOROUS AMORPHOUS, UN1338 | 15,795  KILOS 351X 45KILO DRUMS<br><br>RSR QUEMETCO INC. 65 BALLARD RD. MIDDLETOWN, NY 10941 TEL 845-692-4414 X 257<br><br>END USE LEAD SMELTER | *DEA #*<br>*5049366* |

---

| 4a. [X] FOREIGN [ ] DOMESTIC | 4b. [ ] FOREIGN [X] DOMESTIC |
| PORT OF EXPORTATION: SHANGHAI CHINA | PORT OF IMPORTATION: PORT NEWARK , NJ |
| APPROX. DEPARTURE DATE:  04/20/2007 | APPROX. ARRIVAL DATE: 5/20/2007 |

---

5.   MODE OF TRANSPORTATION, NAME OF VESSEL, OR NAME OF CARRIER:
OCEAN

| SIGNATURE OF AUTHORIZED INDIVIDUAL (Print or Type Name below Signature) | DATE: |
| | 06/06/2007 |
| Print Name:  LUZ CAZENEUVE  TEL 516-466-7676 | |

DEA form - 486  (Previous version obsolete.)
September 2006

Copy  1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC., *et al.*,

        Plaintiffs,

    v.

ALBERTO GONZALES, *et al.*,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

**Civil Action 07-01296 (HHK)**

# EXHIBIT 11a–11e

U.S. DEPARTMENT OF HOMELAND SECURITY
Bureau of Customs and Border Protection

Form Approved
OMB No. 1651-0024

# ENTRY/IMMEDIATE DELIVERY

CST# 245

J.M. Rodgers Co., Inc.
1975 LINDEN BLVD
SUITE 301
ELMONT, NY 11003
PH:  516-872-5570
FAX: 516-872-5592

COND RELEASE SPEC DOCUMENT REVIEW
FDA RELEASE

ABI Certified
C.H. BOX #K006
Broker Code: 943

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE NAME | 4. ENTRY NUMBER |
|---|---|---|---|
| 031307 | | 01    Consumption | 943-9016239-7 |

| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | |
|---|---|---|---|
| 4601 | | 9016239  IN    0001 | |

| 8. CONSIGNEE NUMBER | 9. IMPORTER NUMBER |
|---|---|
| 13-303291200 | Same |

| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME |
|---|---|
| DASTECH INTL INC<br>10 CUTTER MILL RD<br>GREAT NECK, NY 11021 | Same |

| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) |
|---|---|---|
| ZIMU | 10E | E416    MAHER TERM BLDG 2180 CDS |

| 15. VESSEL CODE/NAME | | |
|---|---|---|
| ZIM HAIFA | | |

| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. TOTAL VALUE |
|---|---|---|
| 4601 | | 287675 |

20. DESCRIPTION OF MERCHANDISE

PHENYPROPANOLAMINE,PRAMOXINE,BENZOIC ACID

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER NO. |
|---|---|---|---|---|---|
| M58301 | ZIMUTPE7023092 | 40 | 2939.49.0100 | TW | TWTECCO12TAI |
| M58301 | ZIMUTPE7023094 | 100 | 2934.99.7000 | TW | TWQUACHE11TAI |
| M58301 | ZIMUTPE7023095 | 60 | 2916.31.1105 | TW | TWSANFU21TAI |

| 27. CERTIFICATION | 28. CBP USE ONLY |
|---|---|
| I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.<br><br>SIGNATURE OF APPLICANT  Attorney-In-Fact<br>X J.M. Rodgers Co.<br><br>PHONE NO.          DATE<br>516-872-5570      6/25/07 | ☐ OTHER AGENCY ACTION REQUIRED, NAMELY:<br><br><br>☐ CBP EXAMINATION REQUIRED.<br><br><br>☐ ENTRY REJECTED, BECAUSE: |

| 29. BROKER OR OTHER GOVT. AGENCY USE | |
|---|---|
| Exam Site:  E355  H&M CONTAINER STATI<br>IF AN EXAMINATION IS REQUIRED,<br>THE CARGO WILL BE TRANSFERRED<br>TO THE DESIGNATED EXAMINATION<br>SITE NOTED IN BLOCK 29.      ~<br>Container #:<br>FSCU3862667              200 | EXHIBIT 114 |

| DELIVERY AUTHORIZED: | SIGNATURE | DATE |
|---|---|---|

# Released-ABI Electronic Invoice Entry
I certify that proper release for this
cargo has been received from U.S. Custo
J.M. Rodgers Co., Inc
Authorized by:
Release notification processed by Custo

PAPERWORK REDUCTION ACT NOTICE: This information is needed to determine the admissibility of imports into the United States and to provide the necessary information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary. The estimated average burden associated with this collection of information is 15 minutes per respondent depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to Bureau of Customs and Border Protection, Information Services Branch, Washington, DC 20229, and to the Office of Management and Budget, Paperwork Reduction Project (1651-0024), Washington, DC 20503.

Produced by TradePoint, a Kewill Company

CBP Form 3461 (01/89)

Form Approved
OMB No. 1651-0024

U.S. DEPARTMENT OF HOMELAND SECURITY
Bureau of Customs and Border Protection

# ENTRY/IMMEDIATE DELIVERY

CST# 245

J.M. Rodgers Co., Inc.
1975 LINDEN BLVD
SUITE 301
ELMONT, NY 11003
PH: 516-872-5570
FAX: 516-872-5592

COND RELEASE SPEC DOCUMENT REVIEW
FDA RELEASE

ABI Certified
C.H. BOX #K006
Broker Code: 943

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE NAME | 4. ENTRY NUMBER |
|---|---|---|---|
| 011807 | | 01    Consumption | 943-9014992-3 |

| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | |
|---|---|---|---|
| 4601 | | 9014992  MD    0001 | |

| | 8. CONSIGNEE NUMBER | | 9. IMPORTER NUMBER |
|---|---|---|---|
| | 13-303291200 | | Same |

| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME |
|---|---|
| DASTECH INTL INC 10 CUTTER MILL RD GREAT NECK, NY 11021 | Same |

| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) |
|---|---|---|
| APLU | 12E | E614     SAL SON TRUCKING CO., INC |

| 15. VESSEL CODE/NAME | | |
|---|---|---|
| APL VIRGINIA | | |

| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE |
|---|---|---|---|
| 4601 | | | 9280 |

| 20. DESCRIPTION OF MERCHANDISE |
|---|
| DL-PHENYLPROPANOLAMINE HCL |

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER NO. |
|---|---|---|---|---|---|
| M58301 | APLU401504166 | | 2939.49.0100 | TW | TWTECCO12TAI |
| H | TVLCLNYC6D21EU01 | 8 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 27. CERTIFICATION | 28. CBP USE ONLY |
|---|---|
| I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met. | ☐ OTHER AGENCY ACTION REQUIRED, NAMELY: |

SIGNATURE OF APPLICANT  Attorney-In-Fact
X J.M. Rodgers Co.

| PHONE NO. | DATE |
|---|---|
| 516-872-5570 | 6/25/07 |

☐ CBP EXAMINATION REQUIRED.

29. BROKER OR OTHER GOVT. AGENCY USE

Exam Site:   E355   H&M CONTAINER STATI
IF AN EXAMINATION IS REQUIRED,
THE CARGO WILL BE TRANSFERRED
TO THE DESIGNATED EXAMINATION
SITE NOTED IN BLOCK 29.      ～
Container #:
APHU4531402                    8

☐ ENTRY REJECTED, BECAUSE:

EXHIBIT
116

| DELIVERY AUTHORIZED: | SIGNATURE | DATE |
|---|---|---|

\# Released-ABI Electronic Invoice Entry
I certify that proper release for this
cargo has been received from U.S. Custo
J.M. Rodgers Co., Inc.
Authorized by:
Release notification processed by Custo

PAPERWORK REDUCTION ACT NOTICE: This information is needed to determine the admissibility of imports into the United States and to provide the necessary information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary. The estimated average burden associated with this collection of information is 15 minutes per respondent depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to Bureau of Customs and Border Protection, Information Services Branch, Washington, DC 20229, and to the Office of Management and Budget, Paperwork Reduction Project (1651-0024), Washington, DC 20503.

Produced by TradePoint, a Kewill Company

CBP Form 3461 (01/89)

Form Approved
OMB No. 1651-0024

U.S. DEPARTMENT OF HOMELAND SECURITY
Bureau of Customs and Border Protection

# ENTRY/IMMEDIATE DELIVERY

CST# 245

J.M. Rodgers Co., Inc.
1975 LINDEN BLVD
SUITE 301
ELMONT, NY 11003
PH:  516-872-5570
FAX: 516-872-5587

COND RELEASE SPEC DOCUMENT REVIEW
FDA RELEASE

ABI Certified
C.H. BOX #K006
Broker Code: 943

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE NAME | 4. ENTRY NUMBER |
|---|---|---|---|
| 053107 | | 01    Consumption | 943-9018476-3 |

| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | |
|---|---|---|---|
| 4601 | | 9018476  TC   0003 | |

| 8. CONSIGNEE NUMBER | 9. IMPORTER NUMBER |
|---|---|
| 13-303291200 | Same |

| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME |
|---|---|
| DASTECH INTL INC<br>10 CUTTER MILL RD<br>GREAT NECK, NY 11021 | Same |

| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) |
|---|---|---|
| APLU | 037E | E614    SAL SON TRUCKING CO., INC |

| 15. VESSEL CODE/NAME |
|---|
| MOL EXPEDITOR |

| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE |
|---|---|---|---|
| 4601 | | | 75350 |

**20. DESCRIPTION OF MERCHANDISE**

PSEUDOEPHEDRINE HCL,PHENYPROPANOLAMINE HCL

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER NO. |
|---|---|---|---|---|---|
| M58301 | APLU401691481 | | 2939.42.0000 | TW | TWTECCO12TAI |
| H | TVLCLNYC7503EU01 | 66 | 2939.49.0100 | TW | TWTECCO12TAI |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 27. CERTIFICATION | 28. CBP USE ONLY |
|---|---|

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

SIGNATURE OF APPLICANT  Attorney-In-Fact
X J.M. Rodgers Co.

| PHONE NO. | DATE |
|---|---|
| 516-872-5570 | 6/25/07 |

**29. BROKER OR OTHER GOVT. AGENCY USE**

Exam Site:  E355  H&M CONTAINER STATI
IF AN EXAMINATION IS REQUIRED,
THE CARGO WILL BE TRANSFERRED
TO THE DESIGNATED EXAMINATION
SITE NOTED IN BLOCK 29.    ~
Container #:
TTNU5643878              66

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:

☐ CBP EXAMINATION REQUIRED.

☐ ENTRY REJECTED, BECAUSE:

**EXHIBIT
11c**

| DELIVERY AUTHORIZED: | SIGNATURE | DATE |
|---|---|---|

\# Released-ABI Electronic Invoice Entry
I certify that proper release for this
cargo has been received from U.S. Custo
J.M. Rodgers Co., Inc.
Authorized by:
Release notification processed by Custo

PAPERWORK REDUCTION ACT NOTICE: This information is needed to determine the admissibility of imports into the United States and to provide the necessary information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary. The estimated average burden associated with this collection of information is 15 minutes per respondent depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to Bureau of Customs and Border Protection, Information Services Branch, Washington, DC 20229, and to the Office of Management and Budget, Paperwork Reduction Project (1651-0024), Washington, DC 20503.

Produced by TradePoint, a Kewill Company

CBP Form 3461 (01/89)

U.S. DEPARTMENT OF HOMELAND SECURITY
Bureau of Customs and Border Protection

Form Approved
OMB No. 1651-0024

# ENTRY/IMMEDIATE DELIVERY

CST# 245

J.M. Rodgers Co., Inc.
1975 LINDEN BLVD
SUITE 301
ELMONT, NY 11003
PH: 516-872-5570
FAX: 516-872-5592

PAPERLESS

ABI Certified
C.H. BOX #K006
Broker Code: 943

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE NAME | | 4. ENTRY NUMBER |
|---|---|---|---|---|
| 050607 | | 01    Consumption | | 943-9017992-0 |
| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | | |
| 4601 | | 9017992   1    0001 | | |
| | 8. CONSIGNEE NUMBER | | | 9. IMPORTER NUMBER |
| | 13-303291200 | | | Same |

| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME |
|---|---|
| DASTECH INTL INC<br>10 CUTTER MILL RD<br>GREAT NECK, NY 11021 | Same |

| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) |
|---|---|---|
| KKLU | 13E | E962    E-RAIL TERMINAL |

| 15. VESSEL CODE/NAME | | |
|---|---|---|
| VICTORIA BRIDGE | | |

| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE |
|---|---|---|---|
| 2704 | | | 41383 |

20. DESCRIPTION OF MERCHANDISE

RED PHOSPHOROUS

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER NO. |
|---|---|---|---|---|---|
| I | V0536969145 | | 2804.70.0000 | CN | CNLIATON615LIA |
| M57035 | KKLUSH9992130 | 351 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## 27. CERTIFICATION

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

SIGNATURE OF APPLICANT    Attorney-In-Fact
X J.M. Rodgers Co.

| PHONE NO. | DATE |
|---|---|
| 516-872-5570 | 6/25/07 |

## 28. CBP USE ONLY

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:

☐ CBP EXAMINATION REQUIRED.

☐ ENTRY REJECTED, BECAUSE:

### 29. BROKER OR OTHER GOVT. AGENCY USE

Exam Site:   E355   H&M CONTAINER STATI
IF AN EXAMINATION IS REQUIRED,
THE CARGO WILL BE TRANSFERRED
TO THE DESIGNATED EXAMINATION
SITE NOTED IN BLOCK 29.    ~
Container #:
KKTU7337790              351

| DELIVERY AUTHORIZED: | SIGNATURE | DATE |
|---|---|---|

## ABI Electronic Release ##
I certify that proper release for this
cargo has been received from U.S. Custo
J.M. Rodgers Co. Inc.
Authorized by:
Released:    5/08/07              04:40

PAPERWORK REDUCTION ACT NOTICE: This information is needed to determine the admissibility of imports into the United States and to provide the necessary information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary. The estimated average burden associated with this collection of information is 15 minutes per respondent depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to Bureau of Customs and Border Protection, Information Services Branch, Washington, DC 20229, and to the Office of Management and Budget, Paperwork Reduction Project (1651-0024), Washington, DC 20503.

Produced by TradePoint, a Kewill Company

CBP Form 3461 (01/89)

U.S. DEPARTMENT OF HOMELAND SECURITY
Bureau of Customs and Border Protection

Form Approved
OMB No. 1661-0024

# ENTRY/IMMEDIATE DELIVERY

CST# 245

J.M. Rodgers Co., Inc.
1975 LINDEN BLVD
SUITE 301
ELMONT, NY 11003
PH:  516-872-5570
FAX: 516-872-5592

COND RELEASE SPEC DOCUMENT REVIEW
FDA MAY PROCEED

ABI Certified
C.H. BOX #K006
Broker Code: 943

19 CFR 142.3, 142.16, 142.22, 142.24

| 1. ARRIVAL DATE | 2. ELECTED ENTRY DATE | 3. ENTRY TYPE CODE NAME | 4. ENTRY NUMBER |
|---|---|---|---|
| 042607 | | 01   Consumption | 943-9017448-3 |

| 5. PORT | 6. SINGLE TRANS. BOND | 7. BROKER/IMPORTER FILE NUMBER | |
|---|---|---|---|
| 4601 | | 9017448  MD   0001 | |

| | 8. CONSIGNEE NUMBER | | 9. IMPORTER NUMBER |
|---|---|---|---|
| | 13-303291200 | | Same |

| 10. ULTIMATE CONSIGNEE NAME | 11. IMPORTER OF RECORD NAME |
|---|---|
| DASTECH INTL INC<br>10 CUTTER MILL RD<br>GREAT NECK, NY 11021 | Same |

| 12. CARRIER CODE | 13. VOYAGE/FLIGHT/TRIP | 14. LOCATION OF GOODS-CODE(S)/NAME(S) |
|---|---|---|
| APLU | 15E | F587   VANGUARD LOGISTICS SERVIC |

16. VESSEL CODE/NAME  APL VIETNAM

| 16. U.S. PORT OF UNLADING | 17. MANIFEST NUMBER | 18. G.O. NUMBER | 19. TOTAL VALUE |
|---|---|---|---|
| 4601 | | | 40460 |

20. DESCRIPTION OF MERCHANDISE  PSEUDOEPHEDRINE HCL 40 MESH

| 21. IT/BL/AWB CODE | 22. IT/BL/AWB NO. | 23. MANIFEST QUANTITY | 24. H.S. NUMBER | 25. COUNTRY OF ORIGIN | 26. MANUFACTURER NO. |
|---|---|---|---|---|---|
| M58301 | APLU401644167 | | 2939.42.0000 | TW | TWTECCO12TAI |
| H | TVLCLNYC7329EU01 | 40 | | | |

### 27. CERTIFICATION

I hereby make application for entry/immediate delivery. I certify that the above information is accurate, the bond is sufficient, valid, and current, and that all requirements of 19 CFR Part 142 have been met.

SIGNATURE OF APPLICANT  Attorney-In-Fact
X J.M. Rodgers Co.

| PHONE NO. | DATE |
|---|---|
| 516-872-5570 | 6/25/07 |

### 29. BROKER OR OTHER GOVT. AGENCY USE

Exam Site:  E355  H&M CONTAINER STAT
IF AN EXAMINATION IS REQUIRED,
THE CARGO WILL BE TRANSFERRED
TO THE DESIGNATED EXAMINATION
SITE NOTED IN BLOCK 29.  ~
Container #:
TPHU5077757          40

### 28. CBP USE ONLY

☐ OTHER AGENCY ACTION REQUIRED, NAMELY:

☐ CBP EXAMINATION REQUIRED.

☐ ENTRY REJECTED, BECAUSE:

| DELIVERY AUTHORIZED: | SIGNATURE | DATE |
|---|---|---|

# Released-ABI Electronic Invoice Entry
I certify that proper release for this cargo has been received from U.S. Custo
J.M. Rodgers Co., Inc.
Authorized by:
Release notification processed by Custo

PAPERWORK REDUCTION ACT NOTICE: This information is needed to determine the admissibility of imports into the United States and to provide the necessary information for the examination of the cargo and to establish the liability for payment of duties and taxes. Your response is necessary. The estimated average burden associated with this collection of information is 15 minutes per respondent depending on individual circumstances. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be directed to Bureau of Customs and Border Protection, Information Services Branch, Washington, DC 20229, and to the Office of Management and Budget, Paperwork Reduction Project (1651-0024), Washington, DC 20503.

Produced by TradePoint, a Kewill Company

CBP Form 3461 (01/89)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action 07-01296 (HHK)** |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT 12**

# United States District Court

## DISTRICT OF NEW JERSEY

In the Matter of the Seizure of

**40 DRUMS X 25 KG. FOR A TOTAL OF 1000 KG. OF PSEUDOEPHEDRINE AND 26 DRUMS X 50 KG. FOR A TOTAL OF 1300 KG. OF PHENYLPROPANOLAMINE, LOCATED AT THE U.S. CUSTOMS WAREHOUSE, 888 DOREMUS AVE, NEWARK, NJ 07114**

**SEIZURE WARRANT**

CASE NUMBER: 07-3092

TO: Any Special Agent with the DRUG ENFORCEMENT ADMINISTRATION and any Authorized Officer of the United States,

Affidavit(s) having been made before me by, William J. Salera who has reason to believe that there is now certain property which is subject to forfeiture to the United States, namely;

**40 DRUMS X 25 KG. FOR A TOTAL OF 1000 KG. OF PSEUDOEPHEDRINE AND 26 DRUMS X 50 KG. FOR A TOTAL OF 1300 KG. OF PHENYLPROPANOLAMINE, LOCATED AT THE U.S. CUSTOMS WAREHOUSE, 888 DOREMUS AVE, NEWARK, NJ 07114**

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant in that a protective order may not be sufficient to assure the availability of the property for forfeiture.

**YOU ARE HEREBY COMMANDED** to seize within 10 days the property specified, serving this warrant and making the seizure (in the daytime - 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has been established), leaving a copy of this warrant and receipt for the property seized and prepare a written inventory of the property seized and promptly return this warrant to Honorable Patty Shwartz as required by law.

21 June 2007 /s/ 4:05 p—
Date and Time Issued

Honorable Patty Shwartz, Magistrate Judge
Name and Title of Judicial Officer

at Newark, New Jersey

Signature of Judicial Officer



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action 07-01296 (HHK)** |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

EXHIBIT 13

Back to the Main OTI Query Screen

Information dated as of :   Aug 30 2007 11:00PM

## Query Match Selections - NVOCCs

| | Search Page | Reset |

## Press "Alt s" to repeatedly search page

**Note**: You may search on organization or license number, name or portion of a name or number.  When your search reaches the end of the file, it will return to the top of the file.

FMC-1 OTI/NVOCC Listing

**Note**: Commission regulations permit non-US-based NVOCCs to be licensed or unlicensed (See 46 CFR 515.11, 46 CFR 515.21, also Ocean Transportation Intermediary FAQs available on the Commission website under the FAQ and Notices button). On this listing, unlicensed non-US-based NVOCCs are designated with ** in the License No. field. Licensed non-US-based NVOCCs are included in this list with their license number in the License No. field.

| Org. No. | License No. | Name | NVOCC Trade Name | NVOCC Trade Name | Optional Rider for China Trade (Effective Date) |
|---|---|---|---|---|---|
| 014703 | 004403N | "A" PACIFIC EXPRESS, ENTERPRISES | | | |
| 007823 | 007823N | (EUROPE/U.K.) GENESIS CO. | GENESIS (EUROPE/U.K.) LTD. | | |
| 013854 | 013854N | 0123 VAN LINES, INC., THE | | | |
| 020125 | 020125N | 132 VERMILYEA CORP. | AGUSTIN CARGO EXPRESS | | |
| 019487 | 019487N | 16 EAST TREMONT CORP. | AMERICAN & CARIBBEAN SHIPPING | | |
| 017855 | 017855N | 1ST CLASS INTERNATIONAL, INC. | 1ST CLASS MOVING & SUPPLY | | |
| 019738 | 019738N | 2090 QUISQUEYA SHIPPING, INC. | QUISQUEYA SHIPPING | | |
| 009585 | 009585N | 21ST CENTURY MARITIME, INC. | CENTURY LINE | | |
| 019354 | 019354N | 3PLUS LOGISTICS CO. | | | |
| 019339 | 019339N | 4 A'S CARGO, INC. | | | |
| 015715 | 004600N | 4 SEAS INTERNATIONAL SHIPPING, INC. | | | |
| 016568 | 016568N | 5K LOGISTICS, INC. | HAUL OF FAME LINES | | |
| 016874 | 016874N | 7M TRANSPORT, INC. | | | 2004-08-26 |

| 013740 | 013740N | TICAL SHIPPING INC. |
| 013998 | 013998N | TICO INTERNATIONAL SHIPPING, INC. |
| 020797 | ** | TIDEWATER SHIPPING PRIVATE LIMITED |
| 020532 | ** | TIFFANY CARGO SYSTEMS |
| 015801 | 015801N | TIGER FREIGHT INTERNATIONAL INC. |
| 019292 | 019292N | TILLICUM GLOBAL NETWORKS, INC. |
| 018779 | 018779N | TIMOTHY E. GRANDERSON |
| 017669 | ** | TINSON SHIPPING LIMITED |

| 016268 | 016268N | VALUE-PLUS EXPRESS, INC. | | |
|--------|---------|--------------------------|---|---|
| 018921 | ** | VANAIR FREIGHT INTERNATIONAL (H.K.) LTD. | | |
| 019645 | ** | VANDER T.L.S. LOGISTICS LTD | | |
| 020570 | ** | VANGUARD GLOBAL LOGISTICS LTD | BOX CONSOLIDATORS | |
| 019927 | ** | VANGUARD LOGISTICS SERVICES (HONG KONG) LIMITED | VANGUARD LOGISTICS SERVICES | VANGUARD |
| 015129 | 015129N | VANGUARD MOVING AND STORAGE CO., INC. | GUARDSHIP | |
| 019403 | 019403N | VANTAGE INTERNATIONAL INCORPORATED | TRANS CARGO SERVICES | VANTAGE INTERNATIONAL INC. |
| 019381 | 003862N | VANTEC WORLD TRANSPORT (USA), INC. | | |
| 019392 | ** | VANTEC WORLD TRANSPORT CO., LTD. | | |

| 014467 | 003381N | N.L. CARGO, INC. | FLORIDA CONSOLIDATOR |
| 009797 | 009797N | N.S. AMERICA SERVICE, INC. | |
| 019279 | ** | N.S.I. LOGISTICS CORP. | |
| 017237 | 017237N | NACA LOGISTICS (USA), INC. | |
| 018690 | ** | NAF NORTHERN AIR FREIGHT LTD. | |
| 009475 | 009475N | NAIGAI NITTO AMERICA INC. | |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) **Civil Action 07-01296 (HHK)** |
| | ) |
| ALBERTO GONZALES, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**EXHIBIT 14**

*What Every Member of the*
*Trade Community Should Know About:*

# Entry



**AN INFORMED COMPLIANCE PUBLICATION**

**MARCH 2004**



**U.S. CUSTOMS and BORDER PROTECTION**

## NOTICE:

This publication is intended to provide guidance and information to the trade community. It reflects the position on or interpretation of the applicable laws or regulations by U.S. Customs and Border Protection (CBP) as of the date of publication, which is shown on the front cover. It does not in any way replace or supersede those laws or regulations. Only the latest official version of the laws or regulations is authoritative.

Publication History

First Published: March 2004

## PRINTING NOTE:

This publication was designed for electronic distribution via the CBP website (http://www.cbp.gov) and is being distributed in a variety of formats. It was originally set up in Microsoft Word97®. Pagination and margins in downloaded versions may vary depending upon which word processor or printer you use. If you wish to maintain the original settings, you may wish to download the .pdf version, which can then be printed using the freely available Adobe Acrobat Reader®.

# PREFACE

On December 8, 1993, Title VI of the North American Free Trade Agreement Implementation Act (Pub. L. 103-182, 107 Stat. 2057), also known as the Customs Modernization or "Mod" Act, became effective. These provisions amended many sections of the Tariff Act of 1930 and related laws.

Two new concepts that emerge from the Mod Act are "*informed compliance*" and "*shared responsibility*," which are premised on the idea that in order to maximize voluntary compliance with laws and regulations of U.S. Customs and Border Protection, the trade community needs to be clearly and completely informed of its legal obligations. Accordingly, the Mod Act imposes a greater obligation on CBP to provide the public with improved information concerning the trade community's rights and responsibilities under customs regulations and related laws. In addition, both the trade and U.S. Customs and Border Protection share responsibility for carrying out these requirements. For example, under Section 484 of the Tariff Act, as amended (19 U.S.C. 1484), the importer of record is responsible for using reasonable care to enter, classify and determine the value of imported merchandise and to provide any other information necessary to enable U.S. Customs and Border Protection to properly assess duties, collect accurate statistics, and determine whether other applicable legal requirements, if any, have been met. CBP is then responsible for fixing the final classification and value of the merchandise. An importer of record's failure to exercise reasonable care could delay release of the merchandise and, in some cases, could result in the imposition of penalties.

The Office of Regulations and Rulings (ORR) has been given a major role in meeting the informed compliance responsibilities of U.S. Customs and Border Protection. In order to provide information to the public, CBP has issued a series of informed compliance publications, and videos, on new or revised requirements, regulations or procedures, and a variety of classification and valuation issues.

This publication, prepared by the International Trade Compliance Division, ORR, is a review of the requirements that attach to the "entry" of imported merchandise. We sincerely hope that this material, together with seminars and increased access to rulings of U.S. Customs and Border Protection, will help the trade community to improve voluntary compliance with customs laws and to understand the relevant administrative processes.

The material in this publication is provided for general information purposes only. Because many complicated factors can be involved in customs issues, an importer may wish to obtain a ruling under Regulations of U.S. Customs and Border Protection, 19 C.F.R. Part 177, or to obtain advice from an expert who specializes in customs matters, for example, a licensed customs broker, attorney or consultant. Reliance solely upon general information in this publication may not be sufficient to show the exercise of reasonable care in specific transactions.

Comments and suggestions are welcomed and should be addressed to the Assistant Commissioner at the Office of Regulations and Rulings, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue, NW, (Mint Annex), Washington, D.C. 20229.

Sandra L Bell
Acting Assistant Commissioner
Office of Regulations and Rulings

3

Entry
March 2004

(This page intentionally left blank)

4

INTRODUCTION ......................................................................... 8

ENTRY REQUIRED ..................................................................... 8
General Rule ............................................................................ 8
Exceptions to Entry Requirement .......................................... 8

RIGHT TO MAKE ENTRY ........................................................... 8
Persons Who Can Enter Merchandise .................................... 8
"Financial Interest" in Imported Merchandise ....................... 9
Self-Filing vs. Hiring a Broker ................................................ 9

TYPES OF ENTRY ...................................................................... 9
Different Entry Types ............................................................... 9
Consumption Entries – Formal and Informal ........................ 10

ENTRY PROCESS ..................................................................... 10
Two-Step Process ................................................................... 10
Exception to Two-Step Process: "Live Entry" ...................... 10

CONSEQUENCES OF LATE FILING OF ENTRY DOCUMENTS .......... 11
"General Order" ....................................................................... 11
Demand for Liquidated Damages ........................................... 11

TIME OF ENTRY ........................................................................ 11
Significance of Time of Entry ................................................. 11
Recognized Times of Entry .................................................... 12

BOND REQUIREMENTS ............................................................ 12
Bond Required to Obtain Release .......................................... 12
Basic Importation Bond Conditions ...................................... 13
Transfer of Liability by Means of Superseding Bond ........... 13

SPECIAL PERMIT FOR IMMEDIATE DELIVERY ...................... 13
Entry vs. Special Permit ......................................................... 13
Qualifying Circumstances ...................................................... 14

EXAMINATION, DETENTION AND RELEASE ........................... 14

RECALL OF MERCHANDISE RELEASED FROM CBP CUSTODY ........ 14

ADDITIONAL INFORMATION .................................................... 16
The Internet .............................................................................. 16
Customs Regulations .............................................................. 16

Customs Bulletin ................................................................................. 16
Importing Into the United States ......................................................... 17
Informed Compliance Publications ..................................................... 17
Value Publications .............................................................................. 18
"Your Comments are Important" ......................................................... 19

(This page intentionally left blank)

# INTRODUCTION

The act of entering merchandise consists of the filing of paper or electronic documents with the United States Customs and Border Protection (CBP) containing sufficient information to enable CBP to determine whether imported merchandise may be released from CBP custody. It also includes the filing with CBP of the declared value, classification and rate of duty applicable to the merchandise, and such other information as is necessary to enable CBP to properly assess duties, collect accurate statistics, and determine whether other applicable requirements of law have been met. All such filings must be done using "reasonable care."

# ENTRY REQUIRED

## General Rule

As a general rule, all merchandise imported into the United States is required to be entered, unless specifically excepted. Importation occurs when a vessel or aircraft laden with goods arrives within a port of entry with the intent to discharge its cargo, or upon arrival within the Customs territory of the United States if by vehicle or train. The "Customs territory of the United States" includes only the States, the District of Columbia, and Puerto Rico. The types of imported merchandise for which no entry is required are described below.

## Exceptions to Entry Requirement

Specific exemptions from entry apply to merchandise described in General Note 3(e) of the Harmonized Tariff Schedule of the United States (HTSUS), to certain vessels, to instruments of international traffic, and to certain railway locomotives and cars from Canada and Mexico. The General Note 3(e) exemptions include corpses and accompanying coffins and flowers; telecommunications transmissions; business records and data; articles returned from space; undeliverable articles returned within 45 days and which have remained in the custody of the carrier or foreign customs service; and aircraft parts or equipment removed from U.S. registered aircraft in international traffic because of accident, breakdown or emergency and returned within 45 days of removal.

# RIGHT TO MAKE ENTRY

## Persons Who Can Enter Merchandise

Only certain persons may enter goods. The term "person" in this context means businesses as well as individuals. The entry law, codified at 19 U.S.C. § 1484, limits the right to make entry to the "owner or purchaser" of imported merchandise, or to a licensed "customs broker" who has been appointed by the owner, purchaser, or consignee of the merchandise. Licensed customs brokers are easy to identify, because they are individuals or businesses that have been issued a customs brokers license by

CBP. It is frequently more difficult to determine who qualifies as an owner or purchaser of imported merchandise for "right to make entry" purposes. As a general rule, an owner or purchaser is someone with a financial interest in the transaction.

## "Financial Interest" in Imported Merchandise

Examples of persons with a financial interest in imported merchandise include:

- ❑ The actual owner or purchaser of the goods;
- ❑ A buying or selling agent;
- ❑ A person who imports on consignment;
- ❑ A person who imports under loan or lease;
- ❑ A person who imports for exhibition at a trade fair;
- ❑ A person who imports goods for repair or alteration or further fabrication.

Persons who have no other right, title, or interest in the goods except as possessed under a bill of lading, air waybill, or other shipping document do not have a sufficient financial interest to make entry. Such persons, known as "nominal consignees", typically include freight forwarders, freight consolidators, and express consignment operators. Although nominal consignees may not make entry, their status as consignees confers on them the right to appoint brokers to serve in that capacity.

## Self-Filing vs. Hiring a Broker

Owners and purchasers of imported merchandise may file the entry documents themselves, or engage licensed customs brokers to do so on their behalf. Importers frequently elect to use a broker because the entry process itself can be quite complex. When an owner or purchaser files its own entries, it will appear as the "importer of record" on the entry documentation. The importer of record is the party to an entry transaction who is responsible for the payment of all duties and taxes due on the transaction. An owner or purchaser can also hire a broker to file entries on its behalf, in which case the owner or purchaser may still appear on the entry documentation as the importer of record, or alternatively, the owner or purchaser may ask the broker to assume that role. Whenever a nominal consignee appoints a broker to make entry, the broker is required to be the importer of record. This is because in that situation of the two parties involved only the broker has the right to make entry.

## TYPES OF ENTRY

## Different Entry Types

There are different types of entry, each with their own distinct documentation requirements. Depending on the circumstances, imported merchandise may be entered for consumption, entered for warehouse, admitted into a foreign trade zone, or transported in bond to another port of entry or country. The focus of this publication is on the type of entry required for merchandise entered for consumption.

9

## Consumption Entries – Formal and Informal

Consumption entries are filed when the intent is to introduce the goods into the stream of U.S. commerce.  A consumption entry will be categorized as either "formal" or "informal."  As a general rule, formal entries are required for all shipments valued over $2000.  A lower threshold value of $250 applies to certain trade-sensitive articles, such as textiles.  Less complex informal entries usually may be filed for shipments valued at $2000 or less (or at $250 or less for shipments containing the aforementioned trade sensitive articles).  A subcategory of informal entry, known as a "Section 321" entry, would allow the duty-free entry of a shipment valued at $200 or less that is imported by one person on one day, with minimal attendant documentation requirements.  The term "Section 321" is derived from this provision's statutory source, 19 U.S.C. § 1321(a)(2)(C).

## ENTRY PROCESS

## Two-Step Process

The formal entry process usually involves two steps.  The first is the filing of an entry on Customs Form (CF) 3461, as well as a commercial invoice (or a pro forma invoice when the commercial invoice cannot be produced), packing lists, if appropriate, and such other documentation as is necessary to determine merchandise admissibility.  This must be done within 15 calendar days after landing from a vessel, aircraft or vehicle, after receipt under a permit to transfer, or after arrival at the port of destination in the case of merchandise transported in-bond.  The information contained in these documents enables CBP to determine whether the merchandise covered by the entry requires examination or may be released.  A follow-up entry summary on CF 7501, with estimated duties attached, must be filed within 10 working days after the time of entry.

Both the CF 3461 and the CF 7501 are available in paper as well as electronic formats.  When providing entry information via an electronic data interchange system, the duties may also be scheduled for electronic payment.

## Exception to Two-Step Process:  "Live Entry"

There is an exception to the general rule that making entry is a two-step process.  This exception is known as "live entry."  A live entry occurs when a CF 7501 entry summary, with estimated duties attached, is filed prior to the release of merchandise.  The CF 7501 in this case serves as both the entry and the entry summary.  The practical effect of a live entry is to deprive the importer of the "float" accorded other importers who, by using the two-step process, may delay the deposit of estimated duties by up to ten working days.  The importer also must produce the more detailed summary information up front.

A live entry is filed either at the option of the importer or if required by CBP.  CBP requires live entries in any one of the following circumstances: 1) the importer fails

repeatedly to file timely entry summaries without justification; 2) the importer has not taken prompt action to settle a claim for liquidated damages; 3) the importer has repeatedly delivered entry summary documentation which is incomplete or which contains erroneous information; 4) the importer is substantially or habitually delinquent in the payment of CBP bills; or 5) the merchandise is of a special class, for example, quota.

A broker may not apply for release of merchandise in the broker's name and under the broker's bond on behalf of a client who is required to file live entries.

# CONSEQUENCES OF LATE FILING OF ENTRY DOCUMENTS

## "General Order"

The failure to file a CF 3461 entry (or a CF 7501 entry/entry summary if a live entry) within 15 calendar days of landing, receipt under a permit to transfer, or delivery at the port of destination if transported in-bond, may result in the merchandise being sent to "general order." This means that the goods will go to a bonded warehouse that is eligible to receive and store general order merchandise. Merchandise may remain in general order for up to six months before being sold at public auction.

## Demand for Liquidated Damages

The failure to file a CF 7501 entry summary within 10 working days after the time of entry will result in a demand being made for liquidated damages against the importer of record's basic importation bond.

# TIME OF ENTRY

## Recognized Times of Entry

There are various recognized times of entry. The times of entry are as follows:

❑ When entry documentation (CF 3461) is filed in proper form without an entry summary, the time of entry is:
  ❑ The time of release; or
  ❑ The time the CF 3461 is filed, if requested by the importer on the CF 3461 at the time of filing, and the merchandise has already arrived within the port limits; or
  ❑ The time the merchandise arrives within the port limits, if the entry documentation is submitted before arrival, and if requested by the importer on the entry documentation at the time of submission.

❑ When the entry summary serves as the entry and the entry summary, the time of entry is the time the entry summary is filed in proper form with estimated duties attached.

11

❏  The time of entry of merchandise released under the immediate delivery procedure is the time the entry summary is filed in proper form with estimated duties attached.

❏  The time of entry for quota class merchandise is the time of presentation of the entry summary or withdrawal for consumption in proper form with estimated duties attached, or without estimated duties attached if the entry/entry summary information and a valid scheduled statement date have been successfully received by CBP via ABI.

❏  The time of entry of merchandise withdrawn from warehouse for consumption is when the CF 7501 is filed with estimated duties attached.

## Significance of Time of Entry

The time of entry is important for two distinct reasons: 1) except in the case of a live entry, the entry summary must be filed within 10 working days after the time of entry; and 2) the rates of duty applicable to merchandise are the rates in effect at the time of entry, with three exceptions.  The three exceptions pertain to merchandise entered for warehouse, to merchandise entered for immediate transportation, and to merchandise entered for consumption but removed from customs custody before release and then returned within 90 days ("overcarried merchandise").  Warehoused merchandise is dutiable at the rates in effect at the time of withdrawal from warehouse for consumption. Merchandise entered for immediate transportation is subject to the rates in effect when the immediate transportation entry was accepted at the port of original importation. Finally, overcarried merchandise is subject to the rates in effect at the time of the original entry.

Therefore, importers through their selection of entry filings may effect a time of entry that results in the most favorable rate of duty.

## BOND REQUIREMENTS

## Bond Required to Obtain Release

Merchandise shall not be released from customs custody at the time CBP receives the entry documentation unless a single entry or continuous bond on a CF 301 has been filed.  A single entry bond covers one entry transaction, whereas a continuous bond covers entry transactions that take place over a one-year period.  A basic importation bond is a contract whereby a guarantor (the surety) has an obligation to pay a second party (CBP) upon default by a third party (the importer of record/bond principal) in the performance that the third party owes to the second party.  Basic importation bonds may be secured through approved surety companies, or may be posted in the form of U.S. currency or certain U.S. government obligations.  In the event that a customs broker is employed for the purpose of making entry, the broker may permit the use of his bond to provide the required coverage.

12

## Basic Importation Bond Conditions

As principal on a basic importation bond, the importer of record agrees to comply with the bond conditions specified in Part 113 of the CBP Regulations (19 CFR Part 113), which currently include:

- Agreement to pay duties, taxes and charges.
- Agreement to make or complete entry.
- Agreement to produce documents or evidence.
- Agreement to redeliver merchandise.
- Agreement to rectify any non-compliance with provisions of admission.
- Agreement to hold merchandise for examination.
- Agreement to reimburse or exonerate the United States.
- Agreement to use and handle duty-free merchandise in accordance with the law.
- Agreement to comply with CBP Regulations applicable to CBP security areas at airports.
- Agreement to comply with electronic entry and/or advance cargo information filing requirements.
- Agreement to ensure and establish the issuance of softwood lumber export permit and collection of export fees.

A default on any of these agreements may lead to the assessment of liquidated damages against the obligors (the principal and surety) for breach of the conditions of the bond.

## Transfer of Liability by Means of Superseding Bond

An importer of record may transfer liability for additional or increased duties if he declares at the time of entry that he is not the actual owner of the merchandise. In addition, he must furnish the name and address of such owner, and file both a declaration and a superseding bond of the actual owner within 90 days from the time of entry.

## SPECIAL PERMIT FOR IMMEDIATE DELIVERY

## Entry vs. Special Permit

Under certain circumstances, importers may elect to file an application for a special permit for immediate delivery of their merchandise. In most respects, the procedures are similar to filing an entry, inasmuch as the same CF 3461 is used as the release document. However, the filer will designate the CF 3461 as a special permit instead of as an entry. A CF 7501entry/entry summary, with estimated duties attached, must then be filed within 10 working days of release.

13

## Qualifying Circumstances

By CBP regulations, use of the special permit procedures is allowed in the following circumstances:

- ❏ Land shipments from Canada and Mexico.
- ❏ Shipments of fresh fruits and vegetables from Canada and Mexico, which are transported to the importer's warehouse at the port of arrival for examination, resulting in entry being made only on those portions with commercial value.
- ❏ Shipments of certain quota class merchandise.
- ❏ Shipments of articles for a trade fair.
- ❏ U.S. government shipments.
- ❏ Split shipments for which an election for incremental release has been made.
- ❏ Other shipments when authorized by CBP Headquarters, such as those that occur at the end of the calendar year, when through use of special permit procedures importers may elect a time of entry in the following year when duty rates have decreased.

# EXAMINATION, DETENTION AND RELEASE

CBP has broad authority to examine imported merchandise. After an entry is filed, CBP has 5 working days from the date of presentation for examination to decide whether to release, seize or detain merchandise. This rule applies only when no other agency determines admissibility. If CBP decides to release the merchandise, the port director will issue a permit to release. Merchandise not released within the 5-day period is considered detained.

CBP must issue a detention notice no later than 5 working days after a decision to detain is made, or after a failure to release within the 5-day period. Following notice, CBP has 30 days from the date of presentation for examination to decide whether to release, seize or deny entry of the goods. Goods denied entry may be exported. If no decision is made within 30 days, the merchandise is deemed excluded. The importer may protest the exclusion. A protest under these circumstances shall be deemed denied on the 30th day after it was filed with CBP if CBP has reached no decision. The importer may then appeal directly to the Court of International Trade.

# RECALL OF MERCHANDISE RELEASED FROM CBP CUSTODY

CBP may release merchandise conditionally before all required evidence is produced, before its quantity and value are determined, or before its right of admission into the United States is determined. The importer of record, as a condition of the basic importation bond, agrees to redeliver merchandise to CBP in a timely manner upon demand by CBP, if it:

- ❏ Fails to comply with the laws or regulations governing admission into the United States;

14

❑ Must be examined, inspected, or appraised; or
❑ Must be marked with the country of origin as required by law or regulation.

A demand for redelivery will be made on CF 4647 no later than 30 days after the date that the merchandise was released or 30 days after the end of the conditional release period, whichever is later. A conditional release period is established in one of two ways:

1. By regulation, *e.g.,* 19 CFR 141.113(b) (180 days to determine country of origin of textiles); or
2. By notifying the importer of record of a conditional release period within 30 days after release, such as through issuance of a CF 28 "Request for Information" requesting a sample. The issuance of a notice establishes the beginning of the conditional release period; the period ends when CBP receives the sample.

A failure to comply with a request for redelivery will result in the issuance of a demand for liquidated damages.

15

# ADDITIONAL INFORMATION

## The Internet

The home page of U.S. Customs and Border Protection on the Internet's World Wide Web, provides the trade community with current, relevant information regarding CBP operations and items of special interest. The site posts information -- which includes proposed regulations, news releases, publications and notices, etc. -- that can be searched, read on-line, printed or downloaded to your personal computer. The web site was established as a trade-friendly mechanism to assist the importing and exporting community. The web site also links to the home pages of many other agencies whose importing or exporting regulations that U.S. Customs and Border Protection helps to enforce. The web site also contains a wealth of information of interest to a broader public than the trade community. For instance, on June 20, 2001, CBP launched the "Know Before You Go" publication and traveler awareness campaign designed to help educate international travelers.

The web address of U.S. Customs and Border Protection is http://www.cbp.gov

## Customs Regulations

The current edition of *Customs Regulations of the United States* is a loose-leaf, subscription publication available from the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402; telephone (202) 512-1800. A bound, 2003 edition of Title 19, *Code of Federal Regulations*, which incorporates all changes to the Regulations as of April 1, 2003, is also available for sale from the same address. All proposed and final regulations are published in the *Federal Register*, which is published daily by the Office of the Federal Register, National Archives and Records Administration, and distributed by the Superintendent of Documents. Information about on-line access to the *Federal Register* may be obtained by calling (202) 512-1530 between 7 a.m. and 5 p.m. Eastern time. These notices are also published in the weekly *Customs Bulletin* described below.

## Customs Bulletin

The *Customs Bulletin and Decisions ("Customs Bulletin")* is a weekly publication that contains decisions, rulings, regulatory proposals, notices and other information of interest to the trade community. It also contains decisions issued by the U.S. Court of International Trade, as well as customs-related decisions of the U.S. Court of Appeals for the Federal Circuit. Each year, the Government Printing Office publishes bound volumes of the *Customs Bulletin*. Subscriptions may be purchased from the Superintendent of Documents at the address and phone number listed above.

16

## Importing Into the United States

This publication provides an overview of the importing process and contains general information about import requirements. The February 2002 edition of *Importing Into the United States* contains much new and revised material brought about pursuant to the Customs Modernization Act ("Mod Act"). The Mod Act has fundamentally altered the relationship between importers and U.S. Customs and Border Protection by shifting to the importer the legal responsibility for declaring the value, classification, and rate of duty applicable to entered merchandise.

The February 2002 edition contains a section entitled "Informed Compliance." A key component of informed compliance is the shared responsibility between U.S. Customs and Border Protection and the import community, wherein CBP communicates its requirements to the importer, and the importer, in turn, uses reasonable care to assure that CBP is provided accurate and timely data pertaining to his or her importation.

Single copies may be obtained from local offices of U.S. Customs and Border Protection, or from the Office of Public Affairs, U.S. Customs and Border Protection, 1300 Pennsylvania Avenue NW, Washington, DC 20229.  An on-line version is available at the CBP web site.  *Importing Into the United States* is also available for sale, in single copies or bulk orders, from the Superintendent of Documents by calling (202) 512-1800, or by mail from the Superintendent of Documents, Government Printing Office, P.O. Box 371954, Pittsburgh, PA 15250-7054.

## Informed Compliance Publications

U.S. Customs and Border Protection has prepared a number of Informed Compliance publications in the "*What Every Member of the Trade Community Should Know About:...*" series.  Check the Internet web site http://www.cbp.gov for current publications.

17

## Value Publications

*Customs Valuation under the Trade Agreements Act of 1979* is a 96-page book containing a detailed narrative description of the customs valuation system, the customs valuation title of the Trade Agreements Act (§402 of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979 (19 U.S.C. §1401a)), the Statement of Administrative Action which was sent to the U.S. Congress in conjunction with the TAA, regulations (19 C.F.R. §§152.000-152.108) implementing the valuation system (a few sections of the regulations have been amended subsequent to the publication of the book) and questions and answers concerning the valuation system. A copy may be obtained from U.S. Customs and Border Protection, Office of Regulations and Rulings, Value Branch, 1300 Pennsylvania Avenue, NW, (Mint Annex), Washington, D.C. 20229.

*Customs Valuation Encyclopedia* (with updates) is comprised of relevant statutory provisions, CBP Regulations implementing the statute, portions of the Customs Valuation Code, judicial precedent, and administrative rulings involving application of valuation law. A copy may be purchased for a nominal charge from the Superintendent of Documents, Government Printing Office, P.O. Box 371954, Pittsburgh, PA 15250-7054. This publication is also available on the Internet web site of U.S. Customs and Border Protection.

The information provided in this publication is for general information purposes only. Recognizing that many complicated factors may be involved in customs issues, an importer may wish to obtain a ruling under CBP Regulations, 19 C.F.R. Part 177, or obtain advice from an expert (such as a licensed Customs Broker, attorney or consultant) who specializes in customs matters. Reliance solely on the general information in this pamphlet may not be considered reasonable care.

Additional information may also be obtained from U.S. Customs and Border Protection ports of entry. Please consult your telephone directory for an office near you. The listing will be found under U.S. Government, Department of Homeland Security.

March 2004

**"Your Comments are Important"**

The Small Business and Regulatory Enforcement Ombudsman and 10 regional Fairness Boards were established to receive comments from small businesses about Federal agency enforcement activities and rate each agency's responsiveness to small business. If you wish to comment on the enforcement actions of U.S. Customs and Border Protection, call 1-888-REG-FAIR (1-888-734-3247).

**REPORT SMUGGLING 1-800-BE-ALERT OR 1-800-NO-DROGA**



**Visit our Internet web site: http://www.cbp.gov**

19

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

EXHIBIT 15

# TIGER FREIGHT INTERNATIONAL INC.

150-30 132ND AVE. SUITE 307
JAMAICA NY 11434

Original

E-MAIL: tiffany@tigerfreightusa.com    Tel:718-341-3677        Fax:718-341-5670        E-MAIL: anniewu@tigerfreightusa.com

## ARRIVAL NOTICE / FREIGHT INVOICE

Revised

DASTECH INTERNATIONAL, INC.
10 CUTTER MILL ROAD,
GREAT NECK, NY 11021

Tel : 516-466-7676    Fax : 516-466-7699
To :LUZ / AD                     [DASTINTE    ]

Consignee : DASTECH INTERNATIONAL, INC.
Tel :516-466-7676    Fax : 516-466-7699
To :LUZ / AD

Feeder_vsl / voy.
Port of Loading      KEELUNG TAIWAN
Vessel Name / voy    APL VIETNAM V. 015E

Port of Discharge    NEW YORK NY
Port of Destination  NEW YORK NY
Place of Delivery
Cargo Location       NACA LOGISTICS USA INC.
Facility code        F587
IT Number                            on    / /          at

| Seac code: | |
| Contract No. | |
| Invoice No. /Date | OS18052          04/18/07 |
| Customer Ref. | |
| Ref.    No. | OI07040261-2 |
| HB/L No. | LNYC7329EU01 |
| Sub HB/L No. | |
| Shipper : | TECHNOCO CO.,LTD. |
| Broker/Notify | J.M.RODGEGS CUSTOMS BROKE |
| Telephone | 516-872-5570    Fax: 516-872-5589 |
| Attention | STEPHANIE/JESSICA |
| Place of Receipt | |
| Loading Date | 04/05/07 |
| Ocean B/L No. | APLU401644167 |
| A.M.S. No. | TVLCLNYC7329EU01 |
| Discharge Date | 04/26/07 |
| ETA Date | 04/26/07 |
| ETA Date | / /      4.89 _ KEITH |
| Telephone /Fax | 732-802-4000        732-802-4055/0 |
| | CUSTOM'S DAD REQUIRED |

| MARKS & NOS. | DESCRIPTIONS | CONTAINER NO. |
|---|---|---|
| PSEUDOEPHEDRINE CHL, USP-29 | 40 DRUMS PSEUDOEPHEDRINE HYDROCHLORIDE, USP - 29 | 07-146 |
| C.A.S. #:345-78-8 | | |
| LOT NO:70202 | | |
| NET WEIGHT :25.0 KGS | | MAY 2 9 .07 |
| GROSS WEIGHT :28.5 KGS | | |
| MADE IN TAIWAN | FREIGHT PREPAID | TPHU5077757 /LCL / |

PCS: 40 DRUMS                  CFS/CFS          WT:  1140.00 KGS  2513.24 LBS
Prepared by:  ANNIE                             CBM:  3.440      FREIGHT PREPAID: $    0.00

1. Only money order or broker check are acceptable.
2. Freight can be released only upon receipt of charges
   shown below or properly endorsed original Bill of Lading.
3. Please allow at least 24 to 48 hours from the time that
   Tiger Freight receives your payment and/or original
   Bill of Lading for process freight release.
4. Please arrange pick up your shipment asap to avoid
   additional charges from warehouse.

NO ORIGINAL BILL OF LADING REQUIRED !
**Please make check payable to:**
**TIGER FREIGHT INTERNATIONAL INC.**



| IMPORT SERVICE CHARGE | 65.00 |
| WHSE IN / OUT | 169.30 |
| EXAM CHARGE | 276.15 |

**REVISED**
5-25-07

*Total balance $276.15 —*

Total :      $   510.45

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Civil Action 07-01296 (HHK)** |
| | ) | |
| ALBERTO GONZALES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

EXHIBIT 16

hjkhjkhjk



**Transportation and Marketing**

AMS    USDA    SEARCH

**Shipper and Exporter Assistance**

## Non-Vessel Operating Common Carrier

Smaller shippers, with less-than-containerload (LCL) shipments, can take advantage of the lower costs associated with being a big shipper. Non-vessel operating common carriers (NVOCCs) book space on steamships in large quantities at lower rates and sell space to shippers in smaller amounts. NVOCCs consolidate small shipments into containerloads that move under one bill of lading. More favorable rates are passed on to the shipper. Services typically offered by NVOCCs, in addition to customary services provided by freight forwarders, are:

- Consolidation of freight, and

- Financial liability for goods due to loss or damage during transport.

NVOCCs operate as carriers and should be evaluated by applying the same service, price, and delivery standards.



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

EXHIBIT 17

# TIGER FREIGHT INTERNATIONAL INC.

150-30 132ND AVE. SUITE 307
JAMAICA, NY 11434
Tel: 718-341-3677    Fax: 718-341-5670    TIGERFREIGHT@EARTHLINK.NET

## TURNOVER LETTER

**To:** SALSON CONTAINER FREIGHT SERVICES
888 DOREMUS AVENUE

NEWARK NJ 07114

**TEL:** 973-986-0250    **FAX:** 973-368-1959

**Date** 06/04/2007 12:22:54 PM
**Ref. No.** OI07050356

FAXED
6/4/07

TIGER FREIGHT INTERNATIONAL INC.

IS HEREBY TURNING OVER THE FOLLOWING CARGO TO :

DASTECH INTERNATIONAL, INC.
10 CUTTER MILL ROAD,
GREAT NECK, NY 11021

06-201

| | | |
|---|---|---|
| FEEDER VSL/VOY. | | |
| NAME OF VESSEL | MOL EXPEDITOR V. 037E | |
| PLACE OF RECEIPT | | |
| PORT OF LOADING /ETD | KEELUNG TAIWAN | / 05/10/2007 |
| PORT OF DSTN /ETA | NEW YORK NY | / 05/31/2007 |
| PLACE OF DELIVERY | | / |
| MASTER/HOUSE B / L | APLU401691481 | / LNYC7503EU01 |
| I.T. NUMBER | ON / / | AT |
| PACKAGES / WT /CBM | 66 DRUMS | / 2497.00 K / CBM 6.600 |
| COMMODITY | 1,000KGS PSEUDOEPHEDRINE | |
| CARGO LOCATION | SALSON CONTAINER FREIGHT SERVICES | TEL: 973-986-0250 |
| | Facility Code E614 | CUSTOM'S DAD REQUIRED |
| SERVICE MODE | CFS/CFS | |
| CONTAINER # | TTNU5643878 /40' / | |

*** Important **
This must be surrendered to the warehouse for cargo pick up.

Sincerely,

(Signature)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

————————————————————
DASTECH INTERNATIONAL, INC., *et al.*,

               Plaintiffs,

      v.

ALBERTO GONZALES, *et al.*,

            Defendants.
————————————————————

)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Action 07-01296 (HHK)**

**EXHIBIT 18**

SalSoft.com



CENTRALIZED EXAM SITE    CONTAINER FREIGHT STATION    TRUCKLOAD    LTL    WAREHOUSING

OVERVIEW

IPI RATES AND LOCATIONS

AVAILABILITY

CUSTOMER LOGIN

RATE QUOTES

HOME | ABOUT US | CONTACT US | EMPLOYMENT | SITE MAP

Select Option

## CONTAINER FREIGHT STATION
## OVERVIEW

**We provide customized service to the import/export industry by paying particular attention to detail. SalSon CFS will provide you with personal service that will cater to your exact requirements.**

**ALL-ENCOMPASSING SERVICES INCLUDE:**

- Guaranteed 24 hour stripping (same day pick-up and evening stripping for next day availability)
- Stripping for same day availability upon request
- Sorting and segregation
- Labeling, shrink wrapping and palletizing of cargo
- P.T.I. abd I.T. preparation and customs validation
- Annual blanket (P.T.I.) with all major steamship lines
- Fully computerized on-line CFS program
- CFS out ports with delivery days

**TRANSPORTATION**

- Expedited nationwide LCL delivery
- Local pickup, as well as pier and airport pickup service
- Local delivery, flat goods or Garment on Hanger
- Full container pickup and delivery service
- Nationwide I.T. delivery schedules, 2 to 4 day service offered to all points east of the Mississippi
- 2 to 4 days service to all points west of the Mississippi
- 4 to 7 days service offered to all points east of the Mississippi
- Salson Trucking has been given the highest safety rating by the U.S. Department of Transportation.
- We hold a complete set of common carrier and contract carrier certificates.

**DISPATCHING & INVOICING SERVICES**

The heart of SalSon Trucking features state of the art dispatching and invoicing services.

- We operate on a 24 hours/7 days a week schedule.
- A three stage computer system allows original shipping information to travel automatically from dispatched order to delivery receipt and then directly into invoicing. This system

http://www.salson.com/container.html



SalSon.com

- eliminates billing errors and facilitates a much faster turn-around time.
- Our team of professional and courteous dispatchers are supported by the latest technology in radio equipment, database transmissions and global positioning satellite services takes the guess work out of selecting a drayman.

**The cornerstone of our company has been to provide our customers with the highest standards of service. You can be certain that you made the right choice!**

CORPORATE HEADQUARTERS AT PORT NEWARK: 888 DOREMUS AVENUE  NEWARK, NJ 07114  T 973.986.0200  F 973.368.1950

©2005-07 SALSON. ALL RIGHTS RESERVED.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                          )
DASTECH INTERNATIONAL, INC., et al.,      )
                                          )
                Plaintiffs,               )
                                          )
        v.                                )      Civil Action 07-01296 (HHK)
                                          )
ALBERTO GONZALES, et al.,                 )
                                          )
                                          )
                Defendants.               )
_____)
```

EXHIBIT 19

Shipment Details

Automated Targeting System

Import Shipment - Details

**Conveyance: APLU APL VIETNAM/15   Mode: SEA   ProbCtry: TW**
**SID: 56235798Z   Scores: TEST1: 0   OCEN4: 41**

Bill (M): APLU40104416.7 ArrDt: 04/27/2907 POU: 1701 CnstNbr: 0
Carrier: AMERICAN PRESIDENT LINES (APL)

S: ORIENTAL LOGISTICS GROUP LIMITED
6F,88,SEC.2,NANKING E.RD.,TAIPEI,TA
TAIPEI

C: NACA LOGISTICS(USA)INC. 
AS AGENT FOR VANGUARD LOGISTICS
SERVICE.300 MIDDLESEX AVE,CARTERET,
NJ07008, ATTN:JACKY TEL:732-969-880
FAX:732-802-4055

M: NACA LOGISTICS(USA)INC. 
AS AGENT FOR VANGUARD LOGISTICS
SERVICE.300 MIDDLESEX AVE,CARTERET,
NJ07008, ATTN:JACKY TEL:732-969-880

1stBill:
LastBill:          04/02/07 06:28
NoEnts:            04/09/07 05:08
Qty:               0
Weight:            774 W/CS
Volume:            18879 KG
FqmPid:            53 CM
PortLa:            TAOYUAN CHINA
IBType:            58309
ISValu:            61
IBDest:            0
IBFdes:
PTPPort:
FROB:              N
MTBFNg:            5005/
(BSCAC:
IBNbr:             950871180
SHBill:
SprChrr:
HseBill:

LstBill:
LastBill:
NoEnts:
Qty:
Weight:
Volume:
FqmPid:

Entry: 9Z3/9013.1483 POE: 4601 CredDt: 04/30/2007 ReId
Filer: JM RODGERS CO., INC.
I: DASTECH INTL INC
10 CUTTERMILL RD

L: GREAT NECK, NY 110213201
DASTECH INTL INC.
10 CUTTERMILL RD
GREAT NECK, NY 110213201
ID: 13-30329 1200

More...

L:1  HTS: 29394 0000   CO: TW   M: TECHNOCO CO.,LTI
     Desc: PSEUDOEPHEDRINE AND ITS SALTS
     Upd: 04/27/2007   MID: TWTECCO12TAI   Val

NoBill:      2
Quanty:      774
Value:       4046
EntType:     01
RisType:
SetType:     2

PTRMS:       F587
ActArvl:     04/2
InspNfy:     Y
PosQuot:
Paperlx:     E
BRASS:

Container No.: TPHU5077757   No. Bills: 27   Seal 1, 2:
APL8090866, None
Container Type: G0   Equipment Type: CN   Service Type: CY
Cntr Length (feet): 40
Cargo Description:
AUTO PARTS

P/N: 026GA101X GEAR & PINION
ASSY-HYPOID DRIVE

Piece Count: 774

Containers:

☐ Hide Zero-Weighted
TEST1OCEN4   Rule ID        Rule Name/Type        Rule Findings: 25   Not Shown: 0        Rule Data

Query ID   Previous   Next View   Prev Err                27 record(s) retrieved.        Record 1 12 13 14 15 16 of 27

ATS Hotline: (703)

HOME   FIND   CREATE   REP

Page 1 of 1

13

Case 1:07-cv-01296-HHK   Document 15-2   Filed 08/10/2007   Page 2 of 11

Bill [N]: 'IVLCLNYC7503EU01 ArrDt: 05/10/7200    PU: 1001
CostNbr: 0

Carrier: T Y L CONTAINER LINE

**S:** TECHNOCO CO., LTD. @
9 FL., NO.1-2 NANDING WEST RD.
TAIPEI
TAIWAN

**C:** DASTECH INTERNATIONAL, INC. @
10 CUTTER MILL RD.,
GREAT NECK NY 11021
USA

**Ni:** DASTECH INTERNATIONAL, INC. @
10 CUTTER MILL RD.,
GREAT NECK NY 11021
USA

1stBill: 05/07/07 03:16
LastBill: 05/07/07 03:16
NoItems: 0
QtY: 660 DRM
Weight:
Volume:
PgePlac:
IBType:
IsValue: 0
IBDest:
IBFDest:
PTPPort:
PROB: N
FROM: 1&2Nbyt APLU/
MIBFlg:
INSCAC:
SHBill:
SpecCntn:
HonBill:
PortAi: 56309
PortD: KEELUNG CHINA

**Containers:**

**Containers: 1**

Container No.: TIMU5643878   No. Bills: 17   Seal 1, 2:
APL8050904, None, None,
Container Type: None   Equipment Type: AC   Service Type: PP
Cntr Length (feet): 0

Cargo Description:
SODIUM DICHLORO-S-TRIAZINETRIONE, USP-29;
SODIUM HYPOCHLORITE, USP-29;
Piece Count 66
SODIUM HYDROXIDE, USP-29;
SENE) USP-29 WITH 90% IN PASS THRU 200 MESH
NORMAL MESH 140

Marks & Numbers:
NO MARKS

Entry / POE: 1001    Credt:

## No Entry Data

*Pseudo / MFA*

*Current Shipment*



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC., *et al.*,

        Plaintiffs,

     v.

ALBERTO GONZALES, *et al.*,

        Defendants.

**Civil Action 07-01296 (HHK)**

# EXHIBIT 20



Privacy Impact Assessment
for the

# Automated Targeting System

November 22, 2006

**Contact Point**
**Phil Landfried**
**Office of Information and Technology**
**U.S. Customs and Border Protection**
**(703) 822-6237**

**Reviewing Official**
**Hugo Teufel III**
**Chief Privacy Officer**
**Department of Homeland Security**
**(571) 227-3813**



 **Homeland Security**

# Abstract

The Department of Homeland Security (DHS), Customs and Border Protection (CBP) has developed the Automated Targeting System (ATS). ATS is one of the most advanced targeting systems in the world. Using a common approach for data management, analysis, rules-based risk management, and user interfaces, ATS supports all CBP mission areas and the data and rules specific to those areas. This PIA is being conducted in conjunction with the System of Records Notice (SORN) that was published on November 2, 2006 in the *Federal Register*.

# Introduction

ATS is an Intranet-based enforcement and decision support tool that is the cornerstone for all CBP targeting efforts. CBP uses ATS to improve the collection, use, analysis, and dissemination of information that is gathered for the primary purpose of targeting, identifying, and preventing potential terrorists and terrorist weapons from entering the United States. Additionally, ATS is utilized by CBP to identify other violations of U.S. laws that are enforced by CBP. In this way, ATS allows CBP officers to focus their efforts on travelers and cargo shipments that most warrant greater scrutiny. ATS standardizes names, addresses, conveyance names, and similar data so these data elements can be more easily associated with other business data and personal information to form a more complete picture of a traveler, import, or export in context with previous behavior of the parties involved. Every traveler and all shipments are processed through ATS, and are subject to a real-time rule based evaluation.

ATS provides equitable treatment for all individuals in developing any individual's risk assessment score, because ATS uses the same risk assessment process for any individual using a defined targeting methodology for a given time period at any specific port of entry.

ATS receives various data in real time from the following different CBP mainframe systems: the Automated Commercial System (ACS), the Automated Export System (AES), the Automated Commercial Environment (ACE), and the Treasury Enforcement Communication System (TECS). ATS collects certain data directly from commercial carriers in the form of a Passenger Name Record (PNR). Lastly, ATS also collects data from foreign governments and certain express consignment services in conjunction with specific cooperative programs.

ATS accesses data from these sources, which collectively include electronically filed bills, entries, and entry summaries for cargo imports; shippers' export declarations and transportation bookings and bills for cargo exports; manifests for arriving and departing passengers; land-border crossing and referral records for vehicles crossing the border; airline reservation data; nonimmigrant entry records; and records from secondary referrals, incident logs, suspect and violator indices, and seizures.

In addition to providing a risk-based assessment system, ATS provides a graphical user interface (GUI) for many of the underlying legacy systems from which ATS pulls information. This interface improves the user experience by providing the same functionality in a more rigidly controlled access environment than the underlying system. Access to this functionality of ATS uses existing technical security and privacy safeguards associated with the underlying systems.



ATS consists of six modules that provide selectivity and targeting capability to support CBP inspection and enforcement activities.

- ATS-Inbound – inbound cargo and conveyances (rail, truck, ship, and air)

- ATS-Outbound – outbound cargo and conveyances (rail, truck, ship, and air)

- ATS-Passenger (ATS-P) – travelers and conveyances (air, ship, and rail)

- ATS-Land (ATS-L) - private vehicles arriving by land

- ATS - International (ATS-I) - cargo targeting for CBP's collaboration with foreign customs authorities

- ATS-Trend Analysis and Analytical Selectivity Program, (ATS-TAP) (analytical module)

Five of these modules are operational and subject to recurring systems' maintenance. They are: the ATS cargo modules, import, and export (ATS Inbound and ATS Outbound); the ATS-Passenger module; the ATS-Land module; and ATS-Analytical module. The ATS-International module is being developed to support collaborative efforts with foreign customs administrations.

As part of an ongoing effort to review and update system of records notices, CBP published a new SORN for ATS in the *Federal Register* on November 2, 2006 located at 71 FR 64543. This information collection was previously covered by the legacy TECS SORN.

ATS System Overview

Currently, ATS consists of six modules that focus on exports, imports, passengers and crew (airline passengers and crew on international flights, passengers and crew on sea carriers), private vehicles crossing at land borders, and import trends over time. ATS assists CBP officers at the borders effectively and efficiently identify cargo, individuals, or conveyances that may present additional risk to the United States. A large number of rules are included in the ATS modules, which encapsulate sophisticated concepts of business activity that help identify suspicious or unusual behavior. The ATS rules are constantly evolving to both meet new threats and refine existing rules. ATS applies the same methodology to all individuals to preclude any possibility of disparate treatment of individuals or groups. ATS is consistent in its evaluation of risk associated with individuals and is used to support the overall CBP law enforcement mission.

- *ATS-Inbound* is the primary decision support tool for inbound targeting of cargo. This system is available to CBP officers at all major ports (air/land/sea/rail) throughout the United States, and also assists CBP personnel in the Container Security Initiative (CSI) decision-making process. ATS Inbound provides CBP officers and Advance Targeting Units (ATU) with an efficient, accurate, and consistent method for targeting and selecting high-risk inbound cargo for intensive examinations.  ATS-Inbound assists in identifying imported cargo shipments, which pose a high risk of containing weapons of mass effect, narcotics, or other contraband.  ATS-Inbound increases the effectiveness of CBP officers dealing with imported cargo by improving the accuracy of the targeting of weapons of mass effect, narcotics or other contraband, commercial fraud violations, and other violations of U.S. law. The approach is to process data pertaining to entries and manifests

 **Homeland Security**

against a variety of rules to make a rapid automated assessment of the risk of each import. Entry and manifest data is received from the Automated Manifest System (AMS), Automated Broker Interface (ABI), and the Automated Commercial Environment (ACE).

- *ATS-Outbound* is the outbound cargo targeting module of ATS that assists in identifying exports which pose a high risk of containing goods requiring specific export licenses, narcotics, or other contraband. ATS-Outbound uses Shippers' Export Declaration (SED) data that exporters file electronically with CBP's AES.[1] The SED data extracted from AES is sorted and compared to a set of rules and evaluated in a comprehensive fashion. This information assists CBP officers with targeting and/or identifying exports with potential aviation safety and security risks, such as hazardous materials and Federal Aviation Administration (FAA) violations. In addition, ATS-Outbound identifies the risk of specific exported cargo for such export violations as smuggled currency, illegal narcotics, stolen vehicles or other contraband.

- *ATS-Passenger* (ATS-P) is the module used at all U.S. airports and seaports receiving international flights and voyages to evaluate passengers and crewmembers prior to arrival or departure. It assists the CBP officer's decision-making process about whether a passenger or crewmember should receive additional screening prior to entry into or departure from the country because the traveler may pose a greater risk for violation of U.S. law. The system analyzes the Advance Passenger Information System (APIS) data from TECS, Passenger Name Record (PNR) data from the airlines, TECS crossing data, TECS seizure data, and watched entities. ATS-P processes available information from these databases to develop a risk assessment for each traveler. The risk assessment is based on a set of National- and user-defined rules which are comprised rule sets that pertain to specific operational/tactical objectives or local enforcement efforts.

- *ATS-Land* (ATS-L) is a module of ATS that provides for the analysis and rule-based risk assessment of private passenger vehicles crossing the nation's borders. By processing and checking of the license plate numbers of vehicles seeking to cross the border, ATS-L allows CBP officers to cross-reference the TECS crossing data, TECS seizure data, and State Department of Motor Vehicle (DMV) data[2] to employ the weighted rules-based assessment system of ATS. In this way ATS-L provides, within seconds, a risk assessment for each vehicle that assists CBP Officers at primary booths in determining whether to allow a vehicle to cross without further inspection or to send the vehicle for secondary evaluation.

---

[1] The Shipper's Export Declaration (SED), Commerce Form 7525-V, is used to compile the official U.S. export statistics for the United States and for export control purposes. The regulatory provisions for preparing, signing and filing the SED are contained in the Foreign Trade Statistics Regulations (FTSR), Title 15 Code of Federal Regulations (CFR) Part 30.

[2] DMV data to support ATS-L is obtained from a government source, National Law Enforcement Telecommunications System (NLETS). DMV data obtained to support ATS-L will only be used to support land border targeting applications. Access to the ATS-L application and the DMV data it uses are limited to DHS users including CBP officers and Border Patrol Agents. No other use or dissemination of DMV data will be performed by CBP.



- *ATS-International* (ATS-I) is being developed to provide foreign customs authorities with controlled access to automated cargo targeting capabilities and provide a systematic medium for exchanging best practices and developing and testing targeting concepts. The exchange of best practices and technological expertise can provide vital support to other countries in the development of effective targeting systems that can enhance the security of international supply chains and fulfill the objective of harmonizing targeting methodologies. If information from foreign authorities is run through the ATS-I module, it may also, consistent with applicable cooperative arrangements with that foreign authority, be retained in ATS-I by CBP to enhance CBP's targeting capabilities.

- *ATS-Trend Analysis and Analytical Selectivity* (ATS-TAP,) improves CBP's ability to examine, locate, and target for action violators of US laws, treaties, quotas, and policies regarding international trade. ATS-Analytical offers trend analysis and targeting components. The trend analysis function summarizes historical statistics that provide an overview of trade activity for commodities, importers, manufacturers, shippers, nations, and filers to assist in identifying anomalous trade activity in aggregate.

ATS supports the decision-making process and reinforces the role of the trained professionals making independent decisions necessary to identify violations of U.S. law at the border.

# Section 1.0 Information Collected and Maintained

The following questions are intended to define the scope of the information requested as well as the reasons for its collection as part of the system, rule, and/or technology being developed.

## 1.1    What information is to be collected?

Generally, ATS collects and maintains personally identifiable information relating to name, risk assessment, and the internal system rules upon which the assessment is based and Passenger Name Record data obtained from commercial carriers.

In order to build the risk assessment, ATS uses data obtained from other governmental information systems including: electronically filed bills, entries, and entry summaries for cargo imports; shippers' export declarations and transportation bookings and bills for cargo exports; manifests for arriving and departing passengers and crew; airline reservation data; nonimmigrant entry records; and records from secondary referrals, CBP incident logs, suspect and violator indices, state Department of Motor Vehicle Records, and seizure records.

- ATS-Inbound: Collects information about importers, cargo, and conveyances used to facilitate the importation of cargo into the United States. This includes personally identifiable information (e.g., name, address, birth date, government issued identifying records, where available and applicable) concerning individuals associated with imported cargo: brokers, carriers, shippers, buyers, sellers, and crew.



- ATS-Outbound: Collects information about exporters, cargo, and conveyances used to facilitate the exportation of cargo from the United States. This includes personally identifiable information (*e.g.*, name, address, birth date, government issued identifying records, where available and applicable) concerning individuals associated with exported cargo: brokers, carriers, shippers, buyers, sellers, and crew.

- ATS-P: Collects information about passengers and crew entering or departing the United States. This data includes passenger and crew manifests (through APIS), immigration control information, and PNR data. The PNR data may include such items as name, address, flight, seat number, and other information collected by the airline in connection with a particular reservation (Appendix B contains a list of PNR data elements). Not all carriers capture the same amount of information; the number of items captured may even vary among individual PNR from the same carrier.

- ATS-L: Collects information about vehicles and persons entering the U.S. at land border ports of entry. This data includes license plate numbers for vehicles entering the United States, vehicle, and registered owner data (derived from state DMV records). ATS-L receives license plate number via TECS. Using that license plate number, ATS-L then queries DMV data via National Law Enforcement Telecommunications System (NLETS) to obtain registration information for that vehicle (name, date of birth, address of the registered owner).

- ATS-I: Provides an interface for access to cargo targeting functionality by foreign customs authorities, as defined in separate information sharing arrangements. ATS-I permits foreign customs authorities to view restricted cargo information in ATS-Inbound coming from or to their nations, according to their own queries, or to add data, separately collected from their own systems, to be targeted against the developed screening queries. ATS-I collects trade data and related personally identifiable information (*e.g.*, name, address, birth date, government issued identifying records, where available and applicable) collected by foreign customs authorities, in accordance with the applicable MOU negotiated for data sharing and access with that customs authority.

- ATS-TAP: Aggregates entry summary declarations to enable analysis of trends in trade activity and selective targeting of summary transactions related to identified anomalies.

ATS obtains information from the various sources identified in Appendix A. The information in these data files is cross-referenced between databases to correlate and augment information pertaining to an individual for purposes of screening or risk assessing. ATS permits user analysis of these risk assessments for purposes of targeting persons and commodities requiring further scrutiny or examination. As part of this risk assessing, ATS incorporates watched entities, including persons, data that is obtained from other government agencies and accessed through TECS.



## 1.2    From whom is information collected?

ATS does not collect information directly from individuals. The information maintained in ATS is either collected from private entities providing data in accordance with U.S. legal requirements (e.g., PNR from air carriers regarding individual passengers) or is created by ATS as part of the risk assessment and associated rules.

The information used by ATS to build the risk assessment is collected from government data sources and from private entities providing data in accordance with U.S. legal requirements or other applicable arrangements (e.g. inward and outward manifests, merchandise entries).

## 1.3    Why is the information being collected?

Personally identifiable information is collected to ensure that people and cargo entering or exiting the United States comply with all applicable U.S. laws. Relevant data, including personally identifiable information, is necessary for CBP to assess effectively and efficiently the risk and/or threat posed by a person, a conveyance operated by person, or cargo handled by a person, entering or exiting the country. CBP's ability to identify possible violations of U.S. law or other threats to national security would be critically impaired without access to this data. ATS permits all such information to be applied more efficiently and effectively to support both CBP's law enforcement mission, while also facilitating legitimate travel, trade, commerce, and immigration.

## 1.4    How is the information collected?

The information that ATS uses is collected from government data sources (e.g., other government databases) and from entities providing data in accordance with U.S. legal requirements or other applicable arrangements (e.g., PNR from air carriers regarding individual passengers). ATS does not collect additional information directly from individuals.

Personally identifiable information that is collected through other government databases, such as TECS, ACE, ACS, AMS, APIS, AES, and National Crime Information Center (NCIC), is collected and stored in source systems of records. This information is collected by CBP in those systems to assist it in carrying out its law enforcement responsibilities relative to the importation or exportation of cargo, or the entry or exit of persons from the United States.

## 1.5    What specific legal authorities/arrangements/agreements define the collection of information?

ATS-Outbound and ATS-Inbound supports CBP functions mandated by Title VII of Public Law 104-208, which provides funding for counter-terrorism and drug law enforcement. ATS-Outbound also supports functions arising from the Anti-Terrorism Act of 1997, the Clinger-Cohen Act, the Paperwork Reduction Act (PRA), and the Privacy Act. Both the PRA and the Privacy Act impose requirements and limits upon the government regarding the collection of information directly from persons, the flexibility of ATS's design and cross-referencing of databases permits CBP to employ information collected from persons, separately, for additional compatible uses



within a secure information system. The risk assessments for cargo that are conducted through ATS are also mandated under section 203 of the "Security and Accountability for Every Port Act of 2006" (SAFE Port Act) (P.L. 109-347) (October 11, 2006). ATS-P helps satisfy CBP's responsibilities arising from the Aviation and Transportation Security Act of 2001, which mandated the electronic transmission of APIS and PNR information to CBP; these requirements are vital to the protection of national security and were enacted as a result of the terrorist attacks of September 11, 2001, which revealed significant deficiencies in the area of aviation security. ATS-TAP was developed in response to analytical deficiencies identified in a Congressional GAO audit. ATS-TAP also addressed mandates to modernize import and export processing systems and to provide automated tools that assist in the administration and enforcement of international trade agreements. ATS-TAP gives CBP the capability to issue periodic compliance reports to Congress, set priorities for allocating available resources, and improves fiscal management associated with revenue collection.

### 1.6 Privacy Impact Analysis: Given the amount and type of data being collected, discuss what privacy risks were identified and how they were mitigated.

The privacy risks associated with the maintenance of the information in ATS include: the information may not be accurate or timely because it was not collected directly from the individual, the information could be used in a manner inconsistent with the privacy policy stated at the time of collection, and/or the individual may not be aware that the information is being used by ATS for the stated purposes and/or a negative CBP action could be taken in reliance upon computer generated information in ATS that has been skewed by inaccurate data.

To mitigate these privacy risks, CBP has done the following:

*Accurate and Timely Information.* The system generates a risk assessment; however, no action will be taken unless the information has been reviewed by a CBP officer trained in the interpretation of the information and familiar with the environment in which the information is collected and used. The ATS system supports CBP officers in identifying individuals or cargo that may pose a risk of violating U.S. laws or otherwise constitute a threat to national security, but it does not replace their discretion to determine whether the individual or cargo should be allowed into the country. If personally identifiable information is believed by the data subject to be inaccurate, a redress process has been developed and the individual is provided information about this process during the secondary review. See Section 7 of this PIA.

*Consistency with the stated privacy policy.* Prior to inclusion of information from system of records notices other than ATS, CBP reviews the routine uses and purposes statements to ensure that the purposes for which the information was collected and used are consistent with the law enforcement purposes of ATS. CBP officers are trained on the limited uses for which the information may be used in connection with their official duties.

*Lack of awareness of the use of information.* In order to increase transparency, CBP has published a SORN (see 71 FR 64543) and this PIA as means of informing individuals about the specific elements of ATS (ATS was previously considered a part of TECS). Additionally, before information



may be used in ATS the Privacy Act system of records notice must be reviewed by CBP to ensure the use is consistent with the stated purposes.

*Automatic negative determination.* As part of CBP's inspection policies and procedures no adverse action is taken by CBP with respect to an individual, cargo or conveyance until the relevant information is reviewed by a well-trained CBP officer.

# Section 2.0 Uses of the System and the Information

The following questions are intended to delineate clearly the use of information and the accuracy of the data being used.

## 2.1    Describe all the uses of information.

Authorized CBP officers and other government personnel located at seaports, airports, and land border ports around the world use ATS to support targeting, inspection, and enforcement related requirements.

ATS is a critical tool that enables CBP to improve the collection, use, analysis, and dissemination of intelligence to target, identify, and prevent potential terrorists and terrorist weapons from entering the United States and identify other violations and violators of U.S. law. The automated nature of ATS greatly increases the efficiency and effectiveness of the officer's otherwise manual and labor-intensive work, and thereby helps facilitates the more efficient movement of legitimate cargo and people while safeguarding the border and the security of the United States. In this way ATS facilitates international trade and travel while enhancing homeland and border security.

## 2.2    Does the system analyze data to assist users in identifying previously unknown areas of note, concern, or pattern?

Yes. ATS builds a risk-based assessment for persons, cargo and conveyances based on criteria and rules developed by CBP. ATS maintains the risk assessment together with a record of which rules were used to develop the risk assessment.

The ATS rules and resulting risk assessments are designed to signal to CBP officers that further inspection of a person, shipment or conveyance may be warranted, even though an individual may not have been previously associated with a law enforcement action or otherwise be noted as a person of concern to law enforcement.

## 2.3    How will the information collected from individuals or derived from the system be checked for accuracy?

ATS relies upon the source systems to ensure that data used by ATS is accurate and complete. Discrepancies may be identified in the context of a CBP officer's review of the data and the CBP officer will take action to correct that information, when appropriate. Although ATS is


**Homeland Security**

not the system of record for most of the source data, ATS monitors source systems for changes to the source system databases. Continuous source system updates occur in real-time or near real-time from TECS, ACE, AMS, APIS, ACS, AES, and NCIC. When corrections are made to data in source systems, ATS updates this information immediately and only the latest data is used. In this way, ATS integrates all updated data (including accuracy updates) in as close to real-time as possible.

Furthermore, in the event personally identifiable information (such as PNR) used by and/or maintained in ATS is believed by the data subject to be inaccurate a redress process has been developed and the individual is provided information about this process during the secondary review. See Section 7 of this PIA.

To the extent information that is obtained from another government source (for example, DMV data that is obtained through NLETS) is determined to be inaccurate, this problem would be communicated to the appropriate government source for remedial action.

## 2.4 **Privacy Impact Analysis**: Given the amount and type of information collected, describe any types of controls that may be in place to ensure that information is used in accordance with the above described uses.

The privacy risks associated with the use of the information maintained in ATS include: additional inspection and misuse of data by users.

*Additional Inspection.* One risk to individuals from the use of ATS is to be referred to secondary inspection. Individuals are subject to random secondary inspection under U.S. law, so, all individuals are always at risk of referral to secondary inspection. Accordingly, the greatest impact that ATS can have on an individual is comparable to that of random inspection, a required component of the inspection process. As a decision support system, ATS operates according to the rules within the system that were created to parallel the policies and procedures that govern the CBP inspection process to ultimately protect individual's privacy rights. To the extent that an individual may be referred to secondary inspection based, in part, upon an analysis of information derived through ATS, this PIA and the SORN for ATS as well as the PIAs and SORNs for the source systems, from which ATS draws information, provide the greatest mitigation to the risk that information may be improperly obtained or inappropriately accessed or used.

ATS offers equitable risk assessment using a secure encrypted network; however, it is the policies and procedures and laws that govern the inspection process that ultimately protect individual privacy rights. The professionalism applied by CBP officers serves to further protect individual privacy rights.

*Misuse or Breach of ATS.* ATS User roles are highly restricted and audited. ATS has role-based access. Access is restricted in the form of Mandatory Access Control, which is based on a demonstrated "need to know." Data may only be accessed using the CBP network with encrypted passwords and user sign-on functionality. CBP officers with access to ATS are required to


# Homeland
# Security

complete security and data privacy training on a biennial basis and their usage of the system is audited to ensure compliance with all privacy and data security requirements.

# Section 3.0 Retention

### 3.1    What is the retention period for the data in the system?

The retention period for data in ATS reflects the underlying retention period for the data in its source records (for example, since the data from ACS, AMS, and ACE is retained for six years, the associated information in ATS is only retained for that period of time). Provided the data is not associated with an open investigation (in which it is retained until the investigation is closed), this retention period will not exceed forty years for the source record data and is forty years for the risk assessment and associated rules upon which the assessment is based

Generally, data maintained specifically by ATS will be retained for up to forty years. Certain data maintained in ATS may be subject to other retention limitations pursuant to applicable arrangements (e.g., PNR information derived from flights between the U.S. and the European Union). Cost and performance impact of data retention may lead to retention periods less than forty years.

### 3.2    Has the retention schedule been approved by the National Archives and Records Administration (NARA)?

A NARA Electronic Records Appraisal Questionnaire was completed for Passenger Name Record (PNR) Data in spring 2005. Efforts are underway and ongoing to obtain NARA approval for the remaining data retained in ATS.

### 3.3    <u>Privacy Impact Analysis</u>: Given the purpose of retaining the information, explain why the information is needed for the indicated period.

ATS maintains the risk assessment together with a record of which rules were used to develop the risk assessment. This assessment and related rules history associated with developing a risk-based assessment are maintained for up to forty years to support ongoing targeting requirements. Forty years of data retention as an outside limit is consistent with the longest retention period for the source records which constitute information maintained in ATS.

Nonetheless, The touchstone for data retention is the data's relevance and utility. Accordingly, CBP will regularly review the data maintained in ATS to ensure its continued relevance and usefulness. If no longer relevant and useful, CBP will delete the information.

All risk assessments need to be maintained because the risk assessment for individuals who are deemed low risk will be relevant if their risk attributes change in the future, for example, if new terrorist associations are identified. Additionally, certain data collected directly by ATS may be subject to shorter retention limitations pursuant to separate arrangements. The adoption of



shorter retention periods may not be publicly disclosed if DHS concludes that disclosure would affect operational security, for example by giving terrorism suspects the certainty that their past travel patterns would no longer be available to U.S. authorities.

# Section 4.0 Internal Sharing and Disclosure

### 4.1   With which internal organizations is the information shared?

The principal users of ATS data are within the Department of Homeland Security including:

- CBP Office of Field Operations (OFO)
- CBP Office of Intelligence (OI)
- CBP National Targeting Center (NTC)
- CBP Office of International Trade (OT)
- U.S. Immigration and Customs Enforcement (ICE)

The information collected through ATS may be shared with component agencies within DHS on a need to know basis consistent with the component's mission.  Access to ATS is role-based according to the mission of the component and the user's need to know.

### 4.2   For each organization, what information is shared and for what purpose?

Authorized users from CBP OFO, OI, and the NTC have full access to all the ATS modules for purposes of enforcing U.S. laws related to the entry into and exit from the United States of persons, cargo, and conveyances.  Authorized users from ICE and the DHS Office of the Secretary have been provided access to ATS-P, for purposes of carrying out their law enforcement and counter-terrorism responsibilities.  Finally, data collected and/or maintained in ATS (including PNR) may be shared with any DHS component consistent with U.S. law, DHS and CBP policy, the ATS SORN, and any applicable arrangements or agreements.

### 4.3   How is the information transmitted or disclosed?

Data may be retrieved through authorized users logging in to the CBP network remotely using encryption and passwords to access the ATS web-based interface. Data may only be accessed using the CBP network with encrypted passwords and user sign-on functionality.  Data maintained in ATS may also be shared with other components with a need to know on a case-by-case basis, consistent with U.S. law, DHS and CBP and DHS policies, and any applicable arrangements or agreements.

 **Homeland Security**

### 4.4 Privacy Impact Analysis: Given the internal sharing, discuss what privacy risks were identified and how they were mitigated.

The key privacy risk concerns the potential number of DHS personnel with access to the system. This risk is mitigated and managed by employing user profiles that define rights and responsibilities concerning a user's access to data contained in the system. The principal method for determining what access rights and system responsibilities a user will have is reference to the user's need-to-know. Need-to-know determinations are covered by internal CBP policies and procedures that relate a user's mission or operational responsibilities to the specific sub-set of data, contained within ATS, that supports those functions. For example, users at a seaport on the East coast do not have access to current risk assessment data associated with an arriving air traveler at a West coast airport. ATS retains audit logs for all user access, these logs are reviewed to ensure that a user should have no more access than is minimally necessary to perform his or her job. Lastly, users are subject to periodic renewal of their access and regular privacy awareness training to maintain attentiveness to the need for safeguarding and the liabilities for inappropriate use or sharing of ATS protected information.

## Section 5.0 External Sharing and Disclosure

### 5.1 With which external organizations is the information shared?

For the information maintained in ATS (name, risk assessment, rules applied, and PNR), a limited number of users outside of DHS have access to this information. Only if there is a specific information sharing arrangement permitting the development of an outside agency specific rule sub-set will users from that outside agency be permitted to access and review the name, risk assessment, and rules fired based on the rules developed for the outside agency.

Currently such information sharing agreements exist with the following:

- ATS-Inbound access outside of DHS, for access to information regarding imported commodities, include:

  - U.S. Department of Agriculture (this access includes viewing of specific USDA risk assessments and rule sets)

  - U.S. Food and Drug Administration (FDA) (limited to personnel at the FDA Prior Notice Center)

  - Canada Border Security Agency (CBSA) (See section 5.2 below)

- ATS-Outbound access outside of DHS, for access to information regarding exported commodities, include:

  - U.S. Department of Commerce Bureau of Industry and Security



# Homeland Security

- The Mexican government, through a Memorandum of Understanding (MOU), may submit queries to CBP seeking verification of Mexican import data by U.S. export data. CBP uses ATS to perform the verification. The verification consists of a yes or no indicator regarding whether or not the two data sets are comparable, that is within or outside of a defined range of standard deviation pertaining to the reported valued of the subject commodity. There is no direct access to ATS by Mexico, nor is there any transfer of personally identifiable information or specific trade data pursuant to this arrangement.

- ATS-P access outside of DHS:

  - Various law enforcement task forces outside of DHS require queries to be run against ATS-P data (for example, the FBI-led Joint Terrorism Task Force). Generally, these task force groups do not have direct access to ATS-P and must present a request for a query to the CBP representative that supports or is part of the requesting task force.

  - Access to PNR may also be facilitated for various law enforcement and counterterrorism agencies, through the receipt of direct requests and authorized releases.

As a graphical user interface for underlying older existing systems, users outside of DHS use ATS as an easier means of accessing these older existing systems. User access is tightly controlled and users may only access the source data consistent with their user roles in the underlying systems. In some instances users have less access through ATS then if they had direct access to the underlying system. Agencies with this type of access include:

- Department of Justice (Federal Bureau of Investigation)

- Department of State (Diplomatic Security)

## 5.2    What information is shared and for what purpose?

Data obtained from other systems (e.g., ACE, AES, TECS, and NCIC) is used to identify cargo conveyances and travelers at high risk for involvement in terrorist activities or for other statutory violations, such as drug smuggling, counterfeiting, and intellectual property rights infringement.

USDA users are supported by rule sets specific to the USDA for enforcement of compliance with meat and poultry inspection regulations and other perishable commodity restrictions. USDA users can view the risk assessment and rule history for the USDA specific rule sets only. For all other rule sets, USDA users can view the source data, but may not view the risk assessment.

For all other ATS users outside of CBP, users may view the source data, but may not view the risk assessment. Access to ATS modules and underlying data, as previously stated, is determined by user profiles assigning a particular user rights and responsibilities dependent upon his or her operational and mission functions and authority.



# Homeland Security

Access to ATS-L and the DMV data for U.S. plated vehicles that it uses is limited to CBP Officers. No other use or dissemination of DMV data is performed.

Canada is currently the only foreign country that accesses data directly using ATS. CBSA users can only view Canadian data provided by Canada. Other countries may, through ATS-I, be permitted to use ATS, but they will likewise be limited to viewing their own data and the related risk assessment and rules applied, if expressly stated within the terms of their particular arrangement.

## 5.3    How is the information transmitted or disclosed?

For facilitated disclosure, various users outside of DHS must present a request for a query to the CBP representative that supports or is part of the requesting user, task force, agency, etc. Upon CBP approval of the specific request for access, access may be provided either electronically or by hard copy print out.

ATS users access data using the ATS user interface. Data may only be accessed using the CBP network with encrypted passwords and user sign-on functionality. Data is retrieved through authorized users logging in to the CBP network remotely using encryption and passwords to access to ATS web-based interface.

Access for users outside of DHS is limited to source data only (the access employs ATS as an interface to the ATS image of the underlying database).

## 5.4    Is a Memorandum of Understanding (MOU), contract, or any agreement in place with any external organizations with whom information is shared through the system, and does the agreement reflect the scope of the information currently shared?

Yes, there are agreements in place to share information from ATS. Each agreement defines the nature of access to ATS, including specific modules and scope of information subject to the sharing arrangement. In defining the sharing arrangement, the agreements also set forth the terms and conditions of access to information and the limitations upon the use and redissemination of the information. As an example and as previously noted, the Mexican government is an indirect beneficiary of ATS-Outbound data and is permitted to submit a request for a query to CBP in accordance with an agreement (Memorandum of Understanding, MOU[3]) between CBP and the Mexican government. If CBP approves the request for query is approved, a response is forwarded using secure electronic messaging. (See section 5.1 above.)

---

[3] CBP has the authority to provide information to foreign customs and law enforcement agencies pursuant to Title 19, United States Code, Section 1628, and more specifically with respect to the CGA, as provided for under to the Agreement between the Government of the United States of America and the Government of the United Mexican States Regarding Mutual Assistance Between their Customs Administrations (CMAA), dated June 20, 2000. This MOU is subject to the implementing guidelines contained within the CMAA.

**Homeland Security**

## 5.5    How is the shared information secured by the recipient?

The terms and conditions within agreements permitting access to ATS set forth the requirements that external users of ATS must meet in order to obtain and maintain access. Generally, CBP's requirements for external users require that the external user employ the same or similar security and safeguarding precautions as employed by CBP. For CBP, ATS has role-based security. Users from other government organizations must use the ATS interface to access the system where access is limited via a user profile/role. ATS User roles are highly restricted and audited. Application access is restricted in the form of Mandatory Access Control, which is based on a demonstrated "need to know."

## 5.6    What type of training is required for users from agencies outside DHS prior to receiving access to the information?

CBP requires all external users of ATS information to receive the same training as CBP users regarding the safeguarding, security, and privacy concerns relating to information stored in the ATS database. This means that users are subject to periodic recertification of their access (typically every six months), that they receive initial functional training related to their particular access and role, and that they are required to complete and pass a system based privacy awareness course (initially before access, and every two years, thereafter).

## 5.7    <u>Privacy Impact Analysis</u>: Given the external sharing, what privacy risks were identified and describe how they were mitigated.

When sharing information with external agencies, similar risks are posed as those arising with respect to internal sharing with DHS. To this extent the agreements with external agencies require similar measures to be employed relating to security, privacy, and safeguarding of information. Separately, an additional risk is posed by the potential for further dissemination of information by the external agency to a third agency. Again, the terms and conditions of the agreement, which provides for access by an external agency, address and mitigate this risk, in the confidentiality section of each agreement, by requiring any further dissemination of shared data outside of the receiving agency to be subject to prior authorization by CBP. Lastly, CBP emphasizes that, within each agreement, each external user is provided with training, as outlined in paragraph 5.6, designed to ensure that data that is accessed through ATS is safeguarded and secured in an appropriate manner, consistent with applicable laws and policies.

# Section 6.0 Notice

The following questions are directed at notice to the individual of the scope of information collected, the right to consent to uses of said information, and the right to decline to provide information.


Homeland
Security

Privacy Impact Assessment
Customs and Border Protection, Automated Targeting System
November 22, 2006
Page 17

## 6.1 Was notice provided to the individual prior to collection of information? If yes, please provide a copy of the notice as an appendix. (A notice may include a posted privacy policy, a Privacy Act notice on forms, or a system of records notice published in the Federal Register Notice.) If notice was not provided, why not?

ATS does not collect any information directly from individuals. ATS does collect and maintain passenger name record (PNR) data derived from air carrier reservation/departure control systems, as indicated in the SORN for ATS published on November 2, 2006 at 71 FR 64543 and discussed above at paragraph 1.1.

In cases where an individual has a concern about the information collected during an interaction with a CBP officer, the CBP officer may provide the individual with a copy of the IBIS Fact Sheet (See Appendix), which provides both general information concerning CBP's border enforcement mission and responsibilities, and specific information concerning where to direct inquiries about CBP's actions or the information collected.

Most of the information that ATS uses is collected from government data sources. Notice was provided for under the applicable source systems of records and privacy impact assessments (where applicable), as well as through the publication of the laws and regulations authorizing the collection of such information. This information is collected and stored in the source systems of record, is collected for other purposes, and would be collected with or without ATS.

This information is collected by CBP primarily for law enforcement purposes related to the entry and exit of people, cargo, and conveyances; use of this data also facilitates legitimate trade and immigration.

## 6.2 Do individuals have an opportunity and/or right to decline to provide information?

Generally, the decision whether to travel to or import goods/merchandise into a foreign country is within the discretion of the individual. United States law requires individuals seeking to enter the country to identify themselves and demonstrate admissibility to the United States; likewise, persons seeking to import goods and merchandise in the U.S. are required to provide certain information to allow CBP to determine whether the goods/merchandise may enter the U.S. ATS does not require individuals to provide information beyond that authorized by law. This information is captured by the source systems (e.g., ATS, ACS, and TECS) and used by ATS to efficiently and expeditiously identify persons, conveyances, and cargo that may pose a concern to law enforcement, resulting in further review by appropriate government officers.

While ATS does not collect information directly from individuals, it employs information obtained from persons by these source systems. The only way an individual can decline to provide information is to refrain from traveling to, through, or over the United States or by not bringing in, shipping, or mailing any goods/merchandise to the United States.



### 6.3 Do individuals have the right to consent to particular uses of the information, and if so, how does the individual exercise the right?

Any consent individuals may grant is controlled by the source systems described in earlier sections.

Because the submission of information is required in order to travel to, through, or over the United States or to bring in, ship, or mail any goods/merchandise to the United States restrictions on CBP use and sharing of accessed information are limited to legal requirements set forth in the Privacy Act, Trade Secrets Act, and the uses published in System of Records Notices (SORN). Consent to store or use this information must be done in accordance with the above legal requirements.

ATS does not directly collect information from individuals. Opportunities for individuals to consent to particular uses of information would be addressed using the process defined by the source systems. As all information collected by these systems is mandated by law, there is effectively no consent mechanism other than the choice not to travel or ship items.

Many air carriers have provided their own notice to customers concerning these requirements.

### 6.4 Privacy Impact Analysis: Given the notice provided to individuals above, describe what privacy risks were identified and how you mitigated them.

There is a risk that the individual may not know that the information is being used by ATS in the ways described. As such, CBP has published the System of Records Notice and this PIA to increase transparency of its operations. Additionally, it has drafted language for commercial carriers to include in their privacy statements so as to provide further transparency.

## Section 7.0 Individual Access, Redress and Correction

The following questions are directed at an individual's ability to ensure the accuracy of the information collected about them.

### 7.1 What are the procedures which allow individuals to gain access to their own information?

Procedures for individuals to gain access to data maintained in source systems that provide data used by ATS would be covered by the respective SORNs for the source systems. In addition, the Freedom of Information Act (FOIA) (5 U.S.C. 552) provides a means of access to information, including PNR data, for all persons, irrespective of the individual's status under the Privacy Act.

With respect to data for which ATS is the actual source system (e.g., PNR), the applicable SORN is published at Volume 71, Federal Register 64543 (November 2, 2006). FOIA requests for



# Homeland Security

access to information for which ATS is the source system may be directed to CBP in the manner prescribed by regulations at Title 19, Code of Federal Regulations, Part 103.

With respect to the data that ATS creates, i.e., the risk assessment for an individual, the risk assessment is for official law enforcement use only and is not communicated outside of CBP staff, nor is it subject to access under the Privacy Act. ATS is a system that supports CBP law enforcement activities, as such an individual might not be aware of the reason additional scrutiny is taking place, nor should he or she as this may compromise the means and methods of how CBP came to require further scrutiny. Additional screening may occur because of a heightened risk assessment, or because of other concerns by the CBP officer, or on a random basis. If a reviewing officer determines that a person is not a match to a record or the record is determined to not be accurate, CBP has a policy in place which permits the officer to promptly initiate corrective action with regard to that record to avoid that person being identified for examination during future entry or exit processing based on that erroneous information.

## 7.2    What are the procedures for correcting erroneous information?



CBP has created a Customer Satisfaction Unit in its Office of Field Operations to provide redress with respect to inaccurate information collected or maintained by its electronic systems , which include ATS, TECS, IBIS, and APIS). Inquiries to the Customer Satisfaction Unit should be addressed to: Customer Satisfaction Unit, Office of Field Operations, U.S. Customs and Border Protection, Room 5.5C, 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229. Individuals making inquiries should provide sufficient information to identify the record at issue.

DMV data to support ATS-L is obtained from a government source, NLETS. If problems with the DMV data are identified through the redress process, the problem would be communicated to NLETS. Upon request, CBP officers will provide the IBIS fact sheet that provides information on appropriate redress. The redress process includes the ability to correct data in the source systems including TECS and IBIS.

ATS incorporates the procedures of the source systems with respect to error correction. Once any updates or corrections are made, they are transmitted to ATS. Corrected data becomes available to ATS almost immediately after the correction is entered to the source system. ATS monitors source systems for changes to the source system databases. Continuous source system updates occur in real-time, from ACS, AES, and TECS. When corrections are made to data in source systems, ATS reflects these updates to data, accordingly.

## 7.3    How are individuals notified of the procedures for correcting their information?

Upon request, CBP officers will provide the IBIS fact sheet that provides information on appropriate redress. The redress procedure provides the ability to correct data in the source systems include TECS and IBIS. Publication of the source system SORNs also provides information on accessing and amending information collected through those systems. There is no procedure to correct the risk assessment and associated rules stored in ATS as the assessment is based on the underlying data and will change when the data from source system(s) is amended.



**Homeland Security**

### 7.4    If no redress is provided, are alternatives available?

Redress is provided.

### 7.5    Privacy Impact Analysis: Given the access and other procedural rights provided for in the Privacy Act of 1974, explain the procedural rights that are provided and, if access, correction and redress rights are not provided please explain why not.

As set forth in the ATS SORN (71 FR 64543, November 2, 2006), pursuant to 31 CFR § 1.36 pertaining to the Treasury Enforcement Communications System, ATS, which was previously covered by the Treasury Enforcement Communications System (TECS) system of records notice and associated with the below exemptions, records and information in this system are exempt from a number of provisions of the Privacy Act (5 U.S.C. 552a (c)(3), (d)(1), (d)(2), (d)(3), (d)(4), (e)(1), (e)(4)(G), (H), and (I), and (f) ) pursuant to 5 U.S.C. 552a (j)(2) and (k)(2)). DHS intends to review these exemptions and, if warranted, issue a new set of exemptions specific to ATS within ninety (90) days of the publication of this notice. However, as noted above in paragraph 7.1, individuals may seek access to information collected in ATS or originating from a government source system pursuant to the FOIA, and as a matter of CBP policy, redress may also be requested in the manner described above in paragraph 7.2.

# Section 8.0 Technical Access and Security

The following questions are intended to describe technical safeguards and security measures.

### 8.1    Which user group(s) will have access to the system?

All user groups will have access to the system defined by the specific user's profile and limited through reference to the determined rights and responsibilities of each user. Access by Users, Managers, System Administrators, Developers, and others to the ATS data is defined in the same manner and employs profiles to tailor access to mission or operational functions. User access to data is based on a demonstrated need-to-know basis.

### 8.2    Will contractors to DHS have access to the system?

Yes, subject to the same background, training, need-to-know, and confidentiality requirements as employees.

 **Homeland Security**

### 8.3 Does the system use "roles" to assign privileges to users of the system?

Yes, ATS user access is restricted in the form of Mandatory Access Controls assigned based on the user's role. Users cannot assign their roles to any other user, nor can they elevate their own rights within the system. User access is enforced with the ATS Security Desk procedures referenced in the section above and roles are assigned only after supervisor request, process owner approval, and appropriate security checks have been confirmed.

### 8.4 What procedures are in place to determine which users may access the system and are they documented?

Initial requests for grants to the system are routed from the user through their supervisor to the specific CBP Process Owners. Need-to-know determinations are made at both the supervisor and process owner level. If validated, the request is passed on to the Security Help Desk. Once received, System Security Personnel are tasked to determine the user Background Investigation (BI) status. Once the BI is validated, the user's new profile changes are implemented. The user, supervisor and Process Owner are notified via email that the request has been processed along with instructions for the initial login. These records are maintained by CBP. Profile modification requests follow the same process as for an initial request. If an individual has not used the system for more than 90 days, that individual's access will be denied and the same procedures as noted above must be completed to renew access. In addition, on a periodic basis access is reviewed by the process owner, on a periodic basis, to ensure that only appropriate individuals have access to the system.

### 8.5 How are the actual assignments of roles and rules verified according to established security and auditing procedures?

ATS User roles are highly restricted and audited.

Application access is restricted in the form of Mandatory Access Control, which is based on a demonstrated "need to know." Data may only be accessed using the CBP network with encrypted passwords and user sign-on functionality. Data is retrieved through authorized users logging in to the CBP network remotely using encryption and passwords to access to ATS web-based interface.

### 8.6 What auditing measures and technical safeguards are in place to prevent misuse of data?

On a periodic basis access is reviewed by the process owner to ensure that only appropriate individuals have access to the system. Additionally, CBP's Office of Internal Affairs conducts periodic reviews of the ATS system in order to ensure that the system is being accessed and used in accordance with documented DHS and CBP policies.



## Homeland Security

### 8.7    Describe what privacy training is provided to users either generally or specifically relevant to the functionality of the program or system?

The CBP process owners and all system users are required to complete bi-annual training in privacy awareness. If an individual does not take training, he/she will lose access to all computer systems, which are integral to his/her duties as a CBP Officer.

### 8.8    Is the data secured in accordance with FISMA requirements?  If yes, when was Certification & Accreditation last completed?

ATS underwent the Certification and Accreditation (C&A) process in accordance with Customs and Border Protection policy, which complies with these Federal statutes, policies, and guidelines, and was certified and accredited on June 16, 2005, for a three year period.

A Security Risk Assessment was completed on March 28, 2006 in compliance with FISMA, OMB policy and NIST guidance.

### 8.9    <u>Privacy Impact Analysis</u>: Given access and security controls, what privacy risks were identified and describe how they were mitigated.

Privacy risks identified with respect to access and security were in appropriate use and access of the information.  These risks are mitigated through training, background investigations, internal system audit controls, CBP Code of Conduct and Disciplinary system, and the practice of least privileged access.

## Section 9.0 Technology

### 9.1    Was the system built from the ground up or purchased and installed?

ATS was built from the ground up.

The data collected through ATS is maintained using existing data models in the source systems of records.

### 9.2    Describe how data integrity, privacy, and security were analyzed as part of the decisions made for your system.

Integrity, privacy, and security are analyzed as part of the decisions made for ATS in accordance with CBP security and privacy policy from the inception of ATS, as demonstrated by the successful transition through the systems development lifecycle (SDLC), certification and



accreditation, and investment management processes. Particular areas that were identified as needing to be addressed during the development included: use of accurate data, system access controls, and audit capabilities to ensure appropriate use of the system.

## 9.3    What design choices were made to enhance privacy?

The system was developed so that the rules are building risk assessments based on the most accurate information available in the source systems. This improves the data integrity of the system. User access controls were developed in order to ensure that only the minimum number of individuals with a need to know the information are provided access to the information. Audit provisions in conjunction with policies and procedures were also put in place to ensure that the system is properly used by CBP officers.

The system is designed to provide the following privacy protections:

- Equitable risk assessment:

    o   ATS provides equitable treatment for all individuals. Equitable risk assessment is provided because ATS uses the same risk assessment process for everybody (using a defined targeting methodology for a given period at a specific port).

    o   ATS applies the same methodology to all individuals to preclude any possibility of disparate treatment of individuals or groups. ATS is consistent in its evaluation of risk associated with individuals and is used to support the overall CBP law enforcement mission.

    o   ATS supports a national targeting policy that is established at the National Targeting Center. CBP policies regarding inspections and responding to potential terrorists and other criminals seeking entry into the United States are documented in various CBP Directives and individuals with access to the system are trained on the appropriate use of the information.

- CBP's secure encrypted network:

    o   ATS security processes, procedures, and infrastructure provide protection of data, including data about individuals that is stored in ATS databases.

    o   Encryption and authentication are the technical tools used to protect all ATS data, including data about individuals.

- ATS's role as a decision support tool for CBP officers:

    o   As a decision support system, ATS is employed to support but not replace the decision-making responsibility of CBP officers and analysts. The information accessed in ATS is not the conclusion about whether or not to act but merely part of the basis upon which a CBP officer will make his or her decision. Human

 **Homeland Security**

intervention, professionalism, and training all serve to mitigate the potential privacy threat posed by data comparisons made outside of an operational context. .

In order to enhance privacy and transparency, a separate and distinct System of Records under the Privacy Act was published to address both the risk assessments derived using ATS, the rules applied, as well as other information for which ATS is considered the actual source system (i.e, PNR). The SORN for ATS is published in Volume 71, Federal Register 64543 (November 2, 2006).

Additionally, access to the assessment and related rules is limited to a small number of CBP officers who have gone through extensive training on the appropriate use of the information and CBP targeting policies. These CBP officers are trained to review the risk assessments and the underlying information to identify cargo and individuals that truly pose a risk to law enforcement.

## Conclusion

ATS is a decision support tool used by CBP officers to identify individuals, cargo and conveyances that may require additional scrutiny based on observations related to data describing those individuals.

The ATS system supports CBP officers in identifying individuals or cargo that may be a risk to U.S. law enforcement, but it does not replace their judgment in determining whether the individual or goods/merchandise, as applicable, should be allowed into the country.

ATS offers equitable risk assessment using a secure encrypted network; however, it is the policies and procedures and laws that govern the inspection and other law enforcement processes that ultimately protect individual privacy rights. The professionalism applied by CBP officers serves to further protect individual privacy rights.

 **Homeland Security**

# Appendix A: Detailed Description of Information Sources Being Compiled

The information ATS uses is described by module and is presented in the following format.

- Nature, Source

*ATS- Inbound:* Collects information about Importers and cargo and conveyances used to import cargo to the United States from destinations outside its borders.  Information regarding individuals, such as importers, that is collected in connection with items identified below, include, but are not limited to,

- Sea/Rail Manifests (bills of ladings), Automated Manifest System (AMS)
- Cargo Selectivity Entries, Automated Broker Interface (ABI)
- Entry Summary Entries, ABI
- Air Manifest (bills of lading), AMS-Air
- Express Consignment Services (bills of lading)
- CCRA Manifest (bills of ladings), Canada Customs and Revenue (CCRA)
- CAFÉ, QP Manifest Inbound (bills of ladings), AMS
- Truck Manifest, Automated Commercial Environment (ACE)
- Inbound Data (bills of ladings), AMS
- Food and Drug Administration (FDA) Entries/Prior Notice (PN), Automated Commercial System (ACS)
- Census Import Data, Department of Commerce

*ATS-Outbound:* Collects information about exporters and cargo and conveyances used to transport cargo from the United States to destinations outside its borders.

- Shippers Export Declarations, Automated Export System (AES)
- Export Manifest Data, AES
- Export Air Way Bills of Lading
- Census Export Data, Department of Commerce

## Homeland Security

ATS-L: Collects information about vehicles and persons crossing land border locations. This data includes license plate numbers for vehicles entering the United States, vehicle and registered owner data (derived from state DMV records).

- Publicly Available State DMV Data

- Border Crossing, TECS

- Seizures, TECS

ATS-P: Collects information about travellers entering the United States from destinations outside its borders. This data includes passenger manifests, immigration control information and Passenger Name Record (PNR) information (for which ATS is the source system).

- Advance Passenger Information System (APIS)

- Border Crossing, TECS

- Land Border Crossing, TECS

- I94, TECS[4]

- Personal Search, TECS

- Secondary Referrals, TECS

- Secondary Referrals/Land, TECS

- Secondary Referrals/CBP/ICE, TECS

- Seized Property, TECS

- Seized Vehicle, TECS

- USVISIT, TECS[5]

- NCIC III, TECS

- Air Craft Arrivals, ACS

- PNR (Approximately 100 airlines), Airline Reservations System data collected in ATS

- Visa, TECS

- Enforcement Subjects: Person, TECS

- Enforcement Subjects: Business, TECS

- Enforcement Subjects: Address, TECS

---

[4] ATS receives I94 data via TECS. TECS receives I94 data directly from the source ICE system.
[5] ATS receives USVISIT data via TECS. TECS receives US VISIT data directly from USVISIT.



## Homeland Security

*ATS-TAP*: Collates information derived from ATS- Outbound and ATS-Inbound.

ATS also uses watched entities data:

- Debarred Parties, Dept of State ODTC
- Nuclear Proliferation, Dept of Commerce BXA
- Specially Designated Parties, Dept of Treasury OFAC

 **Homeland Security**

# Appendix B PNR Data Elements

PNR Data Elements May Include*

1.  PNR record locator code
2.  Date of reservation
3.  Date(s) of intended travel
4.  Name
5.  Other names on PNR
6.  Number of travelers on PNR
7.  Seat information
8.  Address
9.  All forms of payment information
10. Billing address
11. Contact telephone numbers
12. All travel itinerary for specific PNR
13. Frequent flyer information (limited to miles flown and address(es))
14. Travel agency
15. Travel agent
16. Code share PNR information
17. Travel status of passenger
18. Split/Divided PNR information
19. Identifiers for free tickets
20. One-way tickets
21. Email address
22. Ticketing field information
23. ATFQ fields
24. General remarks
25. Ticket number
26. Seat number
27. Date of ticket issuance
28. Any collected APIS information
29. No show history
30. Number of bags
31. Bag tag numbers
32. Go show information
33. Number of bags on each segment
34. OSI information
35. SSI information
36. SSR information
37. Voluntary/involuntary upgrades
38. Received from information
39. All historical changes to the PNR

*Not all carriers collect PNR and of those that do collect this data, not all collect the same sets of PNR data.



## Responsible Officials

Laurence Castelli, Chief, Privacy Act Policy and Procedures Branch, Office of Regulations and Rulings, CBP, (202) 572-8712.

## Approval Signature Page

_____

Hugo Teufel III
Chief Privacy Officer
Department of Homeland Security

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**EXHIBIT 21**

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: DASTECH INTERNATIONAL INC.

Selected Entity Status Information

**Current Entity Name:** DASTECH INTERNATIONAL INC.
**Initial DOS Filing Date:** JULY 01, 1980
**County:** NEW YORK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
DASTECH INTERNATIONAL INC.
10 CUTTER MILL RD
STE 400
GREAT NECK, NEW YORK, 11021-3201

**Chairman or Chief Executive Officer**
ROBERT KAHEN
10 CUTTER MILL RD
STE 400
GREAT NECK, NEW YORK, 11021-3201

**Principal Executive Office**
DASTECH INTERNATIONAL INC.
10 CUTTER MILL RD
STE 400
GREAT NECK, NEW YORK, 11021-3201

**Registered Agent**
NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: DASTECH DEVELOPMENT CORP.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | DASTECH DEVELOPMENT CORP. |
| **Initial DOS Filing Date:** | APRIL 11, 2002 |
| **County:** | NASSAU |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
DASTECH DEVELOPMENT CORP.
10 CUTTER MILL ROAD
GREAT NECK, NEW YORK, 11021

**Chairman or Chief Executive Officer**
ROBERT KAHEN
10 CUTTER MILL RD
GREAT NECK, NEW YORK, 11021-3201

**Principal Executive Office**
DASTECH DEVELOPMENT CORP.
10 CUTTER MILL RD
GREAT NECK, NEW YORK, 11021-3201

**Registered Agent**
NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# NYS Department of State

## Division of Corporations

### Entity Information

---

Selected Entity Name: DASTECH INDUSTRIES, LTD.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | DASTECH INDUSTRIES, LTD. |
| **Initial DOS Filing Date:** | AUGUST 04, 1995 |
| **County:** | NASSAU |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

DASTECH INDUSTRIES, LTD.
10 CUTTER MILL ROAD
GREAT NECK, NEW YORK, 11021-2419

**Chairman or Chief Executive Officer**

ROBERT KAHEN
10 CUTTER MILL ROAD
GREAT NECK, NEW YORK, 11021-2419

**Principal Executive Office**

DASTECH INDUSTRIES, LTD.
10 CUTTER MILL ROAD
GREAT NECK, NEW YORK, 11021-2419

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,   )
                                          )
                    Plaintiffs,           )
                                          )
        v.                                )        **Civil Action 07-01296 (HHK)**
                                          )
ALBERTO GONZALES, *et al.*,               )
                                          )
                                          )
                    Defendants.           )
                                          )

EXHIBIT 22

# Dastech International, Inc.

*10 Cutter Mill Rd. Great Neck NY 11021*
*Tel 516-466-7676 Fax 516-466-7699*
*e-mail info@dastech.com*

April 4, 2002

Special Agent in charge
Newark Field Division
80 Mulberry St. 2nd Floor
Newark, NJ 07102

RE: Dastech International

As required under CFR 1310.04 (c), please be advised that all records pertaining to any
regulated transaction will be kept at a central location, Dastech's corporate office in New
York, located at:

Dastech International, Inc.
10 Cutter Mill Rd.
Suite 400
Great Neck, NY 11021
Tel 516-466-7676
Fax 516-466-7699
Email: info@dastech.com
Contact: Luz Cazeneuve

Sincerely,

Dastech International, Inc.

Luz Cazeneuve



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,      )
                                            )
                 Plaintiffs,                )
                                            )
        v.                                  )    **Civil Action 07-01296 (HHK)**
                                            )
ALBERTO GONZALES, *et al.*,                 )
                                            )
                 Defendants.                )
                                            )

**EXHIBIT 23**

# DASTECH INTERNATIONAL, INC

May 10, 2007

*Send 5/30/07*

*10 Cutter Mill Rd. * Great Neck, New York 11021*
*(516)466-7676 * Fax (516)466-7699*

**To:** *J.M. RODGERS CO., INC.*
*1975 LINDEN BLVD 3RD FLOOR*
*ELMONT        NY      11003*

**Attn:** *JOHN*
**Fax#** *516-872-5589/* **Tel#** 516-872-5570

## *Copies Of Documents To Clear Shipment*

REFERENCE # 07-201a    Eta: 5/31/2007

OCEAN FRT CHARGES TO BE PAID BY BROKER
ANY QUESTIONS PLEASE CALL TRAFFIC DEPT.

| Vessel Name | Bill Of Lading # | Container# |
|---|---|---|
| Mol Expeditor V.037e | LNYC7503EU01 | Ttnu5643878 |

| Ocean Frt S/b: | Trucker | Customer -Port | Destination |
|---|---|---|---|
|  | HAWKS EXPRESS | NEW YORK | HAWKS EXPRESS |

_____ BROKER INFORMATION _____

| Product | Hts# | DEA - 486 | FDA Number  Yes |
|---|---|---|---|
| PSEUDOEPHEDRINE HCL 40 MESH, USP  | 2939.42.0000 | FREE | 60-C-A-S-10 |
| 'HAZARDOUS SHIPMENT OF : |  |  |  |
| PHENYLPROPANOLAMINE HCL , 40 MESH, USP | 2939.49.0100 | FREE | 60-C-Q-S-49 |
| HAZARDOUS SHIPMENT OF : (B) |  |  |  |
| PHENYLPROPANOLAMINE HCL, 200 MESH USP | 2939.49.0100 | FREE | 60-C-Q-S-49 |
| HAZARDOUS SHIPMENT OF : (C) |  |  |  |



*****IF FDA  REQUIRED PLEASE CHECK MFG NAME 'S BEFORE MAKING ENTRY******
**** PLEASE ENCLOSED THE PROPER HAZARDOUS INFORMATION ON  D.O. *******

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,     )
                                           )
                     Plaintiffs,           )
                                           )
          v.                               )     **Civil Action 07-01296 (HHK)**
                                           )
ALBERTO GONZALES, *et al.*,                )
                                           )
                     Defendants.           )
                                           )

EXHIBIT 24a–24c

# Container Breakdown

(PLEASE ADVISE OF ANY DISCREPANCIES IMMEDIATELY)

**DASTECH INTERNATIONAL INC**
10 CUTTERMILL ROAD GREAT NECK, NY 11021
TEL 516-466-7676 FAX # 516-466-7699

**HAWKS EXPRESS INC.**

**Fax** 973-344-2525

Reference # **07-201A**

Trucker: **HAWKS EXPRESS INC.**

ETA **5/31/2007**

Recieved Date:

Cust #: **ttnu5643878**

| | | | | Info To Be Filled Out By Receiver | | | |
|---|---|---|---|---|---|---|---|
| Product Name | Lot# | Qty To Be Rec'd | | Qty Rec'd | Damaged Qty Per Lot | Drum Condition | Gross Weight |
| Psudoephedrine HCl 40 MESH, USP | 70401 | 40 | 25 | | | | |
| | | Pcs | kgs | drums | | | |

Received by: _____

Do not Ship without Signed Purchase Order, MUST BE KEPT INSIDE CAGE

**Fax** 973-344-2525

**HAWKS EXPRESS INC.**

Received Date:

Cust #: **ttnu5643878**

Reference #    **07-201B**

Trucker: **HAWKS EXPRESS INC.**

## Container Breakdown

(PLEASE ADVISE OF ANY DISCREPANCIES IMMEDIATELY)

*DASTECH INTERNATIONAL INC*
10 CUTTERMILL ROAD GREAT NECK, NY 11021
TEL 516-466-7676 FAX # 516-466-7699

**ETA 5/31/2007**

### Info To Be Filled Out By Receiver

| Product Name | Lot# | Qty To Be Rec'd | | | | Qty Rec'd | Damaged Qty Per Lot | Drum Condition | Gross Weight |
|---|---|---|---|---|---|---|---|---|---|
| Phenylpropanolamine , 40 Mesh  Crystal USP | 70208 | 20 | 20 | 50 | kgs | drums | | | |
| | | | | | | | | | |

Received by: _____

**HAWKS EXPRESS INC.**

Fax    973-344-2525

Received Date:

Cust#: **ttnu5643878**

Reference #    **07-201C**

Trucker:    **HAWKS EXPRESS INC.**

## Container Breakdown

(PLEASE ADVISE OF ANY DISCREPANCIES IMMEDIATELY)

**DASTECH INTERNATIONAL INC**
10 CUTTERMILL ROAD GREAT NECK, NY 11021
TEL 516-466-7676 FAX # 516-466-7699

**ETA 5/31/2007**

| Product Name | Lot# | Qty To Be Rec'd | | | Info To Be Filled Out By Receiver | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Pcs | kgs | drums | Qty Rec'd | Damaged Qty Per Lot | Drum Condition | Gross Weight |
| Phenylpropanolamine HCL, 200 Mesh USP | 70305 | 6 | 40 | | | | | |

Received by: _____

Do not Ship without Signed Purchase Order, MUST BE KEPT INSIDE CAGE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ALBERTO GONZALES, *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**Civil Action 07-01296 (HHK)**

**EXHIBIT 25**

FROM BETA                                    (FRI) 8. 10' 07 18:30/ST. 18:29/NO. 4861391817 P 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC.,                )
et al.,                                     )
                        Plaintiffs          )
                                            )
        v.                                  )        Civil Action No. 1:07-CV-01296
                                            )        (HHK)
                                            )
ALBERTO GONZALES, et al.,                   )
                                            )
                        Defendants          )
                                            )

## CORRECTION TO ATTACHED DECLARATION OF RICHARD TILNEY,
## FILED JULY 24, 2007

I, Richard Tilney, pursuant to 28 U.S.C. § 1746, declare and say:

1.     On July 24, 2007, I executed a declaration in the instant case, attached herein as Exhibit 21. In that declaration, which was filed with this Court on July 24, 2007, I stated the following:

> On March 28, 2007, DEA received a completed DEA Form 486 from Dastech c/o Hawks for 1000 kilograms of pseudoephedrine HCl. This shipment was imported into the United States along with 1000 kilograms of Phenylpropanolamine, also shipped pursuant to a DEA-486 submitted by Dastech c/o Hawks. A copy of both DEA forms 486 is attached herein as Exhibits 4-4a. Both DEA-486 forms listed the Customs Broker as J.W. Hampton.

> Based on information received by DEA, this shipment of phenylpropanolamine and pseudoephedrine was actually scheduled to be shipped to the Dastech New York location, an unregistered location. A copy of the CBP data is attached as Exhibit 5. Moreover, the CBP data shows an actual shipment of 66 drums which includes 40-25 kilogram drums of pseudoephedrine (1000 kg) and 26-50 kilogram drums of



phenylpropanolamine (1300 kg). However, the DEA-486 submitted by
Dastech c/o Hawks shows a declaration of only 1000 kilograms of
phenylpropanolamine, *leaving 300 kilograms undeclared.*

(Italics added). *See* Exhibit 21, p. 6. As set forth below, certain of these statements were
incorrect.

2.      Since the filing of that declaration, I received a copy of a third DEA form
486 ("DEA-486") completed by Dastech c/o Hawk's and filed with DEA. This third
DEA-486 was provided to me on July 30, 2007, by J.M. Rodgers Co., the actual Customs
Broker who handled the transactions described in paragraph 1 above. In that DEA-486,
attached hereto at Exhibit 20, Dastech c/o Hawk's declared a shipment of 240 kilograms
of phenylpropanolamine with an estimated arrival date of May 30, 2007.

3.      After receiving the DEA-486 from J.M. Rodgers Co., I conducted another
search through documents which the Plaintiff previously provided to me on June 18,
2007. After conducting that search, I discovered that the Plaintiff has also provided me
with a copy of the DEA-486 which referenced the shipment of 240 kilograms of
phenylpropanolamine.

4.      Based on the documents provided to me by both J.M. Rodgers Co. and the
Plaintiff, it appears that a total of 1240 kilograms of phenylpropanolamine was imported
in the shipment referenced above, and that the 1240 kilograms had been declared in *two*
separate DEA-486 forms. Therefore, the allegation that Plaintiff failed to declare 300
kilograms of phenylpropanolamine was incorrect and is withdrawn. This allegation was
also made in an affidavit submitted by DEA Diversion Investigator William Salera as
part of an Application for Seizure Warrant, filed June 21, 2007, in the United States

District Court, District of New Jersey.  DEA is currently taking appropriate measures to correct that error as well.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Richard J. Tilney
Group Supervisor
Office of Diversion Control
New Jersey Division

Executed this 10ᵗʰ day of August, 2007 at Newark, New Jersey.

3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**EXHIBIT 26**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 07-1296 (HHK) |
| | ) |
| ALBERTO GONZALES, et al., | ) |
| | ) |
| Defendants. | ) |

## SECOND AFFIDAVIT OF LUZ CAZENEUVE

**State of New York**        :

**County of New York**    : **ss:**

The undersigned, Luz Cazeneuve, having personal knowledge of the following matters, states as follows:

1.    I am the Import Manager for Dastech International, Inc. ("Dastech"), a New York corporation. Dastech is an importer of chemicals for the pharmaceutical, industrial, and pulp and paper industries, pharmaceutical products and other varied products. I began working for Dastech in 1994 . My first position was traffic manager. I was promoted to the position of Import Manager in 1996.

2.    Robert Kahen is the vice president of Dastech.

3.    As Import Manager for Dastech, I am responsible for the day-to-day business of importing products from overseas. As the import manager I have the primary responsibility for all the functions related to importing goods for Dastech, including regulatory compliance.

4.    As part of my regulatory compliance responsibilities, I fill out and submit the applications for the renewal of Dastech's DEA Certificates of Registration. A DEA Certificate

1



of Registration is a prerequisite for the importation of listed chemicals. I also pay the fees associated with these applications using Robert Kahen 's credit card. *See* Attachment 1 (Robert Kahen credit card activity).

5.    Since I began working for Dastech in 1994, only Robert Kahen and myself have been authorized to maintain and renew Dastech's DEA Certificates of Registration. I renew Dastech's DEA Certificates of Registration in Dastech's name using the DEA's online DEA Form 510A. *See* Attachment 2 (Dastech's last set of completed DEA Form 510A).

6.    Tiger Freight International is not a trucking company, but is a NVOCC.

7.    In the past, Dastech had imported listed chemicals to California under DEA registration #K354075023 Dastech c/o Admiral Transportation, 300 N. Baldwin Park Blvd., City of Industry, California 91748.

8.    Sometime before January 25, 2005, Diversion Investigator ("DI") Eliana Escobar informed me that the DEA had conducted an inspection of Admiral Transportation for reasons completely unrelated to Dastech's handling of listed chemicals.

9.    DI Escobar also informed me that Admiral Transportation was not in compliance with new California regulations concerning the storage of listed chemicals and hazardous waste. I later learned that these regulations had been enacted just a few months before the DEA inspected Admiral Transportation. I then realized that Dastech had to find a warehouse that would comply with the new California laws if it wished to continue importing listed substances into California.

10.    DI Escobar was extremely helpful in trying to remedy the above situation. She provided me with a list of California warehouses that might be able to comply with the new California laws. *See* List of California Warehouses (Exhibit 1.)

2

11.    Despite Dastech's best efforts and even with the help of the DEA, it could not find a suitable California warehouse.  Other similarly situated importers also failed to find new accommodations.  Because it could not find a warehouse that would comply with the new California regulations, Dastech decided to stop importing to California.  As such, it no longer had a need for its DEA registration for the California warehouse.  Consequently, Dastech decided to surrender this DEA registration.

12.    Dastech then authorized me to act as its agent to voluntarily surrender the California DEA registration.  Knowing that Dastech had committed no regulatory violation, I checked the box that stated "in view of my desire to terminate handling of all List 1 chemicals" I voluntarily surrender my DEA registration.  *See* Voluntary Surrender Form dated Jan. 25, 2005 (Exhibit 2).  I executed this form on January 25, 2005.  Since that date, Dastech has not imported listed chemicals to California.

13.    On June 6, 2007, I received an email from DEA Diversion Group Supervisor Richard Tilney ("Tilney").  In this email, Mr. Tilney requested that I sign two DEA Form 104s that were electronically attached to his email.  After reviewing the DEA Form 104s, they appeared to be forms to surrender Dastech's DEA Certificates of Registration.  Mr. Tilney's email also requested that I immediately fax the signed DEA Form 104s to him and that I send the signed original forms via overnight express to his office.  Contrary to what the forms indicated, Mr. Tilney had never "fully advised me of my rights" in his correspondence.

14.    Later in the day on June 6, 2007, I received a facsimile from Mr. Tilney.  This facsimile contained a cover sheet and two DEA Form 104s.  The instructions on the cover sheet largely mirrored those contained in his email from earlier in the day --- he requested that I sign the two DEA Form 104s, immediately fax the signed forms to him, and then overnight the signed originals to his office.

3

15.    Knowing how critical Dastech's DEA Certificates of Registration are to Dastech's continued operation and knowing that Dastech had done nothing wrong, I refused to sign the forms.

16.    On June 7, 2007, a Thursday, I received a call from Mr. Tilney. He requested that I come into his office in New Jersey the following day to discuss the voluntary surrender of Dastech's DEA Certificates of Registration. I told Mr. Tilney that I could not come in on the following day because I will be taken a day off Friday  Subsequently, Dastech retained counsel to represent it in this matter.

17.    Sometime in August of 1999, RP Scherer ordered 4,500 kilograms of pseudoephedrine from Dastech. *See* Letter to DI Boerner (Jan. 29 2001) (Exhibit 1). Because this order was placed over eight years ago, I have been unable to locate the purchase order itself. The DEA, however, was previously provided with RP Scherer's purchase order for the 4,500 kilos of pseudoephedrine. *See* Letter to DI Boerner (Dec. 15, 2000) (Exhibit 2).

18.    In 2002, the DEA notified Dastech that it was improperly inserting its central office address (in Great Neck, New York) on the DEA Form 486 rather than its New Jersey registered location. No penalty was ever assessed against Dastech for this inadvertent error; the DEA simply wanted to make sure Dastech was aware that it was required to identify its DEA registered addresses on the Form 486, not its central office address. Dastech corrected the errors and has not made the same mistake since.

FURTHER AFFIANT SAYETH NAUGHT.

Luz Cazeneuve

The foregoing Affidavit was sworn to and signed in my presence, this _17_ day of _Sep, 2007_ September, 2007.

Notary Public

DAVID E. POUR
Notary Public, State of New York
No. 02PO6016909
Qualified in the County of Nassau
Commission Expires February 26, 2011

4

# DASTECH INTERNATIONAL, INC.

10 Cutter Mill Road, Great Neck, New York 11021 USA
516-466-7676 * FAX: 516-466-7699        E-MAIL: DASTECH@WORLDNET.ATT.NET

DATE: January 29, 2001                COVER + 0 Page

| NAME: | MR. TIMOTHY P. BOERNER |
|---|---|
| COMPANY: | DRUG ENFORCEMENT ADMINSTRATION |
| FAX NO.: | 973-297-4842 |

DEAR MR. BOERNER:

AS PER YOUR DISCUSSIONS OF EARLIER WITH MS. LUZ CAZANEUVE, AND AS PER
YOUR REQUEST, BELOW PLEASE FIND A SUMMARY OF OUR HISTORY WITH HARRIS
AND FORD.

MR. JOE FORD OF HARRIS AND FORD CONTACTED US SOMETIME IN SUMMER OF 1997
TO LEARN MORE ABOUT DASTECH AND DISCUSS SOME OF THE PRODUCTS OF
MUTUAL INTEREST. WE BECAME INTERESTED IN TRYING TO DEAL WITH THEM
SINCE THEY WERE DISTRIBUTING SOME OF THE PRODUCTS THAT WE WERE IMPORT-
ING REGULARLY. IN ORDER TO ESTABLISH THE BUSINESS, WE ASKED FOR CREDIT
REFERENCES AND THEY ALSO ASKED US FOR COPIES OF CERTIFICATES OF ANALYSIS
OF PPA, PSEUDOEPHEDRINE, METHYL PARABEN AND PROPYL PARABEN. THEY SENT
US THE REFERENCES AND UPON THEIR CHECKING, WE FOUND THEM SATISFACTORY
AND CREDIT WORTHY TO EXTEND CREDIT IN CASE OF BUSINESS.

IN SEPTEMBER 1997, THEY ASKED ABOUT OUR INVENTORY FOR PSEUDOEPHEDRINE,
SPECIFICALLY MANUFACTURED BY XINJIANG TOCXUN FACTORY IN CHINA. WE
INFORMED THEM THAT WE HAVE ONE TON FROM THIS MANUFACTURER IN STOCK
AND FAXED COPIES OF THE ORIGINAL COA'S. WITHIN A WEEK, WE RECEIVED A
WRITTEN ORDER FOR ONE TON OF PSEUDO FOR DELIVERY TO R.P. SCHERER.
HOWEVER, R.P. SCHERER REQUIRED A MILLED MATERIAL, THAT WE ACCEPTED TO
HAVE DONE. THEY WANTED THE FIRST 500 KILOS FOR PROMPT SHIPMENT AND THE
SECOND 500 KILOS IN OCTOBER 1997. THEIR ORDERS WERE FOR DIRECT SHIPMENT
FROM DASTECH'S WAREHOUSE TO R.P. SCHERER OF NORTH AMERICA IN FLORIDA.
WE ASKED FOR A COPY OF THEIR DEA LICENSE, BUT WERE INFORMED THAT THEY
DID NOT HAVE ONE. AFTER THEY CHECKED WITH DEA IN WASHINGTON, THEY WERE
INFORMED THAT SINCE THE GOODS ARE GOING DIRECTLY TO CUSTOMER AND THEY
HAVE NO CONTACT WITH THE PRODUCT, THEY DO NOT NEED TO HAVE DEA
REGISTRATION.

AFTER SUCCESSFUL COMPLETION OF THE ABOVE ORDERS, WE STARTED TO TALK
AND WORK WITH HARRIS AND FORD ABOUT OTHER BUSINESSES AS WELL. WE SOLD





THEM SOME OTHER NON-REGULATED PRODUCTS. SOME OF THE SHIPMENTS WERE TO HARRIS AND FORD AND SOME DIRECTLY TO THE END USERS.

WE CONTINUED TO WORK WITH THEM IN 1998 FOR VARIETY OF OTHER PRODUCTS. WE ALSO CONTINUED TO DISCUSS THE PSEUDO BUSINESS FOR R.P. SCHERER. WE WERE INFORMED OF THE GOOD WORKING RELATIONSHIP BETWEEN HARRIS AND FORD AND R.P. SCHERER AND THAT HARRIS AND FORD WAS SELLING OTHER PRODUCTS TO THEM AS WELL. DUE TO HARRIS AND FORD'S MINORITY STATUS, THEY HAD CERTAIN ADVANTAGES IN WORKING WITH R.P. SHCERER. UNFORTUNATELY, WE LOST THE BID AND DID NOT GET ANY PSEUDO BUSINESS FROM THEM (HARRIS AND FORD/R.P. SCHERER) IN 1998.

WE CONTINUED OUR RELATIONSHIP WITH HARRIS AND FORD IN 1999 AND KEPT DIS-CUSSING THE BUSINESS WITH THEM. WE SOLD SOME OTHER PRODUCTS AGAIN. IN JULY/AUGUST OUR DISCUSSIONS ABOUT UPCOMING PSEUDO BUSINESS BECAME MORE SERIOUS. FINALLY IN AUGUST 1999, WE WERE INFORMED BY MR. JOE FORD THAT WE WILL GET AN ORDER FOR 4,500 KILOS OF PSEUDO FOR DELIVERY IN NEXT 4-6 MONTHS. AGAIN, THE PRODUCT WAS TO BE ONLY FROM XINJIANG TOCXUN FACTORY. THE FIRST R.P. SCHERER WRITTEN ORDER FOR 1,500 KILOS WAS FAXED TO US FROM HARRIS AND FORD IN AUGUST 1999 REQUESTING DELIVERY IN SEPTEMBER. WE IMMEDIATELY PLACED OUR ORDER WITH CHINA FOR SHIPMENT BY AIR AND WENT AHEAD TO GET THE DEA RELEASE. UPON RECEIPT OF THE LETTER OF NO OBJECTION, WE SENT A COPY TO OUR SUPPLIER IN CHINA AND ASKED THAT THEY ARRANGE FOR PROMPT SHIPMENT ONCE ALL THE FORMALITIES HAD BEEN MADE. BY THE TIME THE MATERIAL WAS TO ARRIVE IN USA, WE HAD PASSED THE DELIVERY DATE, SO WE ASKED HARRIS AND FORD TO GET AN EXTENSION AND WE WERE TOLD THAT THEY WILL GRANT US SOME MORE TIME. AT THE SAME TIME, WE RECEIVED THE ORDER (R.P. SCHERER'S ORDER FAXED BY HARRIS AND FORD) FOR THE BALANCE 3,000 KILOS. AGAIN, WE FOLLOWED THE SAME PROCEDURE TO PLACE OUR ORDER WITH CHINA AND APPLY FOR DEA NON-OBJECTION LETTER.

UPON THE ARRIVAL OF THE FIRST 1,500 KILOS OF PSEUDO AND DUE TO TIGHT DELIVERY SCHEDULE, WE ASKED FOR PERMISSION FROM DEA (IN NEWARK) AND RECEIVED THE SAME TO SHIP THE GOODS DIRECTLY FROM THE AIRPORT TO THE COMPANY THAT WAS TO MILL THE PRODUCT. HOWEVER, BY THE TIME THE MATERIAL WAS MILLED AND RECEIVED IN OUR WAREHOUSE, WE WERE INFOMRED THAT R.P. SCHERER COULD NOT WAIT ANY LONGER AND HAD ALREADY PURCHASED MATERIAL FROM ANOTHER SUPPLIER FOR THAT RUN. WE WERE ASKED TO HOLD ON TO THIS SHIPMENT FOR THEIR NEXT RELEASE.

AT THE SAME TIME, WE LEARNED ABOUT TIGHTER DEA REGULATIONS. THIS TIME WE CONFIRMED WITH DEA IN WASHINGTON IF WE CAN CONTINUE TO SHIP TO R.P SCHERER BUT BILL HARRIS AND FORD. WE WERE INFORMED THAT REGULATION REQUIRES THAT HARRIS AND FORD TO BE REGISTRERED WITH DEA. SO WE SHARED OUR FINDINGS WITH HARRIS AND FORD. THEY ADVISED US THAT THEY DID NOT HAVE A DEA LICENSE. SO WE STARTED TO TALK TO THEM TO TRY TO MAKE THEM UNDERSTAND ABOUT THE NEW REGULATIONS AND EVEN FAXED THEM COPIES OF CFR REGULATIONS ABOUT THIS MATTER. WE TOLD THEM OF THE ONLY TWO



OPTIONS AVAILABLE TO DO THIS BUSINESS. ONE WAS FOR HARRIS AND FORD TO GET A DEA REGISTRATION OR THE SECOND CHOICE WAS FOR R.P. SCHERER TO ALLOW US TO SHIP AND BILL THEM DIRECTLY (AND PAY A COMMISSION TO HARRIS AND FORD). HOWEVER, R.P. SCHERER REFUSED THE IDEA, SINCE DASTECH DID NOT HAVE A VENDOR NUMBER WITH R.P. SCHERER AND THAT THEY WANTED TO ONLY WORK THRU HARRIS AND FORD.

WE DISCUSSED THIS MATTER IN LENGTH WITH MR. JOE FORD AND EVEN WITH THEIR SALESMAN (MR. ED WALTERS) IN FLORIDA URGING THEM TO EITHER GET A DEA REGISTRATION OR TO CONVINCE R.P. SCHERER TO ISSUE A VENDOR NUMBER FOR DASTECH. HARRIS AND FORD HAD TOLD US THAT THEY WILL LOOK INTO GETTING A DEA REGISTRATION, BUT NEVER DID SO TO THE BEST OF OUR KNOWLEDGE. FINALLY, HAVING 3,000 KILOS OF PSEUDO ON HAND AND ANOTHER 1,500 KILOS ON THE WAY, AND KNOWING THAT R.P. SHCERER WILL NOT ALLOW US TO BILL AND SHIP DIRECTLY TO THEM AND HAVING NO INDICATION THAT HARRIS AND FORD HAD EVEN APPLIED FOR DEA REGISTRATION, THE GOODS WERE PUT BACK IN INVENTORY FOR DOMESTIC SALES.

I HOPE YOU WILL FIND THE ABOVE SUMMARY HELPFUL. PLEASE DO NOT HESITATE TO CALL ME PERSONALLY, IF YOU HAVE ANY QUESTIONS ABOUT THIS MATTER OR IF I CAN BE OF ANY ASSISTANCE TO YOU TO CLARIFY THIS MATTER.

LOOKING FORWARD TO HEARING FROM YOU SOON. WE REMAIN,

BEST REGARDS

ROBERT KAHEN
VICE PRESIDENT





# DASTECH INTERNATIONAL, INC.

December 15, 2000

10 Cutter Mill Road • Great Neck, New York 11021
(516) 466-7676 • Fax: (516) 466-7699
Email: Dastech@worldnet. att. net
Website: www.Dastech.com

Timothy P. Boerner
Diversion Investigator
80 Mulberry Street, 2nd Floor
Newark, New Jersey 07102

> RE:    4,500   Kilograms   of   Pseudoephedrine,   Hcl
> Originally Imported By Dastech International, Inc.
> For RP Scherer

Dear Tim,

As per your request, enclosed please find copies of purchase orders for the distribution of the above-mentioned chemical. These orders were submitted by various customers after certainty was established that RP Scherer would not fulfill these orders and purchase the chemical.

During our meeting, it was stated that DEA believes that Dastech, and I, had provided false information to the DEA in order to obtain letters of no objection for the importation of the above-mentioned product. While I already told you that Dastech received RP Scherer purchase orders from Harris & Ford, LLC and provided you with evidence demonstrating that these bona fide purchase orders from RP Scherer were indeed received by Dastech, I have enclosed a copy of the said purchase orders. Please note that these documents include a heading on every page, verifying that in fact these RP Scherer purchase orders were faxed from Harris & Ford, LLC to Dastech.

I hope that this documentation will satisfy you that we acted properly and in good faith in obtaining the no objection letters in this matter.

Best Regards,

Luz Cazeneuve, Import Manager
Dastech International, Inc.



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

EXHIBIT 27

**TELEFAX**

*Cover plus 18 Page(s)*

# DASTECH INTERNATIONAL, INC.

10 Cutter Mill Road, Great Neck, New York 11021 USA
516-466-7676 * FAX: 516-466-7699 * E-MAIL: info@dastech.com

June 6, 2007

DEA (Drug Enforcement Administration)
Attention: Mr. Harry McFadden
Fax # 202-307-4702

## RE: RE-SUBMISSION OF DEA 486 FOR 4 SHIPMENTS (PER DISCUSSION AND INSTRUCTIONS FROM MR. MARK VIA OF DEA)

Dear Mr. McFadden:

Per discussion and assistance from Mr. Mark Via of DEA, we are re-submitting DEA 486 for four import shipments of Red Phosphorous.

Reason is that we have incorrectly listed under box 1a. (of the old DEA 486 format) our corporate address (10 Cutter Mill Road, Great Neck, NY 11021 Tel. 516-466-7676) instead of the actual c/o address listed on our DEA registrations.

Please be advised that all shipments have been assigned a DEA Control number. Pls. advise DEA Control number after consideration of the revision.

| Our PO Number | Assigned DEA Control Number | DEA Control Number after Revision (PLEASE ADVISE AND FAX TO 516-466-7699) |
|---|---|---|
| PK-6551 | 5043831 | 5049368 |
| PC-7162 | 5047483 | 5049366 |
| PD-7216 | 5047953 | 5049367 |
| PD-7231 | 5048251 | 5049369 |

Attached are copies of the previous DEA 486 submitted to your good office and the new revised DEA 486.

Thank you very much for your time, attention and immediate assistance. We remain,

Kindest Regards,

Ryan Tajonera (for Ms. Luz Cazeneuve)
Dastech International, Inc.



# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

# EXHIBIT 28a–28b

# DASTECH INTERNATIONAL, INC.

10 Cutter Mill Road, Great Neck, New York 11021 USA
516-466-7676 * FAX: 516-466-7699          E-MAIL: DASTECH@WORLDNET.ATT.NET

DATE: January 29, 2001                    COVER + 0 Page

| NAME: | MR. TIMOTHY P. BOERNER |
| COMPANY: | DRUG ENFORCEMENT ADMINSTRATION |
| FAX NO.: | 973-297-4842 |

DEAR MR. BOERNER:

AS PER YOUR DISCUSSIONS OF EARLIER WITH MS. LUZ CAZANEUVE, AND AS PER
YOUR REQUEST, BELOW PLEASE FIND A SUMMARY OF OUR HISTORY WITH HARRIS
AND FORD.

MR. JOE FORD OF HARRIS AND FORD CONTACTED US SOMETIME IN SUMMER OF 1997
TO LEARN MORE ABOUT DASTECH AND DISCUSS SOME OF THE PRODUCTS OF
MUTUAL INTEREST. WE BECAME INTERESTED IN TRYING TO DEAL WITH THEM
SINCE THEY WERE DISTRIBUTING SOME OF THE PRODUCTS THAT WE WERE IMPORT-
ING REGULARLY.  IN ORDER TO ESTABLISH THE BUSINESS, WE ASKED FOR CREDIT
REFERENCES AND THEY ALSO ASKED US FOR COPIES OF CERTIFICATES OF ANALYSIS
OF PPA, PSEUDOEPHEDRINE, METHYL PARABEN AND PROPYL PARABEN. THEY SENT
US THE REFERENCES AND UPON THEIR CHECKING, WE FOUND THEM SATISFACTORY
AND CREDIT WORTHY TO EXTEND CREDIT IN CASE OF BUSINESS.

IN SEPTEMBER 1997, THEY ASKED ABOUT OUR INVENTORY FOR PSEUDOEPHEDRINE,
SPECIFICALLY MANUFACTURED BY XINJIANG TOCXUN FACTORY IN CHINA. WE
INFORMED THEM THAT WE HAVE ONE TON FROM THIS MANUFACTURER IN STOCK
AND FAXED COPIES OF THE ORIGINAL COA'S. WITHIN A WEEK, WE RECEIVED A
WRITTEN ORDER FOR ONE TON OF PSEUDO FOR DELIVERY TO R.P. SCHERER.
HOWEVER, R.P. SCHERER REQUIRED A MILLED MATERIAL, THAT WE ACCEPTED TO
HAVE DONE. THEY WANTED THE FIRST 500 KILOS FOR PROMPT SHIPMENT AND THE
SECOND 500 KILOS IN OCTOBER 1997. THEIR ORDERS WERE FOR DIRECT SHIPMENT
FROM DASTECH'S WAREHOUSE TO R.P. SCHERER OF NORTH AMERICA IN FLORIDA.
WE ASKED FOR A COPY OF THEIR DEA LICENSE, BUT WERE INFORMED THAT THEY
DID NOT HAVE ONE. AFTER THEY CHECKED WITH DEA IN WASHINGTON, THEY WERE
INFORMED THAT SINCE THE GOODS ARE GOING DIRECTLY TO CUSTOMER AND THEY
HAVE NO CONTACT WITH THE PRODUCT, THEY DO NOT NEED TO HAVE DEA
REGISTRATION.

AFTER SUCCESSFUL COMPLETION OF THE ABOVE ORDERS, WE STARTED TO TALK
AND WORK WITH HARRIS AND FORD ABOUT OTHER BUSINESSES AS WELL.  WE SOLD





THEM SOME OTHER NON-REGULATED PRODUCTS. SOME OF THE SHIPMENTS WERE TO HARRIS AND FORD AND SOME DIRECTLY TO THE END USERS.

WE CONTINUED TO WORK WITH THEM IN 1998 FOR VARIETY OF OTHER PRODUCTS. WE ALSO CONTINUED TO DISCUSS THE PSEUDO BUSINESS FOR R.P. SCHERER. WE WERE INFORMED OF THE GOOD WORKING RELATIONSHIP BETWEEN HARRIS AND FORD AND R.P. SCHERER AND THAT HARRIS AND FORD WAS SELLING OTHER PRODUCTS TO THEM AS WELL. DUE TO HARRIS AND FORD'S MINORITY STATUS, THEY HAD CERTAIN ADVANTAGES IN WORKING WITH R.P. SHCERER. UNFORTUNATELY, WE LOST THE BID AND DID NOT GET ANY PSEUDO BUSINESS FROM THEM (HARRIS AND FORD/R.P. SCHERER) IN 1998.

WE CONTINUED OUR RELATIONSHIP WITH HARRIS AND FORD IN 1999 AND KEPT DIS- CUSSING THE BUSINESS WITH THEM. WE SOLD SOME OTHER PRODUCTS AGAIN. IN JULY/AUGUST OUR DISCUSSIONS ABOUT UPCOMING PSEUDO BUSINESS BECAME MORE SERIOUS. FINALLY IN AUGUST 1999, WE WERE INFORMED BY MR. JOE FORD THAT WE WILL GET AN ORDER FOR 4,500 KILOS OF PSEUDO FOR DELIVERY IN NEXT 4-6 MONTHS. AGAIN, THE PRODUCT WAS TO BE ONLY FROM XINJIANG TOCXUN FACTORY. THE FIRST R.P. SCHERER WRITTEN ORDER FOR 1,500 KILOS WAS FAXED TO US FROM HARRIS AND FORD IN AUGUST 1999 REQUESTING DELIVERY IN SEPTEMBER. WE IMMEDIATELY PLACED OUR ORDER WITH CHINA FOR SHIPMENT BY AIR AND WENT AHEAD TO GET THE DEA RELEASE. UPON RECEIPT OF THE LETTER OF NO OBJECTION, WE SENT A COPY TO OUR SUPPLIER IN CHINA AND ASKED THAT THEY ARRANGE FOR PROMPT SHIPMENT ONCE ALL THE FORMALITIES HAD BEEN MADE. BY THE TIME THE MATERIAL WAS TO ARRIVE IN USA, WE HAD PASSED THE DELIVERY DATE, SO WE ASKED HARRIS AND FORD TO GET AN EXTENSION AND WE WERE TOLD THAT THEY WILL GRANT US SOME MORE TIME. AT THE SAME TIME, WE RECEIVED THE ORDER (R.P. SCHERER'S ORDER FAXED BY HARRIS AND FORD) FOR THE BALANCE 3,000 KILOS. AGAIN, WE FOLLOWED THE SAME PROCEDURE TO PLACE OUR ORDER WITH CHINA AND APPLY FOR DEA NON-OBJECTION LETTER.

UPON THE ARRIVAL OF THE FIRST 1,500 KILOS OF PSEUDO AND DUE TO TIGHT DELIVERY SCHEDULE, WE ASKED FOR PERMISSION FROM DEA (IN NEWARK) AND RECEIVED THE SAME TO SHIP THE GOODS DIRECTLY FROM THE AIRPORT TO THE COMPANY THAT WAS TO MILL THE PRODUCT. HOWEVER, BY THE TIME THE MATERIAL WAS MILLED AND RECEIVED IN OUR WAREHOUSE, WE WERE INFOMRED THAT R.P. SCHERER COULD NOT WAIT ANY LONGER AND HAD ALREADY PURCHASED MATERIAL FROM ANOTHER SUPPLIER FOR THAT RUN. WE WERE ASKED TO HOLD ON TO THIS SHIPMENT FOR THEIR NEXT RELEASE.

AT THE SAME TIME, WE LEARNED ABOUT TIGHTER DEA REGULATIONS. THIS TIME WE CONFIRMED WITH DEA IN WASHINGTON IF WE CAN CONTINUE TO SHIP TO R.P SCHERER BUT BILL HARRIS AND FORD. WE WERE INFORMED THAT REGULATION REQUIRES THAT HARRIS AND FORD TO BE REGISTRERED WITH DEA. SO WE SHARED OUR FINDINGS WITH HARRIS AND FORD. THEY ADVISED US THAT THEY DID NOT HAVE A DEA LICENSE. SO WE STARTED TO TALK TO THEM TO TRY TO MAKE THEM UNDERSTAND ABOUT THE NEW REGULATIONS AND EVEN FAXED THEM COPIES OF CFR REGULATIONS ABOUT THIS MATTER. WE TOLD THEM OF THE ONLY TWO



OPTIONS AVAILABLE TO DO THIS BUSINESS. ONE WAS FOR HARRIS AND FORD TO GET A DEA REGISTRATION OR THE SECOND CHOICE WAS FOR R.P. SCHERER TO ALLOW US TO SHIP AND BILL THEM DIRECTLY (AND PAY A COMMISSION TO HARRIS AND FORD). HOWEVER, R.P. SCHERER REFUSED THE IDEA, SINCE DASTECH DID NOT HAVE A VENDOR NUMBER WITH R.P. SCHERER AND THAT THEY WANTED TO ONLY WORK THRU HARRIS AND FORD.

WE DISCUSSED THIS MATTER IN LENGTH WITH MR. JOE FORD AND EVEN WITH THEIR SALESMAN (MR. ED WALTERS) IN FLORIDA URGING THEM TO EITHER GET A DEA REGISTRATION OR TO CONVINCE R.P. SCHERER TO ISSUE A VENDOR NUMBER FOR DASTECH. HARRIS AND FORD HAD TOLD US THAT THEY WILL LOOK INTO GETTING A DEA REGISTRATION, BUT NEVER DID SO TO THE BEST OF OUR KNOWLEDGE. FINALLY, HAVING 3,000 KILOS OF PSEUDO ON HAND AND ANOTHER 1,500 KILOS ON THE WAY, AND KNOWING THAT R.P. SHCERER WILL NOT ALLOW US TO BILL AND SHIP DIRECTLY TO THEM AND HAVING NO INDICATION THAT HARRIS AND FORD HAD EVEN APPLIED FOR DEA REGISTRATION, THE GOODS WERE PUT BACK IN INVENTORY FOR DOMESTIC SALES.

I HOPE YOU WILL FIND THE ABOVE SUMMARY HELPFUL. PLEASE DO NOT HESITATE TO CALL ME PERSONALLY, IF YOU HAVE ANY QUESTIONS ABOUT THIS MATTER OR IF I CAN BE OF ANY ASSISTANCE TO YOU TO CLARIFY THIS MATTER.

LOOKING FORWARD TO HEARING FROM YOU SOON. WE REMAIN,

BEST REGARDS

ROBERT KAHEN
VICE PRESIDENT





# DASTECH INTERNATIONAL, INC.

December 15, 2000

10 Cutter Mill Road • Great Neck, New York 11021
(516) 466-7676 • Fax: (516) 466-7699
Email: Dastech@worldnet. att. net
Website: www.Dastech.com

Timothy P. Boerner
Diversion Investigator
80 Mulberry Street, 2nd Floor
Newark, New Jersey 07102

RE:    4,500 Kilograms of Pseudoephedrine, Hcl
Originally Imported By Dastech International, Inc.
For RP Scherer

Dear Tim,

As per your request, enclosed please find copies of purchase orders for the distribution of the above-mentioned chemical. These orders were submitted by various customers after certainty was established that RP Scherer would not fulfill these orders and purchase the chemical.

During our meeting, it was stated that DEA believes that Dastech, and I, had provided false information to the DEA in order to obtain letters of no objection for the importation of the above-mentioned product. While I already told you that Dastech received RP Scherer purchase orders from Harris & Ford, LLC and provided you with evidence demonstrating that these bona fide purchase orders from RP Scherer were indeed received by Dastech, I have enclosed a copy of the said purchase orders. Please note that these documents include a heading on every page, verifying that in fact these RP Scherer purchase orders were faxed from Harris & Ford, LLC to Dastech.

I hope that this documentation will satisfy you that we acted properly and in good faith in obtaining the no objection letters in this matter.

Best Regards,

Luz Cazeneuve, Import Manager
Dastech International, Inc.



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ <br><br> DASTECH INTERNATIONAL, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALBERTO GONZALES, *et al.*, <br><br> Defendants. <br> _____ | **Civil Action 07-01296 (HHK)** |

EXHIBIT 29

02/14/2007  15:32  ]' "4667699                      'L.                    PAGE  04

**U.S. Department of Justice**
Drug Enforcement Administration

████████████

**IMPORT/EXPORT DECLARATION**
Precursor and Essential Chemicals

| SEE REVERSE FOR INSTRUCTIONS AND PRIVACY ACT. | | OMB Approval No. 1117-0023 |
|---|---|---|

| 1.  CHECK ONE: | | U.S. CUSTOMS CERTIFICATION |
|---|---|---|
| [✓] IMPORT DECLARATION    [ ] EXPORT DECLARATION | | |

| 1a.  IMPORTER/EXPORTER (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.) | 1b.  BROKER OR FORWARDING AGENT, IF USED (Name, Address, Telephone No. to include Area Code, Telex No. and where available FAX No.) | Date of Departure/Arrival |
|---|---|---|
| DASTECH INTERNATIONAL, INC. C/O HAWKS EXPRESS INC. 1000 FRANK E. RODGERS BLVD. HARRISON NJ 07029 TEL 973-344-5400 | J.W. HAMPTON JR. (US CUSTOMS BROKER) 161-15- ROCKWAY BOULEVARD JAMAICA, NY 11434 TEL 718-276-0301 | Name of Carrier/Vessel ——————— Date of Certification |

| 1c.  I CERTIFY THAT THE 15-DAY ADVANCE NOTICE REQUIREMENT HAS BEEN WAIVED    [✓] Check if applicable | Signature of Customs Official  **5046178** |
|---|---|

| 2. LISTED CHEMICALS TO BE IMPORTED/EXPORTED | | | |
|---|---|---|---|
| 2a. Name and Description of Chemical appearing on label or container | 2b. Name of Chemical as designated by Title 21 C.F.R. 1310.02 | 2c. Number of containers, size, net weight of each chemical (Kg.) | 2d. Gross Weight of each item (Kg.) |
| Pseudoephedrine HCL, USP CAS: 345-78-8 LOT: NET WEIGHT: 25KILOS GROSS  WEIGHT:27.5 KILOS NDC : NO. 1/UP MADE IN TAIWAN  OUR PURCHASE ORDER # PB-7097 DEA CONTROL # _____ | Pseudoephedrine, HCL   CUSTOMER   HI-TECH PHARMACAL CO. INC ORDER NO. 0041429 DATED 2/13/07 | 1000 kilos  40 X 25 KGS DRUM | 1100 KILOS GROSS WEIGHT 40X 27.5 KILO DRUM   2007 FEB 15  AM 7:53 |

| 3a.  [✓] FOREIGN  [ ] DOMESTIC PORT OF EXPORTATION (last U.S. Customs Port) AND APPROX. DEPARTURE DATE | 3b.  [ ] FOREIGN  [✓] DOMESTIC PORT OF IMPORTATION (first U.S. Customs Port) AND APPROX. ARRIVAL DATE |
|---|---|
| KEELUNG TAIWAN        03/30/2007 | PORT NEWARK, NJ        04/30/07 |

| 4a. MODE OF TRANSPORT: NAME OF VESSEL, CARRIER | 4b. NAME OF ALL INTERMEDIATE CARRIERS |
|---|---|
| OCEAN | N/A |

| 5a. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF FOREIGN CONSIGNEE/CONSIGNOR | 5b. NAME, ADDRESS, TELEPHONE, TELEX, and where available FAX NO. OF ALL INTERMEDIATE CONSIGNEES |
|---|---|
| TECHNOCO CO. LTD. 9 FL. NO. 1-2 NANKING WEST ROAD TAIPEI, TAIWAN | N/A |

| SIGNATURE OF AUTHORIZED INDIVIDUAL ( Print or Type Name below Signature)  LUZ CAZENEUVE | DATE  02/14/2007 | NAME OF FIRM  DASTECH INTERNATIONAL, INC. |
|---|---|---|

DEA Form — 486
(Jun 1989)

Copy 3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ALBERTO GONZALES, *et al.*, )<br><br>Defendants. ) | **Civil Action 07-01296 (HHK)** |

EXHIBIT 30

U. S. Department of Justice - Drug Enforcement Administration

# VOLUNTARY SURRENDER OF LIST I CHEMICAL PRIVILEGES

| DEA USE ONLY |
| --- |
| File No.<br>R1-04-2050 |

After being fully advised of my rights, and understanding that I am not required to surrender my List I chemical privileges, I freely execute this document and choose to take the actions described herein.

☐ In view of my alleged failure to comply with the Federal requirements pertaining to List I chemicals, and as an indication of my good faith in desiring to remedy any incorrect or unlawful practices on my part;

☒ In view of my desire to terminate handling of all List I chemicals.

☐ In view of my desire to terminate handling of List I chemicals that are identified by chemical code(s) _____ _____ _____ ;

I hereby voluntarily surrender my Drug Enforcement Administration (DEA) Domestic Chemical Diversion Control Registration Certificate, and shall seek authority and instructions to dispose of the List I chemicals obtained under the authority of that registration. Further, I agree and consent that this document shall be authority for the Administrator of the Drug Enforcement Administration to terminate and revoke my registration without an order to show cause, a hearing, or any other proceedings. If not all List I chemical privileges are surrendered, I will retain my chemical registration which will be limited to chemical code (s)

_____ _____ _____ _____ .

I waive refund of any payments made by me in connection with my registration.

I understand that I will not be permitted to manufacture, distribute, import, or engage in any other List I chemical(s) activities whatever that require registration with the DEA until such time as I am again properly registered.

| NAME OF REGISTRANT *(Print)* | ADDRESS OF REGISTRANT |
| --- | --- |
| DASTECH INT'L  C/O ADMIRAL TRANSPORTATION | 300 N. Baldwin  Park Blvd.<br>City of Industry, CA 91748 |
| **DEA REGISTRATION NO.**<br>K354075023 | |

| SIGNATURE OF REGISTRANT OR AUTHORIZED INDIVIDUAL | DATE 1/25/05 |
| --- | --- |

**WITNESSES:**

| NAME AND DATE | TITLE |
| --- | --- |
| Eliana Escobar | Diversion Investigator |
| Lisa Troncoso | Diversion Investigator |

## PRIVACY ACT

AUTHORITY:   Section 301 of the Controlled Substances Act of 1970 (PL 91-513).
PURPOSE:    Permit voluntary surrender of List I chemicals.
ROUTINE USES: The Controlled Substances Act Registration Records produces special reports as required for statistical analytical purposes. Disclosures of information from this system are made to the following categories of users for the purposes stated:
    A. Other Federal law enforcement and regulatory agencies for law enforcement and regulatory purposes.
    B. State and local law enforcement and regulatory agencies for law enforcement and regulatory purposes.
    C. Persons registered under the Controlled Substances Act (Public Law 91-513) for the purpose of verifying the registration of customers and practitioners.
EFFECT:      Failure to provide the information will have no effect on the individual.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DASTECH INTERNATIONAL, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Civil Action 07-01296 (HHK)** |
| ALBERTO GONZALES, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**EXHIBITS 31a–31e**



**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

Dastech International, Inc.
ATTN: Luz Cascnueve
10 Cuttermill Rd.
Great Neck, NY 11021

| | |
|---|---|
| Asset Id: | 07-DEA-485928 |
| Case Number: | C3-07-2072 |
| Property: | 319 Drums of Red Phosphorous (45kgx319=14,355 kg) |
| Asset Value: | $57,420.00 |
| Seizure Date: | 06/21/2007 |
| Seizure Place: | Harrison, NJ |
| Owner Name: | Dastech International, Inc. |
| Seized From: | Dastech International, Inc. |
| Judicial District: | District of New Jersey |

NOTICE MAILING DATE: July 20, 2007

## NOTICE OF SEIZURE

The above-described property was seized by Special Agents of the Drug Enforcement Administration (DEA) for forfeiture pursuant to Title 21, United States Code (U.S.C.), Section 881, because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21, U.S.C., Sections 801 et seq.). The seizure date and place, as well as other pertinent information regarding the property are listed above.

Pursuant to Title 18, U.S.C., Section 983 and Title 19, U.S.C., Sections 1602-1619, procedures to administratively forfeit this property are underway. You may petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court. You should review the following procedures very carefully.

## TO REQUEST REMISSION OR MITIGATION OF FORFEITURE

If you want to request the remission (pardon) or mitigation of the forfeiture, you must file a petition for remission or mitigation with the Forfeiture Counsel of the DEA within thirty (30) days of your receipt of this notice. The petition must include proof of your

interest in the property and state the facts and circumstances which you believe justify remission or mitigation. The regulations governing the petition process are set forth in Title 28, Code of Federal Regulations, Part 9.

## TO CONTEST THE FORFEITURE

In addition to, or in lieu of petitioning for remission or mitigation, you may contest the forfeiture of the seized property in UNITED STATES DISTRICT COURT. To do so, you must file a claim with the Forfeiture Counsel of the DEA by August 24, 2007. The claim need not be made in any particular form (Title 18, U.S.C., Section 983(a)(2)(D)). The claim shall identify the specific property being claimed; state the claimant's interest in such property; and be made under oath, subject to penalty of perjury (Title 18, U.S.C., Section 983(a)(2)(C)). A frivolous claim may subject the claimant to a civil fine in an amount equal to ten (10) percent of the value of the forfeited property, but in no event will the fine be less than $250 or greater than $5,000 (Title 18, U.S.C., Section 983(h)). Upon the filing of a claim under Title 18, U.S.C., Section 983(a), a claimant may request, pursuant to Section 983(f), release of the seized property during the pendency of

the forfeiture proceeding due to hardship. Requests must be sent to the Forfeiture Counsel of the DEA. The following property is not eligible for hardship release: contraband, currency, or other monetary instruments or electronic funds unless the property constitutes the assets of a legitimate business which has been seized; property to be used as evidence of a violation of the law; property, by reason of design or other characteristic, particularly suited for use in illegal activities; and property likely to be used to commit additional criminal acts if returned to the claimant. If you wish to contest the forfeiture of the asset, you must comply with the procedures set forth herein. Your failure to do so will result in the termination of your interest in the asset, and may preclude your contesting the forfeiture of the asset in any judicial proceeding - either civil or criminal - even if such a proceeding has already been commenced or is commenced in the future.

## WHERE TO FILE CORRESPONDENCE

All submissions must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, Virginia 22134-1475. Correspondence sent via private delivery must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, 2401 Jefferson Davis Highway, Alexandria, VA 22301. A PETITION, CLAIM, OR OTHER CORRESPONDENCE SHALL BE DEEMED FILED WITH THE FORFEITURE COUNSEL, ASSET FORFEITURE SECTION, WHEN RECEIVED BY THE DEA AT EITHER OF THE ADDRESSES NOTED ABOVE. SUBMISSIONS BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. The Asset ID referenced above should be used with all submissions. Failure to include the Asset ID may cause a delay in processing your submission(s).



934



**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

Dastech International, Inc.
ATTN: Luz Cazenueve
10 Cuttermill Rd.
Great Neck, NY 11021

| | |
|---|---|
| Asset Id: | 07-DEA-485925 |
| Case Number: | C3-07-2072 |
| Property: | 10 Drums of Pseudoephedrine |
| Asset Value: | $19,000.00 |
| Seizure Date: | 06/21/2007 |
| Seizure Place: | Harrison, NJ |
| Owner Name: | Dastech International, Inc. |
| Seized From: | Dastech International, Inc. |
| Judicial District: | District of New Jersey |

**NOTICE MAILING DATE: July 20, 2007**

### NOTICE OF SEIZURE

The above-described property was seized by Special Agents of the Drug Enforcement Administration (DEA) for forfeiture pursuant to Title 21, United States Code (U.S.C.), Section 881, because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21, U.S.C., Sections 801 et seq.). The seizure date and place, as well as other pertinent information regarding the property are listed above.

Pursuant to Title 18, U.S.C., Section 983 and Title 19, U.S.C., Sections 1602-1619, procedures to administratively forfeit this property are underway. You may petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court. You should review the following procedures very carefully.

### TO REQUEST REMISSION OR MITIGATION OF FORFEITURE

If you want to request the remission (pardon) or mitigation of the forfeiture, you must file a petition for remission or mitigation with the Forfeiture Counsel of the DEA within thirty (30) days of your receipt of this notice. The petition must include proof of your

interest in the property and state the facts and circumstances which you believe justify remission or mitigation. The regulations governing the petition process are set forth in Title 28, Code of Federal Regulations, Part 9.

### TO CONTEST THE FORFEITURE

In addition to, or in lieu of petitioning for remission or mitigation, you may contest the forfeiture of the seized property in UNITED STATES DISTRICT COURT. To do so, you must file a claim with the Forfeiture Counsel of the DEA by August 24, 2007. The claim need not be made in any particular form (Title 18, U.S.C., Section 983(a)(2)(D)). The claim shall identify the specific property being claimed; state the claimant's interest in such property; and be made under oath, subject to penalty of perjury (Title 18, U.S.C., Section 983(a)(2)(C)). A frivolous claim may subject the claimant to a civil fine in an amount equal to ten (10) percent of the value of the forfeited property, but in no event will the fine be less than $250 or greater than $5,000 (Title 18, U.S.C., Section 983(h)). Upon the filing of a claim under Title 18, U.S.C., Section 983(a), a claimant may request, pursuant to Section 983(f), release of the seized property during the pendency of

the forfeiture proceeding due to hardship. Requests must be sent to the Forfeiture Counsel of the DEA. The following property is not eligible for hardship release: contraband, currency, or other monetary instruments or electronic funds unless the property constitutes the assets of a legitimate business which has been seized; property to be used as evidence of a violation of the law; property, by reason of design or other characteristic, particularly suited for use in illegal activities; and property likely to be used to commit additional criminal acts if returned to the claimant. If you wish to contest the forfeiture of the asset, you must comply with the procedures set forth herein. Your failure to do so will result in the termination of your interest in the asset, and may preclude your contesting the forfeiture of the asset in any judicial proceeding - either civil or criminal - even if such a proceeding has already been commenced or is commenced in the future.

### WHERE TO FILE CORRESPONDENCE

All submissions must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, Virginia 22134-1475. Correspondence sent via private delivery must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, 2401 Jefferson Davis Highway, Alexandria, VA 22301. A PETITION, CLAIM, OR OTHER CORRESPONDENCE SHALL BE DEEMED FILED WITH THE FORFEITURE COUNSEL, ASSET FORFEITURE SECTION, WHEN RECEIVED BY THE DEA AT EITHER OF THE ADDRESSES NOTED ABOVE. SUBMISSIONS BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. The Asset ID referenced above should be used with all submissions. Failure to include the Asset ID may cause a delay in processing your submission(s).



934



**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

Dastech International, Inc,
ATTN: Luz Casenueve
10 Cuttermill Rd.
Great Neck, NY 11021

| | |
|---|---|
| Asset Id: | 07-DEA-485920 |
| Case Number: | C3-07-2072 |
| Property: | 40 Drums of Pseudoephedrine (25kgx40= 1,000 kg) |
| Asset Value: | $76,000.00 |
| Seizure Date: | 06/21/2007 |
| Seizure Place: | Newark, NJ |
| Owner Name: | Dastech International, Inc. |
| Seized From: | Dastech International, Inc. |
| Judicial District: | District of New Jersey |

NOTICE MAILING DATE: July 19, 2007

### NOTICE OF SEIZURE

The above-described property was seized by Special Agents of the Drug Enforcement Administration (DEA) for forfeiture pursuant to Title 21, United States Code (U.S.C.), Section 881, because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21, U.S.C., Sections 801 et seq.). The seizure date and place, as well as other pertinent information regarding the property are listed above.

Pursuant to Title 18, U.S.C., Section 983 and Title 19, U.S.C., Sections 1602-1619, procedures to administratively forfeit this property are underway. You may petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court. You should review the following procedures very carefully.

### TO REQUEST REMISSION OR MITIGATION OF FORFEITURE

If you want to request the remission (pardon) or mitigation of the forfeiture, you must file a petition for remission or mitigation with the Forfeiture Counsel of the DEA within thirty (30) days of your receipt of this notice. The petition must include proof of your

interest in the property and state the facts and circumstances which you believe justify remission or mitigation. The regulations governing the petition process are set forth in Title 28, Code of Federal Regulations, Part 9.

### TO CONTEST THE FORFEITURE

In addition to, or in lieu of petitioning for remission or mitigation, you may contest the forfeiture of the seized property in UNITED STATES DISTRICT COURT. To do so, you must file a claim with the Forfeiture Counsel of the DEA by August 23, 2007. The claim need not be made in any particular form (Title 18, U.S.C., Section 983(a)(2)(D)). The claim shall identify the specific property being claimed; state the claimant's interest in such property; and be made under oath, subject to penalty of perjury (Title 18, U.S.C., Section 983(a)(2)(C)). A frivolous claim may subject the claimant to a civil fine in an amount equal to ten (10) percent of the value of the forfeited property, but in no event will the fine be less than $250 or greater than $5,000 (Title 18, U.S.C., Section 983(h)). Upon the filing of a claim under Title 18, U.S.C., Section 983(a), a claimant may request, pursuant to Section 983(f), release of the seized property during the pendency of

the forfeiture proceeding due to hardship. Requests must be sent to the Forfeiture Counsel of the DEA. The following property is not eligible for hardship release: contraband, currency, or other monetary instruments or electronic funds unless the property constitutes the assets of a legitimate business which has been seized; property to be used as evidence of a violation of the law; property, by reason of design or other characteristic, particularly suited for use in illegal activities; and property likely to be used to commit additional criminal acts if returned to the claimant. If you wish to contest the forfeiture of the asset, you must comply with the procedures set forth herein. Your failure to do so will result in the termination of your interest in the asset, and may preclude your contesting the forfeiture of the asset in any judicial proceeding - either civil or criminal - even if such a proceeding has already been commenced or is commenced in the future.

### WHERE TO FILE CORRESPONDENCE

All submissions must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, Virginia 22134-1475. Correspondence sent via private delivery must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, 2401 Jefferson Davis Highway, Alexandria, VA 22301. A PETITION, CLAIM, OR OTHER CORRESPONDENCE SHALL BE DEEMED FILED WITH THE FORFEITURE COUNSEL, ASSET FORFEITURE SECTION, WHEN RECEIVED BY THE DEA AT EITHER OF THE ADDRESSES NOTED ABOVE. SUBMISSIONS BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. The Asset ID referenced above should be used with all submissions. Failure to include the Asset ID may cause a delay in processing your submission(s).





**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

Dastech International, Inc.
ATTN: Luz Cazeneuve
10 Cuttermill Road
Great Neck, NY 11021

| | |
|---|---|
| Asset Id: | 07-DEA-485931 |
| Case Number: | C3-07-2072 |
| Property: | 26 Drums of Phenylpropanolamine (26x50kg=1,300kg) |
| Asset Value: | $52,000.00 |
| Seizure Date: | 06/21/2007 |
| Seizure Place: | Newark, NJ |
| Owner Name: | Dastech International, Inc. |
| Seized From: | Dastech International, Inc. |
| Judicial District: | District of New Jersey |

**NOTICE MAILING DATE:** July 20, 2007

**NOTICE OF SEIZURE**

The above-described property was seized by Special Agents of the Drug Enforcement Administration (DEA) for forfeiture pursuant to Title 21, United States Code (U.S.C.), Section 881 , because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21, U.S.C., Sections 801 et seq.). The seizure date and place, as well as other pertinent information regarding the property are listed above.

Pursuant to Title 18, U.S.C., Section 983 and Title 19, U.S.C., Sections 1602-1619, procedures to administratively forfeit this property are underway. You may petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court. You should review the following procedures very carefully.

**TO REQUEST REMISSION OR MITIGATION OF FORFEITURE**

If you want to request the remission (pardon) or mitigation of the forfeiture, you must file a petition for remission or mitigation with the Forfeiture Counsel of the DEA within thirty (30) days of your receipt of this notice. The petition must include proof of your

interest in the property and state the facts and circumstances which you believe justify remission or mitigation. The regulations governing the petition process are set forth in Title 28, Code of Federal Regulations, Part 9.

**TO CONTEST THE FORFEITURE**

In addition to, or in lieu of petitioning for remission or mitigation, you may contest the forfeiture of the seized property in UNITED STATES DISTRICT COURT. To do so, you must file a claim with the Forfeiture Counsel of the DEA by August 24, 2007. The claim need not be made in any particular form (Title 18, U.S.C., Section 983(a)(2)(D)). The claim shall identify the specific property being claimed; state the claimant's interest in such property; and be made under oath, subject to penalty of perjury (Title 18, U.S.C., Section 983(a)(2)(C)). A frivolous claim may subject the claimant to a civil fine in an amount equal to ten (10) percent of the value of the forfeited property, but in no event will the fine be less than $250 or greater than $5,000 (Title 18, U.S.C., Section 983(h)). Upon the filing of a claim under Title 18, U.S.C., Section 983(a), a claimant may request, pursuant to Section 983(f), release of the seized property during the pendency of

the forfeiture proceeding due to hardship. Requests must be sent to the Forfeiture Counsel of the DEA. The following property is not eligible for hardship release; contraband, currency, or other monetary instruments or electronic funds unless the property constitutes the assets of a legitimate business which has been seized; property to be used as evidence of a violation of the law; property, by reason of design or other characteristic, particularly suited for use in illegal activities; and property likely to be used to commit additional criminal acts if returned to the claimant. If you wish to contest the forfeiture of the asset, you must comply with the procedures set forth herein. Your failure to do so will result in the termination of your interest in the asset, and may preclude your contesting the forfeiture of the asset in any judicial proceeding - either civil or criminal - even if such a proceeding has already been commenced or is commenced in the future.

**WHERE TO FILE CORRESPONDENCE**

All submissions must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, Virginia 22134-1475. Correspondence sent via private delivery must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, 2401 Jefferson Davis Highway, Alexandria, VA 22301. A PETITION, CLAIM, OR OTHER CORRESPONDENCE SHALL BE DEEMED FILED WITH THE FORFEITURE COUNSEL, ASSET FORFEITURE SECTION, WHEN RECEIVED BY THE DEA AT EITHER OF THE ADDRESSES NOTED ABOVE. SUBMISSIONS BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. The Asset ID referenced above should be used with all submissions. Failure to include the Asset ID may cause a delay in processing your submission(s).

024



**U.S. DEPARTMENT OF JUSTICE**
**DRUG ENFORCEMENT ADMINISTRATION**

Dastech International, Inc.
ATTN: Luz Caseneuve
10 Cuttermill Rd.
Great Neck, NY 11021

| | |
|---|---|
| Asset Id: | 07-DEA-485922 |
| Case Number: | C3-07-2072 |
| Property: | 40 Drums of Pseudoephedrine (25kgx40=1,000 kg) |
| Asset Value: | $76,000.00 |
| Seizure Date: | 06/21/2007 |
| Seizure Place: | Staten Island, NY |
| Owner Name: | Dastech International, Inc. |
| Seized From: | Dastech International, Inc. |
| Judicial District: | Eastern District of New York |

NOTICE MAILING DATE: July 20, 2007

### NOTICE OF SEIZURE

The above-described property was seized by Special Agents of the Drug Enforcement Administration (DEA) for forfeiture pursuant to Title 21, United States Code (U.S.C.), Section 881, because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21, U.S.C., Sections 801 et seq.). The seizure date and place, as well as other pertinent information regarding the property are listed above.

Pursuant to Title 18, U.S.C., Section 983 and Title 19, U.S.C., Sections 1602-1619, procedures to administratively forfeit this property are underway. You may petition the DEA for return of the property or your interest in the property (remission or mitigation), and/or you may contest the seizure and forfeiture of the property in Federal court. **You should review the following procedures very carefully.**

### TO REQUEST REMISSION OR MITIGATION OF FORFEITURE

If you want to request the remission (**pardon**) or mitigation of the forfeiture, you must file a petition for remission or mitigation with the Forfeiture Counsel of the DEA within thirty (30) days of your receipt of this notice. The petition must include proof of your

interest in the property and state the facts and circumstances which you believe justify remission or mitigation. The regulations governing the petition process are set forth in Title 28, Code of Federal Regulations, Part 9.

### TO CONTEST THE FORFEITURE

In addition to, or in lieu of petitioning for remission or mitigation, you may contest the forfeiture of the seized property in UNITED STATES DISTRICT COURT. To do so, you must file a claim with the Forfeiture Counsel of the DEA by **August 24, 2007.** The claim need not be made in any particular form (Title 18, U.S.C., Section 983(a)(2)(D)). The claim shall identify the specific property being claimed; state the claimant's interest in such property; and be made under oath, subject to penalty of perjury (Title 18, U.S.C., Section 983(a)(2)(C)). A frivolous claim may subject the claimant to a civil fine in an amount equal to ten (10) percent of the value of the forfeited property, but in no event will the fine be less than $250 or greater than $5,000. (Title 18, U.S.C., Section 983(h)). Upon the filing of a claim under Title 18, U.S.C., Section 983(a), a claimant may request, pursuant to Section 983(f), release of the seized property during the pendency of

the forfeiture proceeding due to hardship. Requests must be sent to the Forfeiture Counsel of the DEA. The following property is not eligible for hardship release: contraband, currency, or other monetary instruments or electronic funds unless the property constitutes the assets of a legitimate business which has been seized; property to be used as evidence of a violation of the law; property, by reason of design or other characteristic, particularly suited for use in illegal activities; and property likely to be used to commit additional criminal acts if returned to the claimant. If you wish to contest the forfeiture of the asset, you must comply with the procedures set forth herein. Your failure to do so will result in the termination of your interest in the asset, and may preclude your contesting the forfeiture of the asset in any judicial proceeding - either civil or criminal - even if such a proceeding has already been commenced or is commenced in the future.

### WHERE TO FILE CORRESPONDENCE

All submissions must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, HQs Forfeiture Response, P.O. Box 1475, Quantico, Virginia 22134-1475. Correspondence sent via private delivery must be filed with the Forfeiture Counsel, Asset Forfeiture Section, Office of Operations Management, Drug Enforcement Administration, 2401 Jefferson Davis Highway, Alexandria, VA 22301. A PETITION, CLAIM, OR OTHER CORRESPONDENCE SHALL BE DEEMED FILED WITH THE FORFEITURE COUNSEL, ASSET FORFEITURE SECTION, WHEN RECEIVED BY THE DEA AT EITHER OF THE ADDRESSES NOTED ABOVE. SUBMISSIONS BY FACSIMILE OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED. The Asset ID referenced above should be used with all submissions. Failure to include the Asset ID may cause a delay in processing your submission(s).



034

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC., *et al.*,   )
)
)
Plaintiffs,   )
)
v.   )     **Civil Action 07-01296 (HHK)**
)
ALBERTO GONZALES, *et al.*,   )
)
)
Defendants.   )
)

# EXHIBIT 32

# KRAVITZ, BROWN & DORTCH, LLC
## Attorneys at Law

Max Kravitz
Janet Kravitz
Paula Brown
Michael D. Dortch
Lori A. Catalano
Kristopher A. Haines

65 East State Street - Suite 200
Columbus, Ohio 43215-4277
614.464.2000
fax 614.464.2002

jkravitz@kravitzllc.com

*Of Counsel:*
William H. Bluth*
*Also admitted in NY

July 26, 2007

Forfeiture Counsel
Asset Forfeiture Section
Office of Operations Management
Drug Enforcement Administration
HQs Forfeiture Response
P.O. Box 1475
Quantico, VA 22134-1475

Via U.S. Ordinary and Certified Mail

Re:   Case No.:    C3-07-2072
      Asset Id:    07-DEA-485920; 07-DEA-485922; 07-DEA-485925;
                   07-DEA-485928; 07-DEA-485931
      Owner:       Dastech International Inc.

Dear Forfeiture Counsel:

I represent Dastech International Inc. Dastech contests the seizure and forfeiture of the property identified above that was seized by the DEA on June 21, 2007. Enclosed are 5 Claims to the seized property that have been signed by Robert Kahen, Vice President of Dastech International under penalty of perjury.

Please immediately forward this matter to the applicable United States Attorney so that judicial proceedings may be initiated and Dastech can contest this matter in federal court.



DEA Forfeiture Counsel
July 26, 2007
Page 2 of 2

      This letter is being sent via ordinary and certified mail. The claims bearing Mr. Kahen's original signature are contained in the certified mailing.

Very truly yours,

Janet Kravitz

JK:kw

Dastech International Inc
10 Cutter Mill Road Suite 400
Great Neck NY 11021-3201

Forfeiture Counsel
Asset Forfeiture Section
Office of Operations Management
Drug Enforcement Administration
HQs Forfeiture Response
P.O. Box 1475
Quantico, VA  22134-1475

Re:   Asset Id:            07-DEA-485920
      Case No.:            C3-07-2072
      Property:            40 Drums of Pseudoephedrine (25kgx40=1,000kg)
      Asset Value:         $76,000.00
      Seizure Date:        06/21/2007
      Seizure Place:       Newark, NJ
      Owner Name:          Dastech International Inc.
      Seized From:         Dastech International Inc.
      Judicial District:   District of New Jersey

To:    Forfeiture Counsel

      Dastech International Inc. hereby makes claim to the above-referenced property that was seized on June 21, 2007 and contests the forfeiture of its property.  Dastech International Inc. is the owner of the seized property.

      The seized property should be returned to Claimant forthwith for the reason that this property was not and is not subject to seizure or to forfeiture pursuant to 18 U.S.C. § 981 or any other statute or regulation of the United States Government.  Claimant hereby makes demand for the immediate return of the seized property.

      If the DEA will not immediately return this property, Claimant requests that this claim be **immediately** forwarded to the applicable United States Attorney pursuant to 18 U.S.C. § 983 to proceed in the United States District Court as required by law.

      Claimant further demands that the government take all necessary steps to preserve the seized property.

      The undersigned, Robert Kahen, executes this Claim in his capacity as Vice President of Dastech International Inc., for and on behalf of the corporation.

      I declare under penalty of perjury that the foregoing is true and correct.

                                          Dastech International Inc.

_July 25, 2007_
Date                                      By: Robert Kahen
                                              Its Vice President

cc:    AUSA William Mark Nebeker

Dastech International Inc
10 Cutter Mill Road Suite 400
Great Neck NY 11021-3201

Forfeiture Counsel
Asset Forfeiture Section
Office of Operations Management
Drug Enforcement Administration
HQs Forfeiture Response
P.O. Box 1475
Quantico, VA  22134-1475

Re:     Asset Id:              07-DEA-485922
        Case No.:           C3-07-2072
        Property:            40 Drums of Pseudoephedrine (25kgx40=1,000kg)
        Asset Value:       $76,000.00
        Seizure Date:      06/21/2007
        Seizure Place:     Staten Island, NY
        Owner Name:      Dastech International Inc.
        Seized From:      Dastech International Inc.
        Judicial District:  Eastern District of New York

To:     Forfeiture Counsel

        Dastech International Inc. hereby makes claim to the above-referenced property that was seized on June 21, 2007 and contests the forfeiture of its property.  Dastech International Inc. is the owner of the seized property.

        The seized property should be returned to Claimant forthwith for the reason that this property was not and is not subject to seizure or to forfeiture pursuant to 18 U.S.C. § 981 or any other statute or regulation of the United States Government.  Claimant herein makes demand for the immediate return of said property.

        If the DEA will not immediately return this property, Claimant requests that this claim be immediately forwarded to the applicable United States Attorney pursuant to 18 U.S.C. § 983 to proceed in the United States District Court as required by law.

        Claimant further demands that the government take all necessary steps to preserve the seized property.

        The undersigned, Robert Kahen, executes this Claim in his capacity as Vice President of Dastech International Inc., for and on behalf of the corporation.

        I declare under penalty of perjury that the foregoing is true and correct.

                                                          Dastech International Inc.


_July 25, 2007_
Date                                                      By: Robert Kahen
                                                          Its Vice President


cc:     AUSA William Mark Nebeker

Dastech International Inc
10 Cutter Mill Road Suite 400
Great Neck NY 11021-3201

Forfeiture Counsel
Asset Forfeiture Section
Office of Operations Management
Drug Enforcement Administration
HQs Forfeiture Response
P.O. Box 1475
Quantico, VA 22134-1475

Re:    Asset Id:          07-DEA-485925
       Case No.:          C3-07-2072
       Property:          10 Drums of Pseudoephedrine
       Asset Value:       $19,000.00
       Seizure Date:      06/21/2007
       Seizure Place:     Harrison, NJ
       Owner Name:        Dastech International Inc.
       Seized From:       Dastech International Inc.
       Judicial District: District of New Jersey

To:    Forfeiture Counsel

       Dastech International Inc. hereby makes claim to the above-referenced property that was seized
on June 21, 2007 and contests the forfeiture of its property. Dastech International Inc. is the owner of the
seized property.

       The seized property should be returned to Claimant forthwith for the reason that this property was
not and is not subject to seizure or to forfeiture pursuant to 18 U.S.C. § 981 or any other statute or
regulation of the United States Government. Claimant herein makes demand for the immediate return of
said property.

       If the DEA will not immediately return this property, Claimant requests that this claim be
immediately forwarded to the applicable United States Attorney pursuant to 18 U.S.C. § 983 to proceed
in the United States District Court as required by law.

       Claimant further demands that the government take all necessary steps to preserve the seized
property.

       The undersigned, Robert Kahen, executes this Claim in his capacity as Vice President of Dastech
International Inc., for and on behalf of the corporation.

       I declare under penalty of perjury that the foregoing is true and correct.

                                                    Dastech International Inc.

_July 25, 2007_                                     _Robert Kahen_ _____
Date                                                By: Robert Kahen
                                                        Its Vice President

cc:    AUSA William Mark Nebeker

Dastech International Inc
10 Cutter Mill Road Suite 400
Great Neck NY 11021-3201

Forfeiture Counsel
Asset Forfeiture Section
Office of Operations Management
Drug Enforcement Administration
HQs Forfeiture Response
P.O. Box 1475
Quantico, VA 22134-1475

| Re: | | |
|---|---|---|
| | Asset Id: | 07-DEA-485928 |
| | Case No.: | C3-07-2072 |
| | Property: | 319 Drums of Red Phosphorous (45kgx319=14,355kg) |
| | Asset Value: | $57,420.00 |
| | Seizure Date: | 06/21/2007 |
| | Seizure Place: | Harrison, NJ |
| | Owner Name: | Dastech International Inc. |
| | Seized From: | Dastech International Inc. |
| | Judicial District: | District of New Jersey |

To:    Forfeiture Counsel

Dastech International Inc. hereby makes claim to the above-referenced property that was seized on June 21, 2007 and contests the forfeiture of its property. Dastech International Inc. is the owner of the seized property.

The seized property should be returned to Claimant forthwith for the reason that this property was not and is not subject to seizure or to forfeiture pursuant to 18 U.S.C. § 981 or any other statute or regulation of the United States Government. Claimant herein makes demand for the immediate return of said property.

If the DEA will not immediately return this property, Claimant requests that this claim be immediately forwarded to the applicable United States Attorney pursuant to 18 U.S.C. § 983 to proceed in the United States District Court as required by law.

Claimant further demands that the government take all necessary steps to preserve the seized property.

The undersigned, Robert Kahen, executes this Claim in his capacity as Vice President of Dastech International Inc., for and on behalf of the corporation.

I declare under penalty of perjury that the foregoing is true and correct.

Dastech International Inc.

July 25, 2007
Date

By: Robert Kahen
Its Vice President

cc:    AUSA William Mark Nebeker

Dastech International Inc
10 Cutter Mill Road Suite 400
Great Neck NY 11021-3201

Forfeiture Counsel
Asset Forfeiture Section
Office of Operations Management
Drug Enforcement Administration
HQs Forfeiture Response
P.O. Box 1475
Quantico, VA  22134-1475

Re:    Asset Id:        07-DEA-485931
        Case No.:       C3-07-2072
        Property:        26 Drums of Phenylpropanolamine (26x50kg=1,300kg)
        Asset Value:    $52,000.00
        Seizure Date:   06/21/2007
        Seizure Place:  Newark, NJ
        Owner Name:   Dastech International Inc.
        Seized From:    Dastech International Inc.
        Judicial District:  District of New Jersey

To:    Forfeiture Counsel

    Dastech International Inc. hereby makes claim to the above-referenced property that was seized on June 21, 2007 and contests the forfeiture of its property.  Dastech International Inc. is the owner of the seized property.

    The seized property should be returned to Claimant forthwith for the reason that this property was not and is not subject to seizure or to forfeiture pursuant to 18 U.S.C. § 981 or any other statute or regulation of the United States Government.  Claimant herein makes for the immediate return of said property.

    If the DEA will not immediately return this property, Claimant requests that this claim be immediately forwarded to the applicable United States Attorney pursuant to 18 U.S.C. § 983 to proceed in the United States District Court as required by law.

    Claimant further demands that the government take all necessary steps to preserve the seized property.

    The undersigned, Robert Kahen, executes this Claim in his capacity as Vice President of Dastech International Inc., for and on behalf of the corporation.

    I declare under penalty of perjury that the foregoing is true and correct.

Dastech International Inc.

_July 25, 2007_
Date

By: Robert Kahen
    Its Vice President

cc:    AUSA William Mark Nebeker

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| DASTECH INTERNATIONAL, INC., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Civil Action 07-01296 (HHK)** |
| ) | |
| ALBERTO GONZALES, *et al.*, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

EXHIBIT 33

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC., et al.,       )
                                           )
            Plaintiffs,                    )
                                           )
      v.                                   )       CIV. NO._____
                                           )
ALBERTO GONZALES, et al.,                  )
                                           )
            Defendants.                    )

AFFIDAVIT OF ROBERT KAHEN

State of New York           :

County of New York:         ss:

      The undersigned, Robert Kahen, having personal knowledge of the following

matters, states as follows:

1.      I am the Vice President of Dastech International, Inc. ("Dastech"), a New York

corporation.  Dastech is an importer of chemicals for the pharmaceutical, industrial, and

pulp and paper industries, pharmaceutical products and other varied products. Dastech

was incorporated on June 1, 1980 and has been in business continually since that date.

2.      I handle the daily operation of running Dastech. I am in charge of the purchasing

of raw materials and dealing with the suppliers overseas. I handle the finances of the

company.  I travel overseas to meet with our suppliers and ensure our position in the

market. I also handle the sales of some key accounts.

1



3.    Dastech has been a law abiding member of the business community for 27 years. Dastech has never experienced a loss, shortage, theft or damage of List 1 chemicals that it has imported.

4.    All of the property seized by the DEA on or about June 21, 2007, as identified in the Complaint to which this affidavit is attached, was lawfully imported and possessed by Dastech. We have paid for the goods within one week from the time of their shipments from Taiwan and China.

5.    The seizure of Dastech's products will have a long-lasting negative impact on the business and reputation of Dastech, as its customers lose faith in its business integrity and cancel orders. The loss to Dastech relates not only to the List 1 products that it imports, but also for the other products that Dastech sells to these clients. 90% of Dastech's List 1 customers also purchase other, non-regulated products from Dastech.

6.    The loss in sales as a result of the seizure is approximately $235,430.00. These losses, coupled with the loss of future business as a result of the seizure, is a huge financial blow to Dastech. The harm to Dastech's reputation as a result of the unlawful seizure and the spurious remarks made by DEA Inspector Richard Tilney to third-parties in regard to Dastech is profound.

7.    As a result of the seizure of Dastech's property, three customers have already cancelled purchase orders previously placed with Dastech. The first to cancel an order was Time-Cap, Labs, Inc.. Time-Cap cancelled a purchase order for 1,000 kg of Pseudoephedrine on July 13, 2007. The loss in sales from that order totals $60,000.00. The second customer to cancel an order was Spectrum Chemicals and Laboratory Products. Spectrum cancelled a purchase order for 50 kg of Phenylpropanolamine on

2

July 18, 2007. The loss in sales from that order totals $2,750.00 . Finally, DSC Labs

cancelled a purchase order for 25kg on July 19, 2007. The loss in sales from that order

totals $2,000.00

8.      I have reviewed the Complaint for Declaratory Relief and the Exhibits attached to

the Complaint. To the very best of my knowledge and belief, all of the factual assertions

are true and correct.

Further Affiant Sayeth Naught

Robert Kahen

The foregoing Affidavit was sworn to and signed in my presence, this 19 day of
July, 2007.

Notary Public

DAVID E. POUR
Notary Public, State of New York
No. 02PO6016909
Qualified in the County of Nassau
Commission Expires February 25, 2011

3

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,

        Plaintiffs,

    v.

ALBERTO GONZALES, *et al.*,

        Defendants.

**Civil Action 07-01296 (HHK)**

**EXHIBIT 34**

# PURCHASE ORDER 69108-043

**SOLD TO:**
REVERE SMELTING & REFINING
65 BALLARD ROAD.
MIDDLETOWN, N.Y. 10941
(845) 692-4414

**SHIP TO:**
REVERE SMELTING & REFINING
65 BALLARD ROAD.
MIDDLETOWN, N.Y. 10941
(845) 692-4414

V# 24472

| ORDER CONFIRMED WITH | |
| --- | --- |
| JIM LINGLE | |
| F.O.B. POINT | |
| SHIPPING POINT | |
| SHIP VIA | |
| BEST WAY | |

DELIVER TO: (516)465-7676
MARLER, BRAD

| BUYER REQUEST SELLER TO SHIP | SELLER PROMISES TO SHIP | ORDER DATE |
| --- | --- | --- |
| 3/21/07 | 3/30/07 | 3/21/07 |
| PROJECT# | | TERMS |
| | | NET 30 DAY |

COLLECT [X]
PREPAID [X]
OTHER [ ]
PREPAID & ADD [ ]

| ITEM NO. | QUANTITY | unit | CATALOG/PART NUMBER and/or DESCRIPTION | UNIT PRICE | TOTAL PRICE |
| --- | --- | --- | --- | --- | --- |
| 1 | 34819.2 | LBS | PHOSPHORUS, RED 99.20LB DRUMS, 351 DRUMS | 1.82 | 63370.94 |
| | | | BLANKET PURCHASE ORDER FOR INTERNAL USE ONLY. | | |
| | | | REVERE IS UNDER NO OBLIGATION/PENALTY IF | | |
| | | | CANCELLED. HOLD FOR AUTHORIZED RELEASE. | | |
| | | | ======================================== | | |
| | | | THIS IS AN ORDER, PLEASE SIGN AND CONFIRM | | |
| | | | THAT YOU AGREE WITH ALL TERMS AND CONDITIONS | | |
| | | | AS NOTED ON THIS DOCUMENT. CONFIRMATION FAXED | | |
| | | | BACK IS ESSENTIAL. MAKE SURE THAT ALL | | |
| | | | SHIPMENTS, INVOICES, ETC REFERENCE OUR | | |
| | | | PURCHASE ORDER NUMBER TO ENSURE PROPER | | |
| | | | PAYMENT. PLEASE FAX TO: (845)692-3306 | | |
| | | | ATTN: WILL CONJURA | | |
| | | | PHONE: (845)692-4414 EXT 229. THANK YOU. | | |
| | | | ------------------------------------- | | |
| | | | SIGNATURE | | |
| | | | ------------------------------------- | | |
| | | | ACCEPTANCE DATE | | |

| | | |
| --- | --- | --- |
| Sub Total | | 63370.94 |
| Tax | | |
| Total | | |

WILL CONJURA

Billing Address: 2777 STEMMONS FREEWAY, SUITE 1800, DALLAS, TX 75207
Send Copy Invoice to "Ship To" address: (214) 631-6070

This Order is subject to the above instructions and the Purchase Order Terms and Conditions.    ORIGINAL.

Page 1 of 1

DASTECH INT.
10 CUTTER MILL ROAD
GREAT NECK,NY, NY 11001-

A. Sign and return Acknowledgement Copy immediately if all items are not subject to immediate delivery.

B. Invoice in duplicate, showing purchase order number, item number, and Part number.

C. Taxes payable by Buyer to Seller must be itemized separately on invoice.

D. Include Packing List in each shipment. Show Bill of Lading or Express Receipt Number and Purchase Order Number on all packages. Mark each container to show number of containers in shipment (such as 1 of 5). Attach Packing list to number one container. Show Purchase Order Number on all papers.

E. Packing list must show all applicable part numbers and Purchase Order Number.

F. No invoice shall be rendered against this Purchase Order until a firm price has been agreed upon which must be accomplished prior to Substantial Completion of this order.

G. All deliveries are to be made only to the Receiving department.

BUYER'S AUTHORIZED REPRESENTATIVE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DASTECH INTERNATIONAL, INC., *et al.*,       )
)
Plaintiffs,       )
)
v.       )       **Civil Action 07-01296 (HHK)**
)
ALBERTO GONZALES, *et al.*,       )
)
)
Defendants.       )
)

**EXHIBIT 35**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DASTECH INTERNATIONAL, INC., et al.,    )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )    Civil Action No. 07-1296 (HHK)
                                        )
ALBERTO GONZALES, et al.,               )
                                        )
                    Defendants.         )

## AFFIDAVIT OF JIM LINGLE

**State of Illinois**        :

**County of Cook**          :  ss:

The undersigned, Jim Lingle, having personal knowledge of the following matters, states as follows:

1.    I am a self-employed Red Phosphorus broker. I operate out of Chicago, Illinois.

2.    As a Red Phosphorus broker, I bring together Red Phosphorus importers with businesses that use Red Phosphorus in various manufacturing, smelting, and refining processes. If a Red Phosphorus transaction results, I receive a sales commission for my efforts.

3.    Being a Red Phosphorus broker, I am intimately aware of my clients' particular needs for Red Phosphorus.

4.    In the past, I have brokered transactions between Revere Smelting and Refining Corporation ("RSR"), a Texas corporation with a principal place of business at 2777 Stemmons Freeway, 18th Floor, Dallas, Texas 75207, and Dastech International Inc. ("Dastech").

5. Dastech is an importer and distributor of Red Phosphorus. I have never known Dastech or its employees to act in an unlawful, fraudulent or questionable manner. Dastech has always handled the Red Phosphorus it imports with the highest degree of care.

6. RSR operates a smelting and refining facility at 65 Ballard Road in Middletown, New York 10941. RSR is registered as a foreign corporation with the New York Secretary of State.

7. For the past 17 years, I have brokered transactions for the purchase and sale of Red Phosphorus on behalf of Dastech. I have facilitated Red Phosphorus transactions between RSR and Dastech for approximately ten years.

8. In the past, Dastech has always fulfilled RSR's Red Phosphorus orders in a timely and professional manner.

9. Dastech has always lawfully conducted its business and has always sold the Red Phosphorus it imports to reputable businesses that use Red Phosphorus for industry applications.

10. The principal function of RSR's New York smelting and refining plant is to convert used batteries and related lead containing materials into lead bullion as mandated by the federal government. Used batteries are defined as a hazardous waste under the Resource Conservation and Recovery Act ("RCRA").

11. RSR then converts the hazardous materials into non-hazardous lead bullion by a proprietary smelting and refining process which requires the use of Red Phosphorus.

12. Red Phosphorus is a hazardous and highly regulated material. There is no Red Phosphorus manufactured in the western hemisphere. Thus all legitimate industries rely on imported materials. Dastech has earned the position of leader in the business of importing Red Phosphorus due to my individual efforts.

imported materials. Dastech has earned the position of leader in the business of importing Red Phosphorus.

13.    I recently brokered a transaction between RSR and Dastech which resulted in the issuance of a purchase order for Red Phosphorus. (See Exhibit __I__). Subsequent to accepting RSR's order, I was informed that Dastech would be unable to deliver the Red Phosphorus to RSR in a timely manner. I was told Dastech could not fulfill its obligations under the contract because the DEA had seized the Red Phosphorus Dastech had imported for RSR's benefit.

14.    The DEA has disrupted a legitimate business transaction

15.    My own business has also been severely impacted by the DEA's actions. My reputation has a dependable businessman has been harmed.

16.    I hereby plead to the Court to release the DEA's hold on Dastech's property and to award to Dastech any damages that it has suffered.

FURTHER AFFIANT SAYETH NAUGHT.

Jim Lingle

3

The foregoing Affidavit was sworn to and signed in my presence, this _17_ day of September, 2007.

_____
Notary Public

OFFICIAL SEAL
JANICE ENGER
Notary Public, State of Illinois
My Commission Expires 10/06/07

4

**SHIP TO**
**REVERE SMELTING & REFINING**

**PURCHASE ORDER 69108-043**

REVERE SMELTING & REFINING
65 BALLARD ROAD.
MIDDLETOWN, N.Y. 10941
(845) 692-4414

SHIP TO
65 BALLARD ROAD.
MIDDLETOWN, N.Y. 10941
(845) 692-4414

| BUYER REQUEST SELLER TO SHIP | SELLER PROMISED TO SHIP | ORDER DATE |
|---|---|---|
| 3/21/07 | 3/30/07 | 3/21/07 |
| | PROJECT# | |

DASTECH INT.
10 CUTTER MILL ROAD
GREAT NECK,NY, NY 11001-

V# 24472

| ORDER CONFIRMED WITH |
|---|
| JIM LINGLE |

F.O.B. POINT

SHIPPING POINT

BEST WAY

SHIP VIA

BILL TO
(516)466-7676

DELIVER TO
MARLER, BRAD

TERMS
NET 30 DAY
[X] COLLECT
[ ] PREPAID
[ ] PREPAID & ADD
[ ] OTHER

| ITEM NO. | QUANTITY | UNIT | EA | CATALOG/PART NUMBER and/or DESCRIPTION | PRICE UNIT | PRICE TOTAL |
|---|---|---|---|---|---|---|
| 34819.2 | LBS | | | PHOSPHORUS, RED 99.20LB DRUMS, 351 DRUMS | 1.82 | 63370.94 |
| | | | | ============================ | | |
| | | | | BLANKET PURCHASE ORDER FOR INTERNAL USE ONLY. | | |
| | | | | REVERE IS UNDER NO OBLIGATION/PENALTY IF | | |
| | | | | CANCELED. HOLD FOR AUTHORIZED RELEASE. | | |
| | | | | ============================ | | |
| | | | | THIS IS AN ORDER. PLEASE SIGN AND CONFIRM | | |
| | | | | THAT YOU AGREE WITH ALL TERMS AND CONDITIONS | | |
| | | | | AS NOTED ON THIS DOCUMENT. CONFIRMATION FAXED | | |
| | | | | BACK IS ESSENTIAL. MAKE SURE THAT ALL | | |
| | | | | SHIPMENTS, INVOICES, ETC REFERENCE OUR | | |
| | | | | PURCHASE ORDER NUMBER TO ENSURE PROPER | | |
| | | | | PAYMENT.  PLEASE FAX TO: (845)692-3306 | | |
| | | | | ATTN: WILL CONJURA | | |
| | | | | PHONE: (845)692-4414 EXT 229. THANK YOU. | | |
| | | | | --------------------------- | | |
| | | | | SIGNATURE | | |
| | | | | --------------------------- | | |
| | | | | ACCEPTANCE DATE | | |
| | | | | --------------------------- | | |

A. Sign and return Acknowledgment Copy immediately if all items are not subject to immediate delivery.

B. Invoice in duplicate, showing purchase order number, item number, and Part number.

C. Taxes payable by Buyer to Seller must be itemized separately on invoice.

D. Include Packing List in each shipment. Show Bill of Lading or Express Receipt Number and Purchase Order Number on all packages. Mark each container to show number of containers in shipment (such as 1 of 3). Attach Packing Slip to number one container. Show Purchase Order Number on all papers.

E. Packing List must show all applicable part numbers and Purchase Order Number.

F. No invoice shall be rendered against this Purchase Order until a firm price has been agreed upon which must be accomplished prior to Substantial Completion of this Order.

G. All deliveries are to be made only to the Receiving department.

| | | Sub Total | 63370.94 |
|---|---|---|---|
| | | Tax | |
| | | Total | |

WILL CONJURA
BUYER'S AUTHORIZED REPRESENTATIVE

SELLER'S AUTHORIZED REPRESENTATIVE
[signature]

Billing Address: 2777 STEMMONS FREEWAY, SUITE 1800, DALLAS, TX 75207
Send Copy Invoice to "Ship To" address: (214) 631-6070

This Order is subject to the above instructions and the Purchase Order Terms and Conditions. ORIGINAL.

Page 1 of 1